TERRI KEYSER-COOPER
Nevada Bar No. 3984
3590 Barrymore Dr.
Reno, NV 89509
(775) 337-0323
*keysercooper@lawyer.com*

DIANE K. VAILLANCOURT
Law Office of Diane K. Vaillancourt
Nevada Bar No. 9277
849 Almar Ave., Suite C403
Santa Cruz, CA 95060
(831) 458-3440
*vaillancourt@cruzio.com*
*Attorneys for Plaintiffs James and Melodie Doud*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JAMES DOUD and MELODIE DOUD        Case No.

       Plaintiffs,

vs.        **COMPLAINT**

YELLOW CAB OF RENO, INC.        **JURY DEMAND**

       Defendant.
_____/

### JURISDICTION AND VENUE

1.     This Court has jurisdiction of this action pursuant to 28 U.S.C. Sections 1331, 1343, 2201, Title I and Title III of the Americans With Disabilities Act ("ADA"), 42 U.S.C. Section 81-12181-12189, 12203(a), 12131, and additionally Sections 12182(a), 12182(b)(2)(A)(ii), 12186(b), 28 C.F.R. Section 36.302(c)(1), and pendant Nevada state law.

2.     Venue in this action is appropriate in the Northern District of Nevada pursuant to 28 U.S.C. Section 1391(b).

3.     This court has jurisdiction to grant the declaratory relief requested pursuant to 28 U.S.C.

1

Section 2201 and Federal Rules of Civil Procedure, Rule 57.

4. Notice has been provided to the Equal Employment Opportunity Commission and a right-to-sue letter for the retaliation claims was issued on September 12, 2013. A true and correct copy of the Notice of Right to Sue is attached to this complaint (Attachment 1). Regarding the Title III ADA claims, a Plaintiff is not required to provide notice to any state or local agency as a prerequisite to filing suit.

## PARTIES

5. Plaintiff MELODIE DOUD ("MRS. DOUD") is currently a resident of Ontario, Canada. As an amputee with one leg, pursuant to ADA guidelines, she is a qualified individual with a disability. She is married to JAMES DOUD.

6. Plaintiff JAMES DOUD ("MR. DOUD") is currently a resident of Colorado Springs, Colorado and, at the time of the alleged incidents, was a resident of Reno, Nevada. He is married to MELODIE DOUD.

7. Defendant YELLOW CAB OF RENO, INC. ("YELLOW CAB") is a Nevada corporation, with its principal place of business in Reno, Nevada. YELLOW CAB is a "person" within the meaning of Section 101(7) of the ADA and is engaged in an industry affecting commerce within the meaning of Section 101(7) of the ADA. YELLOW CAB is a taxi company, a common carrier of passengers, which operates a "demand responsive system" offered by a private entity to the public. YELLOW CAB employs more that fifteen employees.

8. Mr. and MRS. DOUD allege that Title III of the ADA applies to YELLOW CAB and imposes upon YELLOW CAB the general rule that no individual with a disability shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of YELLOW CAB.

9. MR. DOUD alleges Title I of the ADA applies to YELLOW CAB and imposes upon YELLOW CAB the general rule that no employer may retaliate or discriminate against an employee on the basis of his or her exercise of a protected right.

10. Plaintiffs allege that the defendant and/or its agents, employees, and servants

performed, participated in, aided and/or abetted in some manner the acts averred herein, proximately caused the damages averred below, and is liable to Plaintiffs for the damages, injunctive relief and other relief sought herein. Plaintiffs further allege that the defendant ratified, approved, delegated, and authorized all actions of its agents, employees, and servants.

## FACTUAL ALLEGATIONS

11.     MRS. DOUD is a 66-year-old retired female who resides primarily in Ontario, Canada and spends substantial time in Colorado Springs, Colorado with MR. DOUD. As a result of cancer forty years ago, she now has one leg requiring her to utilize a portable electric scooter and a crutch for mobility. She is frequently accompanied by her two service dogs. With these aids, she can travel, enter and exit vehicles, and transport herself on city streets. Her portable electric scooter is small and comparatively light. It is designed to be disassembled quickly and easily without tools, making up five individual components, none of which weighs more than 36 pounds. Any person of normal strength, capable of lifting an ordinary suitcase, can lift the five light components of the disassembled scooter. Once disassembled, the scooter readily fits into the trunk of any standard passenger vehicle such as the YELLOW CABS at issue. It is also easily reassembled within minutes.

12.     MR. DOUD is a 60-year-old male who has resided in in Reno, Nevada for several years but currently resides in Colorado Springs, Colorado. He is a former long-term employee of YELLOW CAB, who was forced to relocate as a result of losing his job.

13.     It is anticipated that YELLOW CAB will maintain MR. DOUD was an independent contractor and not an employee subject to the protections of the ADA, this would be an incorrect characterization of the relationship because YELLOW CAB exercised considerable control over the means and manner of MR. DOUD's operation of his taxi. While YELLOW CAB entered an alleged "leasing" arrangement with MR. DOUD for use of YELLOW CAB's taxi vehicle, YELLOW CAB did not permit its drivers to pursue outside business opportunities, not allowing him to develop his independent business interests. YELLOW CAB had extensive policies, rules and regulations limiting how he was to drive, monitoring his movements via a GPS monitor, requiring him to accept

1   vouchers at reduced rates specified by YELLOW CAB, requiring him to display advertising at
2   YELLOW CAB's discretion, forbidding him from handing out personal business cards, requiring
3   him to adhere to YELLOW CAB's mandatory, detailed dress code, and retaining complete
4   discretion to assign him to different models and types of cabs.[1] In addition, YELLOW CAB at all
5   times exercised control over MR. DOUD's conduct as a driver, issuing him directives as to what he
6   must do, when he must do it, and how he must do it complete with punishments and penalties. He
7   could be punished if he simply disagreed with YELLOW CAB's management. In addition,
8   YELLOW CAB retained its right to fire MR. DOUD at will without notice, for some reason or for
9   no reason at all, without contractual liability. These conditions of employment, and more, equate to
10  an employer/employee relationship notwithstanding YELLOW CAB's anticipated defense that MR.
11  DOUD was an independent contractor and not an employee.

12          14.     On April 9, 2013, MR. and MRS. DOUD arrived at the Reno airport on a flight from
13  Orlando, Florida arriving at 10:30 p.m. They emerged from baggage claim to the area for taxis and
14  MR. DOUD approached the first taxi in line, a YELLOW CAB, taxi number 130. The driver
15  Mohammed Parvez, refused to transport the couple in his taxi. He immediately stated, "I'm not
16  licensed to take the handicapped." A taxi driver himself, MR. DOUD knew this was false as there is
17  no such thing as special handicap permit to transport persons with disabilities and those who
18  accompany them. He and MRS. DOUD discussed Mr. Parvez's response and both understood they
19  could not be refused transport and that YELLOW CAB's driver was violating state and federal law.
20  Exhausted from their long trip, they were distressed by this humiliating response to their request for
21  transport.

22          15.     All the more eager to get home, MR. DOUD next approached a second taxi, again a
23  YELLOW CAB number 132, whose driver also refused to take the couple. The taxi driver stated:

24  _____

25      [1] Distinguishing an "employee" from an "independent contractor" is a fact-based inquiry
26  applying common law agency principles. Although courts look to the totality of the circumstances,
    the essential ingredient of the agency test is the extent of control exercised by the "employer." It
27  rests primarily upon the extent of supervision that the putative employer has a right to exercise over
    the individual, particularly regarding the details of the work. Additional factors relevant to this
28  determination include "entrepreneurial aspects of the individual's business; risk of loss and
    opportunity for profit; and the individual's proprietary interest in his business." See *National Labor
    Relations Board v. Friendly Cab Company, Inc.*, 512 F.3d 1090, 1094-99 (9th Cir. 2008).

"I'm not taking you because you have dogs, dogs are dirty and it is against my religion to transport a dog." MR. DOUD, as an experienced taxi driver, knew disabled persons with service dogs cannot be denied services on that account. Again, he discussed the matter with MRS. DOUD. "They are all refusing to take us," MR. DOUD told his wife. He was extremely upset and she was distraught at the second rejection.

16.    MR. DOUD next approached a third taxi, this time a Whittlesea Taxi number 738, who also waved him off.

17.    After the third refusal, MR. DOUD saw an airport police vehicle approaching. He flagged the officers down and explained that no taxis would transport them. He insisted on filing a police report.

18.    One of the officers approached a fourth taxicab and spoke to its driver. MR. DOUD recognized the driver who finally agreed to give MR. and MRS. DOUD a ride to their Reno home. The DOWDs wasted approximately 45 minutes from the time the first YELLOW CAB number 132 refused them service until the fourth taxi agreed to take them to their destination.

19.    The next day, April 10, 2013, still upset at their maltreatment and worried about a repeat event, the DOUDS went to YELLOW CAB's business premises in Reno to complain about the refusal of the first two YELLOW CAB taxis to pick them up. They saw Frank Street ("Mr. Street") the son of YELLOW CAB owner Roy Street and the general manager of day-to-day operations. Mr. Street is known as the "boss" of the operation with the ability to alter the terms and conditions of employment, to punish company workers for violations of policies and procedures, and to terminate employment for any reason or no reason.

20.    MRS. DOUD approached and introduced herself to Mr. Street. She said, "Did you hear about the incident last night at the airport?" Mr. Street answered, "No." MRS. DOUD said, "You should have been briefed about it. I was refused service by two YELLOW CAB taxis." Mr. Street refused to discuss the matter, saying: "I really don't have time to talk to you, I am taking Kathy to the dentist, we are late, and I don't have time to talk. I will look into it." He left immediately.

21.     It is alleged that YELLOW CAB conducts no training on ADA issues or discrimination issues against persons with disabilities as required by Nevada law. During MR. DOUD's many years of service to YELLOW CAB, he has never once attended training on YELLOW CAB's compliance with ADA requirements and his never received notice of such training.

22.     Following their brief talk with Mr. Street, MR. and MRS. DOUD went directly to the Nevada Transportation Authority ("NTA") and obtained the necessary paper work for a complaint. From home, MR. DOUD also called the information line for the ADA and arranged to have pamphlets sent to him. The couple discussed the matter and decided not to file a complaint, hoping it was a one-time incident and that Mr. Street would look into it, investigate, and take appropriate corrective action to advise taxi drivers of the need to follow state and federal law regarding the transport of persons with disabilities.

23.     MR. DOUD, also on the same day, telephoned Mukesh Sharma, road manager for YELLOW CAB and the individual responsible for dealing directly with the company's drivers on a day-to-day basis.  Mr. Sharma has substantial importance within YELLOW CAB because he and the other road bosses have the power to alter the terms and conditions of the drivers' employment, to order taxis "parked" for violation of rules, and to recommend discipline. MR. DOUD informed Mr. Sharma that two YELLOW CAB taxis refused service to him and his wife based on Mrs. Doud's disability and their service dogs. Mr. Sharma said: "I'll look into it and I will tell Mr. Street first thing in the morning."

24.     MR. DOUD never heard back from Mr. Sharma. He did not hear back from Mr. Street. He went to work the next day for YELLOW CAB and saw Mr. Sharma, but Mr. Sharma did not mention the issue or indicate if the matter would be investigated or corrected.

25.     On May 20, 2013, Mr. and MRS. DOUD again flew into the Reno airport, this time from Alaska, arriving in the early evening at approximately 7:15 p.m. with their two service dogs. Again, they were exhausted having traveled the entire day. They picked up their checked luggage and went outside at approximately 7:30 p.m. to obtain a taxi.

26.     Initially there were no taxis at the taxi stand but within a few minutes a YELLOW CAB taxi approached. It turned out to be the same taxi that initially refused them transport the month before in April, and it had the same driver, Mohammed Parvez. The taxi stopped several feet ahead of where they were standing, something not normally done when a taxi driver expects to pick up a fare. Shortly after, a second YELLOW CAB taxi, number 130, approached, forcing Mr. Parvez to drive closer to where the DOUDS were standing. However, instead of stopping where they were standing, the taxi driver drove a few feet beyond them and stayed in his vehicle. Again, this is something not normally done when a taxi driver expects to pick up a fare. Whenever a taxi driver sees a passenger standing at a taxi stand, he or she typically exits the vehicle to assist with the luggage. MR. DOUD approached the driver and asked if he was going to help them into the taxi. The driver answered: "No." When MR. DOUD asked "why not," the driver answered that he did not take handicapped passengers and they would have to call for a special handicapped vehicle.

27.     At no time did MR. DOUD ask Mr. Parvez to assist with the disassembly of the portable scooter. MR. and MRS. DOUD did not expect or require Mr. Parvez to assist with the disassembly because MR. DOUD was fully capable of disassembling the scooter and expected to do so. Disassembling the scooter was something MR. DOUD did several times a day for his wife when they were together.

28.     At that point MRS. DOUD, using her portable scooter, wheeled onto the street and asked the driver if he was refusing to transport them. YELLOW CAB's driver answered that he was refusing to transport them because he did not have a handicapped vehicle and added that her scooter would not fit in his taxi.[2] MRS. DOUD explained that the couple has a Toyota Sienna, appearing to be the identical make and model as the taxi , and the scooter is easily transported in that vehicle. The driver said, "I don't have a license to take handicapped people, you need a special cab."

29.     As a taxi driver, MR. DOUD knew this to be untrue. There are no special licenses available to taxi drivers to transport handicapped persons. MRS. DOUD also knew this.

---

[2] This is of course not true, as the scooter easily disassembles into five lightweight component and will conveniently and without difficulty fit into the trunk of any passenger vehicle.

30.     At no time did the driver Mohammed Parvez offer to call another taxi to transport them or to assist with any arrangements for their transport.

31.     MR. DOUD immediately telephoned Mukesh Sharma, the "road boss," and told him a YELLOW CAB driver was refusing him service for the second time. Mr. Sharma answered that he would come to the airport to transport MR. and MRS. DOUD and to expect him within ten minutes.

32.     At this point MR. DOUD telephoned the parking authority to report that a YELLOW CAB taxi was denying him and his wife service on account of her physical disability. He requested a parking supervisor attend to the taxi area. He also stated he would be notifying the airport police. When the airport police arrived, MR. DOUD explained this was the second incident in which he and his wife were refused transport because of MRS. DOUD's disability. He explained that they did not need a wheelchair-adapted taxi because the small scooter came apart easily and fit in the trunk along with the luggage. MR. DOUD filed an incident report with the Airport Police. The report was memorialized in another report, Case No. 1305-00202, by Deejay Decena and reviewed by Ricardo Duarte of the Airport Police.

33.     Before Mr. Sharma arrived to transport the DOWDS (using an ordinary, non-wheelchair adapted taxi), another YELLOW CAB taxi drove up. It is alleged that the parking supervisor or airport police had telephoned for a replacement taxi as Mohammed Parvez was adamant he would not transport the DOUDS and at no time offered to call for another taxi that would. MR. DOUD told the driver that road boss Mukesh was already on his way.

34.     When Mr. Sharma arrived, the scooter was disassembled and loaded into the back of the vehicle, without any problems. While his assistance was not necessary, Mr. Sharma offered to assist with the disassembly of the portable scooter and loading it into the vehicle. At no time did MR. DOUD ask Mr. Sharma assist with the disassembly of the portable scooter. MR. and MRS. DOUD did not expect or require Mr. Sharma to assist with the disassembly because MR. DOUD was fully capable of disassembling the scooter and expected to do so. Disassembling the scooter was something MR. DOUD did several times a day for his wife when they were together.

35.     Mr. Sharma transported the DOUDS transported to their home with their service dogs, without any problems. MR. DOUD reported the details of the encounter with YELLOW CAB's driver Mr. Parvez to the road boss, explaining exactly what transpired. In addition, Mr. Sharma was supplied with a copy of the report filed with the airport police. Mr. Sharma promised MR. DOUD he would talk to Mr. Street and "get back" to him. It is believed that Mr. Sharma provided a copy of this report to Mr. Street. At no time did Mr. Sharma or Mr. Street "get back" to MR. DOUD regarding the refusal of YELLOW CAB taxi drivers to transport him and his wife based on her disability.

36.     It is alleged that the conduct of Mr. Sharma and Mr. Street constitutes a pattern of intentional discrimination and bad faith directed at persons with disabilities like MRS. DOUD, and persons associated with them, like MR. DOUD. It is further alleged that YELLOW CAB failed to provide training on requirements for its drivers to comply with state and federal laws protecting the rights of persons with disabilities to full and equal enjoyment of common motor carriers of passengers, which include an obligation to assist a person with a disability to store a mobility device. The incident on May 20, 2013, is the second time where the same driver refused service after notice to the company that the unlawful discrimination must be remedied. The willful, intentional violation exhibited in the repeated refusal of services can only be construed as in bad faith.

37.     MR. and MRS. DOUD both suffered deep embarrassment, humiliation, inconvenience, and outrage at being refused taxi service again based on MRS. DOUD's disability.

38.     On May 21, 2013, MR. DOUD went to the NTA office in Reno to file a report on the refusal of YELLOW CAB to transport the couple and the service dogs. He took the day off of work to there and make sure the complaint was properly filed. His complaint stated that he and his wife were refused service by YELLOW CAB and provided the details as described above.

39.     On or about May 21-25, 2013, MR. DOUD went to talk to Mr. Street regarding maintenance issues with his vehicle. Before Mr. Doud could even speak, Mr. Street said, "Are you in here to complain again, is that all you do is complain to me?" Mr. Street was referring to MR.

1 | DOUD's complaints about YELLOW CAB's refusal to transport him and his wife based on her

2 | disability, as he had not complained of any other issues.

3 |       40.    On May 26, 2013, the DOUDS traveled to Toronto, Canada, and MR. DOUD

4 | returned on June 6, 2013. During the week he was out of town, MR. DOUD (obviously) did not

5 | drive for YELLOW CAB. When he returned to work, he was told, "Go see Frank Street, he wants

6 | to see you." MR. DOUD walked into Mr. Street's office, and the following conversation ensued:

7 |         **MR. DOUD:**       "Good morning, what's up?"

8 |         **MR. STREET:**     "I am terminating you."

9 |         **MR. DOUD:**       "Is this about the incident at the airport?"

10 |         **MR. STREET:**     "No comment, we have a conflict of interest. I'm not going to have

11 |                                     my drivers break their backs to load scooters into taxis."

12 |         **MR. DOUD**:       "The scooter comes apart in five small pieces and each piece weighs

13 |                                     less than a suitcase."

14 |         **MR. STREET:**     "I'm not going to have drivers break their backs"

15 |         **MR. DOUD:**       "No one's back would be broken, the scooter is easy to lift when it is

16 |                                     disassembled and it disassembles easily."

17 |         **MR. STREET:**     "You're out."

18 |       41.    It is alleged that MR. DOUD was terminated from YELLOW CAB not because of

19 | any wrongdoing on his part or because of any violation of rules, policies, or procedures, but solely

20 | in retaliation for his complaints about the failure of YELLOW CAB to follow the law protecting the

21 | rights of persons with disabilities. At no time did Mr. Street provide to MR. DOUD any complaint

22 | about his work, his ethics, his honesty, his ability to follow policies, or his driving conduct.

23 |       42.    On June 17, 2013, Supervisory Investigator R. Reasoner of the NTA issued a citation

24 | to YELLOW CAB of Reno, Citation No. 16283, for violation of Nevada Administrative Code

25 | (NAC") 706.365, later amended to reflect a violation of Nevada Revised Statutes 706.361, alleging

26 | refusal of transportation based on the fact that MRS. DOUD is disabled and utilizes a motorized

27 | scooter. On July 11, 2013, a representative of YELLOW CAB signed that the citation was received.

28 |

43.     Additionally, a second citation, Citation No. 16480 was issued for denial of service based upon the presence of service animals, pursuant to Nevada Revised Statutes ("NRS") 701.366; however, for purposes of the administrative hearing, Investigator Reasoner did not develop evidence that denial of service was specifically based upon the presence of service animals.

44.     On July 11, 2013 a hearing was set before the NTA at their Reno office. The hearing was continued to August 11, 2013 at the request of YELLOW CAB's attorney. On August 11, 2013, the NTA added the additional charge of failure to train pursuant to the ADA. The additional charge continued the hearing until September 5, 2013. NTA Chairman Andrew J. MacKay presided over two-day evidentiary hearing.

45.     On or about October 17, 2013, the NTA affirmed Chairman MacKay's "Findings of Fact, Conclusions of Law, and Order," concluding that on April 9, 2013, and May 19, 2013, one or more YELLOW CAB drivers denied transportation services to a person with a disability and that the drivers' actions violated NRS 706.361(1) and (4) in that it is unlawful for any person to deny a person with a disability of the full and equal enjoyment of the services of a common motor carrier of passengers and, further, NRS 706.361 "makes reference to the obligation of the carrier's employees to assist a person with a disability to store a mobility device." A true and correct copy of the NTA's decision is attached to this complaint (Attachment 2).

46.     In its decision, the NTA found there was "no material dispute as to the facts that on both April 9, 2013 and May 19, 2013, one or more drivers for Yellow Cab of Reno denied transportation services to a person with a disability. The fact that Yellow Cab may have ultimately provided transportation services on one of these occasions, subsequent to the denial of service, does not alter the fact that a refusal of service had already occurred. Even in the instance where service was refused and later provided, the disabled person was denied the full and equal enjoyment of the services of a common motor carrier of passengers."

47.     The NTA further found YELLOW CAB liable for the violation of NRS 306.361 committed by its driver/lessees pursuant to NRS 706.473(3) and fined the company One Thousand Five Hundred Dollars ($1,500.00), suspending half of the fine for two years pending compliance.

48.     The NTA dismissed the citation for violation of NRS 706.366 because Mohammed Parvez, the only driver to testify, denied stating "that transporting dogs was contrary to his religious beliefs." The DOUDs do not allege that Mr. Parvez made this statement. It was the second YELLOW CAB, number 132, not Mr. Parvez, who on April 9, 2013 refused to transport their service dogs. The driver of YELLOW CAB number 132 was not called to testify at the hearing.

49.     Following MR. DOUD's termination from YELLOW CAB, he moved to Colorado Springs, Colorado to find work as a taxi driver. He and MRS. DOUD wish to return to Reno to manage property they own in Reno, conduct business, and visit with friends. They anticipate needing taxi services when they return. They hope to avoid future rejections by YELLOW CAB drivers based on Ms. Doud's disability and use of service dogs.

### FIRST CAUSE OF ACTION

**Melodie Doud and James Doud**
**v.**
**Yellow  Cab Company of Reno**

**(Americans with Disabilities Act, Title III "ADA")**

50.     Plaintiffs MELODIE DOUD and JAMES DOUD reallege all preceding paragraphs and incorporates them by reference.

51.     At all times relevant to this action, the ADA of 1990, 42 U.S.C. §§ 12101 et seq., was in full force and effect in the United States.

52.     The ADA expressly prohibits, inter alia, discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. Under the terms of the ADA, discrimination includes a failure to provide services to a disabled person to the extent that such services are provided to nondisabled persons. The ADA requires that goods, services, facilities, privileges, advantages, and accommodations be afforded to an individual with a disability in the most

1  integrated setting appropriate to the needs of the individual.

2    53.    Title III of the ADA, which applies to public accommodations and private

3  transportation carriers, establishes the general rule that no individual shall be discriminated against

4  on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

5  advantages, or accommodations of any public accommodation by any person who owns, leases (or

6  leases to) or operates a place of public accommodation or provides public transportation as a

7  common motor carrier of passengers, a contract motor carrier of passengers or other entities

8  providing means of public conveyance and transportation.

9    54.    Plaintiff MELODIE DOUD is a qualified individual with a disability within the

10  meaning of the ADA because Plaintiff has a physical impairment that substantially limits one or

11  more of Plaintiff's major life activities, i.e. she is a one-legged amputee with a mobility impairment.

12    55.    The protections of Title III of the ADA applies equally to persons associated with

13  persons with disabilities. Plaintiff JAMES DOUD by virtue of his association with MELODIE

14  DOUD is a person protected by Title III of the ADA. Title III states that "[i]t shall be discriminatory

15  to exclude or otherwise deny equal goods, services, facilities, privileges, advantages,

16  accommodations, or other opportunities to an individual or entity because of the known disability of

17  an individual with whom the individual or entity is known to have a relationship or association." 42

18  U.S.C. § 12182(b)(2).

19    56.    Plaintiffs together requested transportation from YELLOW CAB with the

20  accommodation of allowing MELODIE DOUD'S scooter to be disassembled so that it could easily

21  be carried in the taxi's trunk and her service dogs to be transported with the DOUDs. MR. DOUD

22  did not and does not need or require assistance with the assembly or disassembly of the scooter. The

23  accommodations requested are reasonable and without cost or strain. Such accommodation would

24  allow the DOUDs to enjoy the full and equal enjoyment of the taxi as provided to persons who are

25  not disabled and those associated with them.

26    57.    Defendant is a business that owns, leases, or operates a place of public

27  accommodation within the meaning of the ADA because Defendant owns, leases, or operates a taxi

28

company, which provides transport service to members of the public.

58.     Defendant is in violation of the ADA because it discriminated against Plaintiffs on the basis of MELODIE DOUD's disability in the full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations of YELLOW CAB because it did not afford to Plaintiffs the services, facilities, privileges, advantages, and accommodations of the taxi in the most integrated setting appropriate to Plaintiffs' needs; because it refused to transport the DOUDs in its taxis based on MELODIE DOUD's disability; because it refused the DOUDs transport on more than one occasion; and because the refusals to transport the DOUDs based on MELODIE DOUD's disability caused Plaintiffs irreparable harm.

59.     Plaintiffs intend to return to Reno and to utilize the services of YELLOW CAB on their return.

60.     Plaintiffs have been specifically told by YELLOW CAB that the company does not intend to comply with the ADA with respect to permitting persons with disabilities to ride in its taxis. After JAMES DOUD complained that YELLOW CAB drivers refused the couple service based on MELODIE DOUD's disability, YELLOW CAB manager Frank Street told him: "[W]e have a conflict of interest. I'm not going to have my drivers break their backs to load scooters into taxis." JAMES DOUD's association with his disabled wife, according to Mr. Street, constituted a "conflict of interest" for the company. Mr. Street's statement on behalf of YELLOW CAB and his simultaneous termination of JAMES DOUD constitutes evidence that, absent an injunction, Defendant had no intent to comply with the legal requirements of the ADA or to notify or train its drivers of their need to comply with the ADA.

61.     Plaintiffs request that the court award them injunctive relief requiring YELLOW CAB drivers to accommodate the DOUDs by transporting MELODIE DOUD in its taxis with her portable mobility device and/or her service dogs so she and JAMES DOUD, by association, may enjoy all benefits, privileges, goods, services, facilities, advantages, and accommodations including equal access to and enjoyment of the facilities of YELLOW CAB in future transportation as may be necessary. To effect such relief to the DOUDs, it may be appropriate for the court to provide clear

protocols to all its drivers for handling requests to transport persons with disabilities, those who accompany them, including but not limited to protocols for assisting persons with disabilities with their mobility devices and permitting the transport of service dogs; the posting and disseminating of notices to drivers regarding their legal obligations to transport persons with disabilities, like MELODIE DOUD, and those who associate with them, like JAMES DOUD; annual ADA training; procedures for making and investigating complaints ADA violations by YELLOW CAB drivers with appropriate recordkeeping to insure no future violations; as well as attorneys' fees and costs.

### SECOND CAUSE OF ACTION

**James Doud**
**v.**
**YELLOW CAB Company of Reno**

**(Title I of the ADA, Associational Discrimination)**

62.    Plaintiff realleges all preceding paragraphs and incorporates them by reference.

63.    Title I of the ADA makes it unlawful for an individual or entity to "exclude[] or otherwise deny[] equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S. 12112(b)(4).

64.    Plaintiff JAMES DOUD was terminated from his employment as a driver for YELLOW CAB because of a known "conflict of interest" between YELLOW CAB and himself, based on his association with his wife MELODIE DOUD who is a person with a disability needing transport from YELLOW CAB.

65.    YELLOW CAB manager Frank Street made clear to JAMES DOUD that the reason for the sudden termination was YELLOW CAB and JAMES DOUD "have a conflict of interest." Mr. Street further announced his objection to JAMES DOUD's request that YELLOW CAB accommodate him and his wife, stating, "I'm not going to have my drivers break their backs to load scooters into taxis." This is a disingenuous statement given that the heaviest part of the portable scooter weighs less than the average suitcase and at no time did MR. DOUD request or require any taxi driver to assist with the assembly or disassembly of the scooter.

15

66.     JAMES DOUD's association with his disabled wife, according to Mr. Street, thus constituted a "conflict of interest" for the company. Mr. Street's statement on behalf of YELLOW CAB and his simultaneous termination of JAMES DOUD constitutes evidence that Plaintiff DOUD's termination from YELLOW CAB was due to a conflict with YELLOW CAB based on his association with MELODIE DOUD, a qualified person with a disability.

67.     The termination of Plaintiff was malicious and in bad faith. In terminating Plaintiff, Frank Street acted with intent to injure Plaintiff by depriving him of his employment without legitimate cause and for an unlawful reason. Such conduct was in knowing disregard of Plaintiff's rights to be free of associational discrimination under the ADA.

68.     Frank Street is a managing agent for Defendant YELLOW CAB who exercises substantial independent authority and judgment in his corporate decision-making such that his decisions ultimately determine corporate policy.

69.      As a direct and proximate result of Defendant's actions and disregard for Plaintiff's rights to be free of associational discrimination, Plaintiff has suffered damages including lost pay, lost benefits, the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about his future, damage to his reputation, disruption of his personal life, and loss of enjoyment of the ordinary pleasures of everyday life. Plaintiff requests all applicable damages under the ADA including injunctive relief, reinstatement, back pay, and front pay, as well as compensatory and punitive damages as provided under the ADA in cases of intentional discrimination against those who associate with persons with disabilities; as well as attorneys' fees and costs..

### **THIRD CAUSE OF ACTION**

**James Doud**
**v.**
**Yellow Cab Company of Reno**

**(Title I of the ADA – Retaliation in Employment)**

70.     Plaintiff JAMES DOUD realleges all preceding paragraphs and incorporates them by reference.

71.    Title I of the ADA prohibits any employer from retaliating against an employee who engages in protected activity by opposing unlawful discrimination against persons with disabilities.

72.    Plaintiff complained to YELLOW CAB about the refusal of YELLOW CAB employees to provide taxi service to Plaintiff and his wife. In making such complaints, Plaintiff exercised activity protected under the ADA.

73.    As a result of exercising protected activity, Plaintiff suffered an adverse action, specifically, he was terminated from his employment.

74.    A causal connection exists between the exercise of protected activity and the termination of employment.

75.    Defendant informed Plaintiff in terminating him that the termination was caused by a conflict of interest between him, as a person associated with someone with a physical disability, and YELLOW CAB based on YELLOW CAB's repeated refusal to provide transportation based on his wife's disability and his requests to be accommodated.

76.    Defendant's actions towards Plaintiff were retaliatory and in bad faith.

77.     As a direct and proximate result of Defendant's actions and disregard for Plaintiff's rights to be free of retaliation for complaints of disability discrimination, Plaintiff has suffered damages including lost pay. For violations of the ADA's provisions against retaliation, Plaintiff requests all applicable relief including but not limited to injunctive relief, reinstatement, back pay, front pay, as well as attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### Melodie Doud
### v.
### YELLOW CAB  Cab Company of Reno

### (Nevada Revised Statutes Section 706.361 et seq., Regulating Motor Carriers)

78.    Plaintiffs reallege all preceding paragraphs and incorporates them by reference.

79.    Pursuant to NRS 706.361 it is unlawful for any person to deny a person with a disability the full and equal enjoyment of the services of a common motor carrier of passengers. On April 9, 2013, two YELLOW CAB drivers denied Plaintiffs transportation home from the Reno

airport because of MELODIE DOUD's disability. Again, on May 19, 2013, one YELLOW CAB driver from the April 9, 2013, incident again refused Plaintiffs transportation because of MELODIE DOUD's disability.

80.    Pursuant to the "Findings of Fact, Conclusions of Law, and Order" of the NTA, it is non-disputed that Plaintiffs were refused transport because of MELODIE DOUD's disability on April 9, 2013 and on May 19, 2013.

81.    NRS 706.361 further cites the obligation of the carrier's employees to assist a person with a disability to store a mobility device. On April 9, 2013, and again on May 19, 2013, the same YELLOW CAB driver refused JAMES and MELODIE DOUD transportation for the stated reason that MELODIE DOUD had a mobility device and the driver refused to assist them with it. This is a non-disputed fact.

82.    NRS 706.361 requires motor carriers to designate a person to provide training in the requirements of the ADA and associated regulations and to provide training sessions to all employees to ensure compliance with the ADA by the motor carrier. It is alleged that YELLOW CAB has failed to designate a person with knowledge of the ADA to provide training in the requirements of the ADA and associated regulations. It is further alleged that YELLOW CAB has failed to provide any training to its drivers in the requirements of the ADA and associated regulations protecting the rights of persons with disabilities as well as those associated with them.

83.    Plaintiff MELODIE DOUD is a member of a protected class based on her physical disability and reliance on mobility aids, and Plaintiff JAMES DOUD was also refused transportation based on his wife's physical disability.

84.    Defendant has unlawfully deprived Plaintiff MELODIE DOUD and her husband JAMES DOUD of the full and equal enjoyment of the transportation services of its taxicabs and done so repeatedly. On being notified of the violations, instead of remedying the unlawful discrimination, Defendant terminated Plaintiff's husband JAMES DOUD from his position as a YELLOW CAB driver and employee, and thereby caused Plaintiff MELODIE DOUD additional damages on her own account. In addition, Defendant made clear it would refuse to transport

Plaintiff MELODIE DOUD in the future based on the fact that she utilizes a mobility device.

85.     Defendant has failed to designate a person to provide training in the requirements of the ADA and associated regulations, including but not limited to Defendant's obligations to train its drivers to observe the requirements of the ADA and Defendant's obligations to train its management personnel to not retaliate against persons who complain of unlawful discrimination by refusing to provide transport to persons with disabilities and those associated with them, and also by terminating persons associated with them from their employment when it became evident Defendant did not intend to comply with the ADA and so had a "conflict of interest" with Plaintiffs.

86.     As a direct and proximate result of Defendant's repeated actions and abject disregard for Plaintiff's rights to equal enjoyment of its taxicab services, Plaintiff has suffered damages including the indignity of discrimination, the invasion of the right to be free from discrimination, and humiliation which is and was manifest in emotional distress, outrage, severe anxiety, damage to reputation, disruption of her personal life, and loss of enjoyment of the ordinary pleasures of everyday life. Plaintiff requests injunctive relief as well as all applicable damages including compensatory and punitive damages, as well as attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

**Melodie Doud and James Doud**
**v.**
**Yellow Cab Company of Reno**

**(Nevada Revised Statutes Section 706.366, Relating to Rights of Persons with Service Dogs)**

87.     Plaintiffs reallege all preceding paragraphs and incorporate them by reference.

88.     NRS 706.366 makes it unlawful to deny such services to service dogs accompanying persons with disabilities and includes a specific provision for actual damages, treble punitive damages and attorney's fees for violations.

89.     On April 9, 3013, a YELLOW CAB driver, taxicab number 102, refused to transport the DOUDs with their two service dogs. The taxi driver stated: "I'm not taking you because you have dogs, dogs are dirty and it is against my religion to transport a dog."

90.     Under NRS 706.373 and NAC Chapter 706,

91.     As a direct and proximate result of YELLOW CAB driver number 102's intentional discrimination and YELLOW CAB's abject disregard for Plaintiffs' rights to equal enjoyment of its taxicab services accompanied by service dogs, Plaintiffs have suffered damages including the indignity of discrimination, the invasion of the right to be free from discrimination, and humiliation which is and was manifest in emotional distress, outrage, severe anxiety, damage to reputation, disruption of personal lives, and loss of enjoyment of the ordinary pleasures of everyday life. Plaintiffs request injunctive relief as well as all applicable damages including compensatory and punitive damages, as well as attorneys' fees and costs.

## SIXTH CAUSE OF ACTION

**Melodie Doud and James Doud**
**v.**
**Yellow Cab Company of Reno**

**(Tortious Failure to Furnish Facilities to a Member of the Public)**

92.     Plaintiffs reallege all preceding paragraphs and incorporates them by reference.

93.     At all times relevant to this action, Defendant was under a noncontractual duty to furnish to the public without discrimination the facilities of YELLOW CAB.

94.     At all times relevant tot his action, Plaintiffs were entitled to use and enjoy the facilities of YELLOW CAB.

95.     On April 9, 2013 and May 20, 2013 Defendant violated its duty to furnish to the public without discrimination the facilities of YELLOW CAB taxis because Defendant failed to provide Plaintiffs the services, facilities, privileges, advantages, or accommodations of YELLOW CAB.

96.     Defendant has further breached its duty to furnish to the public without discrimination its taxis because Plaintiffs were denied the full and equal enjoyment of YELLOW CAB's services in a manner consistent with the manner it provides services to persons who do not have disabilities and those who associate with them.

97.     As a direct and proximate result of YELLOW CAB driver number 102's intentional discrimination and YELLOW CAB's abject disregard for Plaintiffs' rights to equal enjoyment of its

taxicab services, Plaintiffs have suffered damages including the indignity of discrimination, the invasion of the right to be free from discrimination, and humiliation which is and was manifest in emotional distress, outrage, severe anxiety, damage to reputation, disruption of personal lives, and loss of enjoyment of the ordinary pleasures of everyday life. Plaintiffs request injunctive relief as well as all applicable damages including compensatory and punitive damages, as well as attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against defendant as follows:

(a)     For injunctive relief, specifically an order directing Defendant to train its drivers to accept persons with disabilities who utilize portable mobility aids and appliances to accept those persons as customers;

(b)     For injunctive relief, specifically an order directing Defendant to transport Plaintiff MELODIE DOUD in all YELLOW CAB taxis with her motorized scooter;

(c)     For injunctive relief, specifically an order directing Defendant to transport Plaintiffs in all YELLOW CAB taxis with their service dogs.

(d)     For reinstatement of Plaintiff JAMES DOUD to his position as a YELLOW CAB driver.

(e)     For actual damages to the extent permitted by law;

(f)     For compensatory damages in an amount to be determined;

(g)     For punitive damages to the extent permitted by law;

(h)     For attorneys' fees and costs incurred herein;

(i)     For leave to amend this complaint should same become necessary;

(j)     For such other legal and equitable relief as this Court may deem appropriate.

DATED:         This 4th day of December, 2013.

/s/ Diane K. Vaillancourt
TERRI KEYSER-COOPER
DIANE K. VAILLANCOURT
*Attorneys for Plaintiffs James and Melodie Doud*

# ATTACHMENT  1

# ATTACHMENT  1

PRIVACY ACT STATEMENT: Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.   FORM NUMBER/TITLE/DATE. EEOC Form 5, Charge of Discrimination (11/09).

2.   AUTHORITY. 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.   PRINCIPAL PURPOSES. The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.   ROUTINE USES. This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION. Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please notify EEOC or the state or local agency where you filed your charge if retaliation is taken against you or others who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against anyone, or for a union to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | **550-2013-01379** |

## Nevada Equal Rights Commission
*State or local Agency, if any*
and EEOC

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Mr. James Doud** | **(775) 337-0323** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **C/O  Law Office Of Terri Keyser-Cooper, 3590 Barrymore Drive, Reno, NV  89512** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  *(If more than two, list under PARTICULARS below.)*

| Name | No Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **YELLOW CAB COMPANY OF RENO** | **Unknown** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **475 Gentry Way,  Reno, NV 89502** | |

| Name | No  Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest                    Latest
**06-06-2013**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**See Attached**

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| _____    _____ Date            Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | James Doud<br>C/O Law Office Of Terri Keyser-Cooper<br>3590 Barrymore Drive<br>Reno, NV 89512 | From: | San Francisco District Office<br>350 The Embarcadero<br>Suite 500<br>San Francisco, CA 94105 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 550-2013-01379 | Darlene G. Turner,<br>Investigator Support Asst | (415) 625-5673 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*signature*

Michael Baldonado,
**District Director**

9/12/13

*(Date Mailed)*

Enclosures(s)

cc:

YELLOW CAB COMPANY OF RENO
475 Gentry Way
Reno, NV 89502

# ATTACHMENT  2

# ATTACHMENT  2

*13*

BEFORE THE NEVADA TRANSPORTATION AUTHORITY

| | | |
|---|---|---|
| In re: Citations 16283 and 16480 issued to Yellow Cab of Reno, Inc. for violations of NRS 706.361 and NRS 706.366. | ) ) ) ) | Citations 16283 and 16480 |

At a general session of the Nevada Transportation Authority held on October 17, 2013.

PRESENT:    Chairman Andrew J. MacKay
            Commissioner Monica B Metz
            Commissioner George Assad
            Deputy Commissioner Marilyn Skibinski

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

On July 11, 2013, and September 5, 2013, a hearing in the above-captioned matters was held before Chairman Andrew J. MacKay, serving in his capacity as Hearing Officer for the Authority. Respondent Yellow Cab of Reno, Inc. was present with legal counsel Michelle Bumgarner, Esq.

After hearing the allegations, the respective arguments, and having considered the evidence introduced by both parties and being fully advised, the Hearing Officer, pursuant to Nevada Administrative Code ("NAC") 706.4015 prepared a proposed decision for review by the Authority.

Based on that proposed decision, the Authority makes the following Findings of Fact and Conclusions of Law, which constitute a final order affirming the decision of the Hearing Officer. Any Finding of Fact that would be better deemed a Conclusion of Law or vice versa shall be so construed. Under Nevada Revised Statutes ("NRS") 706.151, the Authority has legal jurisdiction and authority over this matter.

///

## FINDINGS OF FACT

The Authority finds that there is substantial evidence in the record delivered by the Hearing Officer, which contains the legal evidence presented at the hearing, to establish each of the facts hereinafter set forth in these Findings of Facts.

1. On July 11, 2013 the parties stipulated to amend Citation 16283 to allege one violation of NRS 706.361 rather than one violation of NAC 706.365.

2. On May 21, 2013, NTA Supervisory Investigator R. Reasoner received a complaint from James Doud alleging that on April 9, 2013 and May 19, 2013, Mr. Doud and his wife Melanie Doud were refused transportation from Reno-Tahoe International Airport by the Respondent's driver, Mohammed Parvez (and also denied service by a second Yellow Cab driver on April 9, 2013) based on the fact that Mrs. Doud is a disabled and utilizes a motorized scooter.

3. The Respondent did not file a response to the complaint.

4. The Respondent was issued Administrative Citations 16283 and 16480 for violations of NRS 706.361 and NRS 706.366.

5. On September 5, 2013 at the hearing in these matters, Supervisory Investigator Reasoner credibly testified to the facts set forth in paragraphs 2 through 4 above. On cross-examination by Ms. Bumgarner, Supervisory Investigator Reasoner testified that no evidence was developed that a denial of service was specifically based upon the presence of service animals and that the Doud's did not allege this basis in their written complaints.

6. Mr. Doud credibly testified that with respect to the April 9, 2013 occurrence, a Yellow Cab driver refused to transport the Douds, stating that he needed a special handicap permit to transport them; that a second Yellow Cab driver subsequently refused to

transport the Douds, stating that transporting service dogs was "against his religion" and "they (dogs) are dirty."

7. Mr. Doud credibly testified that with respect to the May 19, 2013 occurrence, a Yellow Cab driver again refused to transport the Douds and that Mr. Doud then called the Yellow Cab "road boss" Mukesh Sharma, who later arrived to transport the Douds. Mr. Doud further testified that Mrs. Doud's motorized scooter breaks down into components that fit into standard passenger vehicles such as the Yellow Cab at issue, with no individual component weighing more than 36 pounds;

8. At hearing, the Respondent contested the allegations. Mohammed Parvez credibly testified that he was involved in both the April 9 and May 19 incidents as a driver for Yellow Cab; that he refused service to the Douds because he could not load the cab due to his lack of special equipment to accommodate a mobility scooter; and that he has never refused transportation for service animals.

9. Yellow Cab employee Mukesh Sharma credibly testified that he understood the allegation of a refusal of service for the April 9 incident, but not the May 19 incident based upon Yellow Cab's effort to correct the situation. The balance of Mr. Sharma's testimony supports no material findings of fact.

10. Kathy Brown, driver manager/driver trainer for Yellow Cab testified at hearing. Ms. Brown's testimony supports no material findings of fact.

## CONCLUSIONS OF LAW

With respect to Citation 16283, pursuant to NRS 706.361(1) and (4), it is unlawful for any person to deny a person with a disability the full and equal enjoyment of the services of a common motor carrier of passengers. Further, NRS 706.361 makes reference to the obligation of the carrier's employees to assist a person with a disability to store a mobility device. The record

in this matter discloses no material dispute as to the facts that on both April 9, 2013 and May 19, 2013, one or more drivers for Yellow Cab of Reno denied transportation services to a person with a disability. The drivers' actions constitute violation of NRS 706.361 as alleged in Citation 16283. The fact that Yellow Cab may have ultimately provided transportation services on one of these occasions, subsequent to the denial of service, does not alter the fact that a refusal of service had already occurred. Even in the instance where service was refused and later provided, the disabled person was denied the full and equal enjoyment of the services of a common motor carrier of passengers.

Pursuant to NRS 706.473(3), the Respondent is jointly and severably liable for the violation of NRS 706.361 committed by its driver/lessees. Thus, the Authority concludes that the Respondent is responsible for a violation of NRS 706.361.

With respect to Citation 16480, NRS 706.366 prohibits refusal of service to a person with a disability *because* the person is accompanied by a service animal. While the record here supports findings that there was a refusal to serve a person with a disability, and that the person was accompanied by a service animal, the Hearing Officer found insufficient evidence to support a finding of fact that the refusal was predicated on the presence of the service animal.

Specifically, the only evidence in the record of such a nexus is Mr. Doud's testimony that a Yellow Cab driver stated that transporting dogs was contrary to his religious beliefs. However, Mr. Doud's testimony was directly contradicted by the driver's own unequivocal testimony denying such a statement or such a basis for the refusal. The Hearing Officer did not find either witness lacking credibility with respect to this conflicting testimony. Mr. Doud did not include the allegation in his written complaint, the allegation does not find corroboration elsewhere in the record, and the record includes ample evidence that the refusal was based on more straightforward bases (lack of a special vehicle or lack of a special permit). Accordingly, the

Hearing Officer found inadequate support in the record to conclude that the refusal was *because* of the service animals.

The Authority concludes that the record does not support a conclusion that the Respondent is responsible for a violation of NRS 706.366.

## DISCUSSION

The Hearing Officer considered the above Findings of Fact and Conclusions of Law and recommended:

1. That with respect to Citation 16283, a finding enter against the Respondent for one violation of NRS 706.361, in that the Respondent is responsible for its driver/lessees' refusal of service to a disabled person on April 9, 2013 and May 19, 2013;

2. That with respect to Citation 16480, the alleged violation of NRS 706.366 be dismissed; and

3. That a fine in the amount of One Thousand Five Hundred Dollars and Zero Cents ($1,500.00) be assessed for the NRS 706.361 violation, with Seven Hundred Fifty Dollars and Zero Cents ($750.00) of said fine amount suspended pending no further violations related to refusal of service within two years and timely payment of the fine amount.

## ORDER

**IT IS THEREFORE ORDERED, based on the foregoing:**

1. That the recommendations of the Hearing Officer for Administrative Citation and Verified Complaints 16283 and 16480, issued to Yellow Cab of Reno, Inc. for violations of NRS 706.361 and NRS 706.366 are hereby AFFIRMED;

2. That Citation 16480 is hereby dismissed;

3. That the *total* fine for Citation 16283 shall be in the amount of One Thousand Five Hundred Dollars and Zero Cents ($1,500.00) be assessed for the NRS 706.361 violation,

with Seven Hundred Fifty Dollars and Zero Cents ($750.00) of said fine amount suspended pending no further violations related to refusal of service within two years and timely payment of the fine amount; and

4. That the Authority retains jurisdiction for correcting any errors that may have occurred in the drafting or issuance of this Order.

By the Authority,

Andrew J. MacKay, Chairman

Monica B Metz, Commissioner

George Assad, Commissioner

Attest: Marilyn Skibinski

Marilyn Skibinski, Deputy Commissioner

Dated: October 23, 2013

Reno, Nevada

NOTICE: Pursuant to NRS 233B.130, any party to this matter aggrieved by the above final decision may file a petition for rehearing or reconsideration. A petition for rehearing or reconsideration must be filed with the Authority within 15 days after the date the party received this Order.

