TERRI KEYSER-COOPER
Nevada Bar No. 3984
3590 Barrymore Dr.
Reno, NV 89509
(775) 337-0323
*keysercooper@lawyer.com*

DIANE K. VAILLANCOURT
Law Office of Diane K. Vaillancourt
Nevada Bar No. 9277
849 Almar Ave., Suite C403
Santa Cruz, CA 95060
(831) 458-3440
*vaillancourt@cruzio.com*
*Attorney for Plaintiffs James and Melodie Doud*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

James Doud and Melodie Doud

       Plaintiffs,

    vs.

YELLOW CAB OF RENO, INC.

      Defendant.

_____/

Case No. 3:13-cv-00664

**MOTION FOR PRELIMINARY INJUNCTION**

## I.   BRIEF BACKGROUND ON THE ADA AND THE NEED FOR INJUNCTIVE RELIEF

When President George H.W. Bush signed the Americans with Disabilities Act ("ADA") into law, he famously declared: "Let the shameful wall of exclusion finally come tumbling down…"[1] Congress enacted the ADA after finding that "individuals with disabilities continually encounter various forms of discrimination, including outright exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and]

_____

[1] "Remarks of President George Bush at the Signing of the Americans with Disabilities Act" http://www.eeoc.gov/eeoc/history/35th/videos/ada_signing_text.html; see also Peter Blanck et al., Disability Civil Rights Law and Policy xxxiv (2004).

failure to make modifications to existing facilities and practices…" 42 U.S.C. § 12101(a)(5). The ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The Act responds to what Congress described as a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled individuals. *Fortyune v. American Multi-Cinema, Inc.,* 364 F.3d 1075, 1080 (2004).

Title III of the ADA prohibits discrimination in public accommodations and services and establishes a "general rule" that:

> No individual shall be discriminated against on the basis of disability in the **full and equal enjoyment of the goods**, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. Section 12182(a) (Emphasis added).

The passage of the ADA was premised on Congress's finding that discrimination against the disabled is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference," of "benign neglect," and of "apathetic attitudes rather than affirmative animus." *Chapman v Pier 1 Imports Inc.,* 631 F.3d 939, 944 (9th Cir. 2011). The concept of "discrimination" under the ADA does not extend only to such obvious exclusionary conduct—such as a sign stating that persons with disabilities are unwelcome or an obstacle course leading to a store's entrance. Rahter, the Ada proscribes more difficult-to-navigate restrooms and hard-to-open-door—that interfere with disabled individuals' "full and equal enjoyment" of places of public accommodation. Id. citing also 42 U.S.C. Section 12182(a); see also *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 674-75 (2001); *Alexander v. Choate,* 469 U.S. 287, 295 (noting Congress's conclusion that "we can no longer tolerate the invisibility of handicapped in America" (quoting 118 Cong. Rec. 525-26 (1972)).

At issue in this case is the right of transportation is integral part to the ADA. Acknowledging its crucial role in enabling persons with disabilities to participate in public life, Title III of the ADA protects their rights to "full and equal enjoyment" of transportation services by private providers – including taxicab companies – in the business of transporting people and whose operations affect

1  commerce. 42 U.S.C. § 12184. It is well-known fact that before passage of the ADA, persons with

2  disabilities have historically been excluded, isolated and, all too frequently, homebound. The

3  ADA's promise of participation in society is an empty one indeed if these persons are refused

4  transportation only because they are disabled.

5      Plaintiff Melodie Doud has a physical disability. An amputee with one leg, she utilizes a

6  portable scooter for mobility and is frequently accompanied by her two service dogs. Since the

7  ADA has been the law of the land, she has been able to lead an active and independent lifestyle,

8  flying back and forth between Reno and Alaska, Florida, Colorado and Canada, often with her

9  husband plaintiff James Doud. She has experienced no difficulties—none—flying on airplanes or

10  utilizing ordinary taxi services in locations other than Reno. The scooter breaks down into five easy

11  to lift pieces that her husband conveniently lifts into an ordinary truck. She does not require a

12  special vehicle. Her scooter can easily fit into any car. Only in Reno is she refused transportation

13  based on her disability, and only by Yellow Cab of Reno.[2]

14      Notwithstanding the ADA's prohibitions against disability discrimination, Yellow Cab – a

15  covered transportation provider – stubbornly insists its drivers are entitled to refuse the Douds

16  transportation based on Ms. Doud's disability. On two occasions, April 9, 2013, and May 19, 2013,

17  Yellow Cab driver Mohammed Parvez, refused the Douds transportation home from the Reno

18  airport only because Ms. Doud uses a portable scooter, a fact he admitted in sworn testimony.[3] It

19  did not matter to Mr. Parvez that Ms. Doud regularly travels in ordinary, non-adapted vehicles,

20  ordinary vehicles and does not require any special vehicle. It is an outright violation of the ADA

21  Title III for drivers of Yellow Cab to refuse transportation to Ms. Doud who, despite her disability,

22  can use a regular taxi.

23      In addition, on April 9, 2013, immediately after driver Parvez rejected the Douds, a second

24  Yellow Cab refused to transport them, this time because of the service dogs. The driver stated, "I'm

25  not taking you because you have dogs, dogs are dirty and it is against my religion to transport a

26  _____

27  [2] Mr. Doud is also protected by the ADA as someone associated with a disabled person.

28  [3] See generally, Testimony of Mohammed Parvez before Nevada Transportation Authority, 9/5/2013, Exhibit 1, pages 72:20-76:23.

1   dog." This too is an outright violation of Title III's prohibition against discrimination based on

2   service dogs.

3          Relief under Title III may be in the form of preliminary injunctions and other equitable

4   relief. 42 U.S.C. § 12188(a)(1). Although the Douds no longer reside in Reno, they travel frequently

5   to Reno. They have family in Reno, they have friends in Reno and they own a home in Reno. They

6   have plans to return to Reno but until and unless this court orders injunctive relief they fear more

7   discriminatory rejections by Yellow Cab drivers.[4] The Douds have good reason to fear they will be

8   denied service again as Yellow Cab has insisted its driver committed no wrongdoing in denying

9   them service.  On September 5, 2013, a hearing was held by the Nevada Transportation Authority

10  ("NTA") on the matter pursuant to state law violations. Yellow Cab had a full and fair opportunity

11  in the day-long proceeding to provide all rationale for denying service to the Douds. On October 23,

12  2013, the NTA hearing officer found violations of state law in the refusal of Mr. Parvez to provide

13  service to the Douds and fined Yellow Cab of Reno $1,500.00. (Exhibit 6). Since that time Yellow

14  Cab has adamantly rejected any finding of fault, insisting its driver Mr. Parvez was correct in

15  rejecting the Douds. Yellow Cab is currently appealing the NTA decision.

16  **II.    FACTS SUPPORTING THE REQUESTED RELIEF**

17          Plaintiff Melodie Doud is a retired female who lives primarily in Ontario, Canada and

18  spends substantial time in Colorado Springs, Colorado with her husband James Doud. As a result of

19  cancer forty years ago, she now has one leg, amputated at the thigh, requiring her to utilize a

20  portable scooter and two crutches for mobility. She is frequently accompanied by her two service

21  dogs. With these aids, she freely travels, enters and exits vehicles, and wheels about city streets.

22  Designed for ease of mobility, Ms. Doud's portable scooter is disassembled quickly and easily

23  without tools, making up five individual components, none of which weighs over 36 pounds. Any

24  person of normal strength, capable of lifting an ordinary suitcase, can lift the scooter's five light

25  components. Once disassembled, the scooter readily fits into the trunk of any standard passenger

26  vehicle. It is also easily reassembled within minutes. Mr. Doud regularly disassembles the scooter

27

28  _____

    4

while travelling with Ms. Doud, or when getting her in and out of their private vehicles.[5] (Exhibit 1, 48:6-50:23; Exhibit 2, Declaration of James Doud, ¶¶2-5; Exhibit 3, Declaration of Melodie Doud, ¶¶1-4; Exhibit 4, Photographs; Exhibit 5, Scooter Specifications). In all their travels to and from the airport, the Douds have **never** had to use wheel-chair-adapted vehicles. They have always used regular cabs without any problems, either with the scooter or with the service dogs (Exhibit 1, 53:4-23, 58:21-24, 67:24-68:2).

### A.   April 9, 2013:  Two Yellow Cab Drivers Refuse Transport to Ms. Doud Home from Airport Based on her Disability

On April 9, 2013, two Yellow Cab drivers, number 132 (Mohammed Parvez) and number 130 (unknown), refused to transport the Douds based on Ms. Doud's disability, the first because she utilized a portable scooter insisting he was "not licensed" to transport the handicapped (which is untrue as no license is required) and the second because she was accompanied by her two service dogs. Around 10:30 p.m. that evening, the Douds arrived at the Reno airport on a flight from Orlando, Florida. Emerging from baggage claim to the designated area for taxis, Mr. Doud approached the first in line, a Yellow Cab, number 130. Its driver Mohammed Parvez refused to transport the Douds. He told the Douds "that he doesn't take handicapped people because he's not authorized. You've got to have a special permit to take handicapped people." (Exhibit 1, 31:20-24). A taxi driver himself, Mr. Doud knew right away this was a lie as there is no such thing as special license to transport persons with disabilities. (Exhibit 1, 31:25-32:6). He discussed Mr. Parvez's response with Ms. Doud. Both realized Yellow Cab's driver was violating ADA law by refusing to transport them. Exhausted from their long trip, they were distressed by this unlawful and humiliating response to their request for a ride home. (Exhibit 2, ¶9; Exhibit 3, ¶¶9-10).

Mr. Doud approached a second taxi, Yellow Cab number 132. The second driver refused to transport the couple as well, but for a different reason. He stated, "I'm not taking you because you have dogs, dogs are dirty and it is against my religion to transport a dog." Again, as an experienced

---

[5] Though unable to lift off the seat due to balancing issues with one leg, Ms. Doud is familiar with its assembly and disassembly. When she is alone, she simply asks for help with the seat and "anyone would help." She has lifted all the parts of the scooter, including the seat, the engine, and the battery, and has moved them to other locations without assistance. (Exhibit 1, 62:14-63:5).

taxi driver, Mr. Doud knew disabled persons cannot legally be denied services based on their service dogs. "They are all refusing to take us," Mr. Doud told his wife. Both were especially upset that Yellow Cab drivers rejected them not once but twice that night. (Exhibit 2, ¶¶10-11; Exhibit 3, ¶¶11-12).

Mr. Doud approached a third taxi, a Whittlesea taxi, whose driver also waved him off. (Exhibit 1, 33:16-19). He then saw an airport police vehicle approach and flagged it down. He explained to the officers no taxis would transport them. One of the officers approached a fourth taxicab and spoke to its driver who agreed to give the Douds a ride home. From Yellow Cab's initial refusal until the fourth taxi – an ordinary van like the one Mr. Parvez drove – finally agreed to take them home, the Douds lost approximately 45 minutes. They did not experience the full and equal enjoyment of the taxi service because he should have been permitted to enter the first taxi driven by Mr;. Parvez. They should never have been required to wait and undergo this time consuming humiliating experience. (Exhibit 1, 33:20-22; Exhibit 2, ¶¶12-13; Exhibit 3, ¶¶13-14).

### B.    The Douds Complain to Yellow Cab Concerning Disability Discrimination by Two Drivers

The next day, April 10, 2013, still upset, the Douds went to Yellow Cab's office to complain about the refusal of the first two taxis to transport them. They saw Frank Street ("Mr. Street") the son of Yellow Cab's owner Roy Street and general manager of day-to-day operations. Mr. Street is known as the "boss" of the operation with the ability to change and implement company policy. Ms. Doud introduced herself, saying, "Did you hear about the incident last night at the airport?" Mr. Street answered, "No." Ms. Doud said, "You should have been briefed about it. I was refused service by two Yellow Cab taxis." Mr. Street responded, "I really don't have time to talk to you..." and proceeded to leave the premises. (Exhibit 2, ¶¶14-15; Exhibit 3, ¶¶15-16).

In addition, Mr. Doud telephoned Mukesh Sharma, Yellow Cab's road manager who dealt directly with the company's drivers on a day-to-day basis. Mr. Sharma had the power to alter the terms and conditions of the drivers' employment. Mr. Doud informed Mr. Sharma that two Yellow Cab taxis refused service to him and his wife, the first based on Ms. Doud's utilization of a portable

scooter, and the second based on the service dogs. Mr. Sharma said, "I'll look into it and I will tell Mr. Street first thing in the morning." Mr. Doud did not hear back from Mr. Sharma or Mr. Street. When he went to work the next day, he saw Mr. Sharma, but Mr. Sharma failed to mention the issue or indicate if the matter would be investigated or corrected. (Exhibit 2, ¶16).

Finally, the Douds went to the NTA and obtained papers with which to file a complaint. They also considered filing an ADA complaint but decided against that at the time. They anticipated that Yellow Cab would inform its drivers of state and federal law concerning transport of persons with disabilities and that there would be no repeat incidents.[6] (Exhibit 1, 52:14-21).

**C.    May 19, 2013:  The First Driver from the April 9 Incident Again Refuses to Transport Ms. Doud Based on her Disability[7]**

Yellow Cab did nothing to correct its drivers' discriminatory conduct.[8] This became clear when, approximately one month later, on May 19, 2013, Yellow Cab's driver Parvez, again rejected the Douds again based on Ms. Doud's disability. The Douds had flown into the Reno airport from Alaska, arriving in the early evening at approximately 7:15 p.m. with the two service dogs. Again, they were exhausted having traveled the entire day. They picked up their luggage and went out to the taxi stand at approximately 7:30 p.m. to obtain a taxi. (Exhibit 1, 57:20-58:1; Exhibit 2, ¶18; Exhibit 3, ¶19).

---

[6] During Mr. Doud's several years with Yellow Cab, he was never once provided training on compliance with ADA requirements and never received notice that Yellow Cab did any such training. But he expected that, with this complaint in hand, the company would conduct training on the ADA and other disability law or at least advise its drivers to avoid future discrimination against disabled persons. Road boss Mukesh Sharma testified that the last training Yellow Cab gave him on handling persons with disabilities was fourteen years ago when he first joined the company and that he has not had any training since. He further testified that, at Yellow Cab, only drivers of the wheelchair-adapted vans are provided such training (Exhibit 1, 93:19-94:11).

[7] Note: The Complaint as filed in this case states that the second incident took place on May 20, 2013. That is a scrivener's error by counsel, which is now retracted and amended to May 19, 2013 based on the testimony the Douds provided before the NTA on September 5, 2013. The substance of the allegation remains the same.

[8] While he regularly transported persons with disabilities while driving ordinary taxis for Yellow Cab, during his approximately fourteen years with the company, Mr. Doud never was provided any training on how to deal with persons with disabilities. (Exhibit 1, 38:12-25).

At the time there were no taxis at the stand but shortly one approached. It turned out to be, astonishingly, the same Yellow Cab that initially refused them transport in April, with the same driver, Mohammed Parvez. Mr. Parvez's taxi stopped several feet from where the Douds were standing, something not normally done when a driver expects to pick up a fare. Looking at each other in surprise, Ms. Doud said, "That's weird," and Mr. Doud agreed, saying, "Yeah." Then, a second taxi approached, forcing Mr. Parvez to move forward and closer to the Douds. Instead of stopping near them, he continued driving approximately ten to twelve feet past and stayed in his cab. Again, the Douds looked at each other in surprise, thinking his behavior "weird." Customarily, when a taxi driver sees a passenger at an airport taxi stand, the driver leaves the vehicle to help with the passenger's luggage. (Exhibit 1, 54:19-55:4). Mr. Doud went up to driver Parvez, still seated in his vehicle, and asked if he was going to take them. Mr. Parvez answered, "No." When Mr. Doud asked "why not," Mr. Parvez answered that he did not take handicapped passengers and they would have to call for a special handicapped vehicle. Mr. Doud went back to his wife and said, "He's refusing to take us." In disbelief, Ms. Doud went, "What?" (Exhibit 1, 33:23-34:8, 58:2-13).

Ms. Doud, using her portable scooter, wheeled onto the street and asked the driver directly, "Is my understanding correct that you're refusing to take me because I'm disabled?" He answered "yes," stating, "It's against the law for me to take disabled people. I would need a special permit. You can call my dispatcher if you don't believe me." (Exhibit 1, 58:13-20). He added that her scooter would not fit in his taxi. Ms. Doud explained, "Well, I drive a vehicle that's exactly the same as the cab – the cab drivers drive. This is a Toyota Sienna and it fits in my vehicle just fine." (Exhibit 1, 59:18-60:3). She confirmed that Mr. Parvez was refusing her because she was disabled and also assured him that the scooter would fit in his car because it fit in hers. (Exhibit 1, 70:1-6). Mr. Parvez did not offer to call another taxi or assist the Douds in any way. Ms. Doud was very frustrated and angry at the outright discrimination. (Exhibit 1, 70:13-14; Exhibit 3, ¶22).

Mr. Doud immediately telephoned Yellow Cab's "road boss" Mukesh Sharma and told him a company driver was refusing him and his wife service a second time in as many months. Mr. Sharma promised to come to the airport and transport the Douds himself. (Exhibit 1:45:21-23). Next

Mr. Doud telephoned the parking authority to report that a Yellow Cab taxi was denying him and his wife service based on her physical disability. He also notified the airport police. When the airport police arrived, Mr. Doud explained this was the second incident in which he and his wife were refused transport by Yellow Cab drivers because of Ms. Doud's disability. He explained that they did not need a wheelchair-adapted taxi because the small scooter came apart easily and fit in the trunk along with the luggage. Mr. Doud filed an incident report. (Exhibit 2, ¶23).

Before Mr. Sharma arrived to transport the Douds – using an ordinary, non-wheelchair adapted taxi (another Toyota Sienna) – a wheelchair adapted vehicle showed up, having been requested by the police. Mr. Doud told the driver that the adapted vehicle was not needed, that road boss "Mukesh" was already on his way. When Mr. Sharma arrived, Mr. Doud disassembled it and, without being requested (as his help was not needed), Mukesh assisted in loading its components into the back of the vehicle. At no time did Mr. Doud ask for assistance with the scooter, but the assistance, willingly provided, was not rejected. (Exhibit 2, ¶24).

Mr. Sharma transported the Douds to their home with the portable scooter and their service dogs, and without adverse incident. (Exhibit 2, ¶25). Mr. Doud reported the details of the encounter with Yellow Cab's driver Mr. Parvez to Mr. Sharma, explaining what happened step by step. In addition, he supplied Mr. Sharma with a copy of the incident report he had filed with the airport police. Mr. Sharma promised Mr. Doud he would talk to Mr. Street and "get back" to him. At no time did Mr. Sharma or Mr. Street "get back" to Mr. Doud regarding the refusal of Yellow Cab taxi drivers to transport him and his wife. (Exhibit 2, ¶25).

**D.   Mr. Doud's Complaint of Repeated Disability Discrimination Results in Termination from his Job with Yellow Cab**

Humiliated by the repeated discrimination, the Douds determined this time to file a complaint with the NTA. (Exhibit 1, 52:22-53:3). A day or two later, they went to the NTA office in Reno to file a formal complaint. The complaint was signed May 21, 2013. (Exhibit 1, 42:20-23, 60:17-24). Next Mr. Doud went to talk to Mr. Street regarding maintenance issues with his vehicle. Before Mr. Doud could open his mouth, Mr. Street said, "Are you in here to complain again, is that

all you do is complain to me?" Mr. Street was speaking of Mr. Doud's complaints about Yellow Cab's refusal to transport him and his wife based on her disability, as there were no other issues.

On or about May 26, 2013, the Douds traveled to Toronto, Canada, and Mr. Doud returned to work on June 6, 2013. As soon as he returned to work, he was told, "Go see Frank Street, he wants to see you." Mr. Doud walked into Mr. Street's office, and the following conversation ensued:

**Mr. Doud:**     "Good morning, what's up?"

**Mr. Street:**     "I am terminating you."

**Mr. Doud:**     "Is this about the incident at the airport?"

**Mr. Street:**     "No comment, we have a conflict of interest. I'm not going to have my drivers break their backs to load scooters into taxis."

**Mr. Doud**:     "The scooter comes apart in five small pieces and each piece weighs less than a suitcase."

**Mr. Street:**     "I'm not going to have drivers break their backs"

**Mr. Doud:**     "No one's back would be broken, the scooter is easy to lift when it is disassembled and it disassembles easily."

**Mr. Street:**     "You're out." (Exhibit 2, ¶26).

Yellow Cab's termination of Mr. Doud in response to his complaint of disability discrimination shows the company's disregard for its substance and the law forbidding disability discrimination in the provision of transportation services.[9]

**E.     The Nevada Transportation Authority Found Yellow Cab Violated State Law Protecting Persons with Disabilities and Fined Yellow Cab $1,500**

On June 17, 2013, the NTA issued a citation to Yellow Cab of Reno for violation of Nevada Administrative Code (NAC") 706.365, later amended to reflect a violation of Nevada Revised Statutes 706.361, alleging refusal of transportation based on the fact that Ms. Doud is disabled and utilizes a motorized scooter. A second citation was issued for denial of service based upon rejection

---

[9] The above relates to the Third Cause of Action in the Complaint, Title I of the ADA – Retaliation in Employment, which is not part of the request for injunctive relief. It is included for context and to show how insistent Yellow Cab is with regard to violation of the ADA.

of service animals, under Nevada Revised Statutes ("NRS") 701.366; however, the NTA investigator did not investigate this issue for purposes of the administrative hearing.

Testifying under oath before the NTA, Mohammed Parvez admitted he refused to transport the Douds on both April 9 and May 19, 2013, because of Ms. Doud's scooter. (Exhibit 1, 73:21-74:9). He attempted to justify his conduct by saying, it was "against the law" for him to transport the "handicap scooter" and asserted the scooter was "too heavy." (Exhibit 1, 74:22-75:1). He repeated that his taxi (a van) was not "equipped for the scooter." (Exhibit 1, 76:12-15, 78:9-14). It is a nondisputed fact that, when disassembled, the scooter is not "too heavy": its components weigh 36 pounds or less, less than the average suitcase. Ms. Doud further testified that she explained this to Mr. Parvez.[10] Yellow's counsel, Michelle Bumgarden argued at the hearing that a Yellow Cab eventually transported the Douds so there was no "problem." Her argument was essentially that it did not matter if Mr. Parvez refused to transport them because eventually another Yellow Cab did.[11]

On or about October 17, 2013, the NTA issued a "Findings of Fact, Conclusions of Law, and Order," concluding that on April 9, 2013, and May 19, 2013, one or more Yellow Cab drivers denied transportation services to a person with a disability and that the drivers' actions violated the state counterparts to Title III of the ADA, NRS 706.361(1) and (4), in that it is unlawful for any person to deny a person with a disability of the full and equal enjoyment of the services of a common motor carrier of passengers and, further, NRS 706.361 "makes reference to the obligation of the carrier's employees to assist a person with a disability to store a mobility device." (Exhibit 6).

In its decision, the NTA found there was "no material dispute as to the facts that on both April 9, 2013 and May 19, 2013, one or more drivers for Yellow Cab of Reno denied transportation services to a person with a disability. (Exhibit 6, p. 4). The fact that Yellow Cab may have ultimately provided transportation services on one of these occasions, subsequent to the denial of service, does not alter the fact that a refusal of service had already occurred. Even in the instance

---

[10] Mr. Parvez further testified that his belief that he needed a "special license" to transport scooters and that it was "against the law" for him to transport someone with a scooter "came from his company" Yellow Cab. (Exhibit 1, 78:15-17).

[11] This argument by counsel belies the what the entire focus of what the ADA was designed to prevent: that individuals with disabilities be given the same equal benefit and enjoyment of the services as non-handicapped persons.

where service was refused and later provided, the disabled person was denied the full and equal enjoyment of the services of a common motor carrier of passengers." (Exhibit 6, p. 4). The NTA further found Yellow Cab liable for the violation of NRS 306.361 committed by its driver/lessees pursuant to NRS 706.473(3) and fined the company One Thousand Five Hundred Dollars ($1,500.00), suspending half of the fine for two years pending compliance.[12]

_____

[12] The NTA dismissed the citation for violation of NRS 706.366 because Mohammed Parvez, the only driver to testify, denied stating "that transporting dogs was contrary to his religious beliefs." The Douds do not allege that Mr. Parvez made this statement. It was the second Yellow Cab, number 132, not Mr. Parvez, who on April 9, 2013 refused to transport their service dogs. The state prosecutor did not call the driver of Yellow Cab number 132 to testify at the hearing. The NTA officer found Mr. Doud's testimony on this question to be credible, but because the driver was not called to testify, the charge was not sustained. The NTA's decision addressing state law violations is currently under appeal.

Upon his termination from Yellow Cab, Mr. Doud moved to Colorado Springs, Colorado to find work as a taxi driver. Mrs. Doud lives primarily in Toronto, Canada and continues to travel frequently with her husband. The Douds bring this motion for a preliminary injunction because they wish to return to Reno as often as they can. They have family in Reno, friends in Reno, and a home to manage in Reno. One urgent date is likely to come up very soon: the Early Neutral Evaluation in the instant case, on April 16, 2014, to which all parties are ordered to attend. To will fly to Reno ton commercial airlines and take a taxi to get to their location. Yellow Cab is a major provider of such services, especially to and from the airport. They hope to avoid future rejections by Yellow Cab drivers just because Ms. Doud is disabled. They reasonably believe Yellow has taken no steps to remedy the situation that existed with Mr. Parvez as Yellow has staunchly defended all actions by Mr. Parvez and are appealing the decision of the NTA. Accordingly they reasonably believe Yellowwill again decline to transport them because not all drivers are aware that they must.

## III.   STANDARD FOR AWARDING PRELIMINARY INJUNCTION

### A.   Standing

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "[T]o satisfy Article III's case or controversy requirement, [Melodie Doud] needs to show that she has suffered an injury in fact, that the injury is traceable to the challenged action of [Yellow Cab of Reno, Inc.] and the injury can be redressed by a favorable decision." *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1019 (9th Cir. 2003). In the context of injunctive relief, Melodie Doud must additionally demonstrate "a sufficient likelihood that she will again be wronged in a similar way[.]" *Lyons,* 461

U.S. at 111. That is, she must establish a "real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). While "past wrongs do not in themselves amount to a real and immediate threat of injury necessary to make out a case or controversy," past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury. *O'Shea,* 414 U.S. at 496. Here, plaintiffs have demonstrated standing: a past wrong has occurred and is likely to occur again.

### B.     The Douds Have Established A Claim Under The ADA

An individual alleging discrimination under Title III must show that: (1) she is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation or service; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability. *PGA Tour*, 532 U.S. at 683. There is no dispute that Melodie Doud is disabled to that Yellow Cab is covered by the ADA.

### C.     Tests For The Granting Of A Preliminary Injunction

The Supreme Court has stated that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural  Res. Def. Council,* 555 U.S. 7, 20 (2008). According to the Court, the plaintiff must show a likelihood of irreparable harm, not just the possibility of irreparable harm. It did so because a preliminary injunction has been traditionally viewed "as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

So holding, the Court left intact the "sliding scale" approach and "serious questions test,"

both of which have a long history in the Ninth Circuit. The sliding scale approach balances the elements of a preliminary injunction test "so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cotrell,* 632 F.3d 1127, 1131 (9th Cir. 2011). And the "serious questions test" slightly modifies the sliding scale approach. Under the serious questions test, a court could issue a preliminary injunction "where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor.'" *Id.* at 1131.

### 1.  <u>Plaintiffs Are Likely to Succeed on the Merits</u>

To establish a violation of the ADA, a plaintiff must demonstrate: "(1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [her] disabilit[y].'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004).[13]

"The ADA shall be construed broadly in order to effectively implement the ADA's fundamental purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *D.K. ex rel. G.M. v. Solano County Office of Educ.,* 667 F. Supp. 2d 1184, 1190 (E.D. Cal. 2009) (citing *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir.2002)). The ADA Title III prohibits discrimination against persons with disabilities in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a). And it also protects those associated with persons with known disabilities. 42 U.S.C. § 12182(b)(2).

In addition to its general prohibition against disability discrimination, Title III includes more specific requirements:

> Entities that provide public accommodations or public transportation: (1) may not impose "eligibility criteria" that tend to screen out disabled individuals, §§ 12182(b)(2)(A)(i), 12184(b)(1); (2) must make "reasonable modifications in polices, practices, or procedures, when such modifications are necessary" to provide disabled individuals full and equal enjoyment, §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A); (3)

---

[13] A plaintiff in a Title III action is not required to provide notice to any state or local agency as a prerequisite to filing suit. *Botosan v. McNally Realty*, 216 F.3d 827, 832 (9th Cir. 2000).

must provide auxiliary aids and services to disabled individuals, §§ 12182(b)(2)(A)(iii), 12184(b)(2)(B); and (4) must remove architectural and structural barriers, or if barrier removal is not readily achievable, must ensure equal access for the disabled through alternative methods, §§ 12182(b)(2)(A)(iv)-(v), 12184(b)(2)(C).

*Spector v. Norwegian Cruise Line Ltd*., 545 U.S. 119, 128-29 (2005); *Pilling v. Bay Area Rapid Transit*, 881 F. Supp. 2d 1152, 1162 (N.D. Cal. 2012).

### 1.   **The Douds Are Protected by the ADA**

#### a.   **The ADA protects Ms. Doud**

A person is "disabled" under the ADA if he suffers from "a physical or mental impairment that substantially limits one or more…major life activities." 42 U.S.C. § 12102(2)(A). Ms. Doud is obviously "disabled" within the meaning of the ADA. She is an amputee with one leg who relies on a portable electric scooter and crutch for mobility.[14]

#### b.   **The ADA protects Mr. Doud by association with a person with a known disability**

The ADA Title III states that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(2). This section has come to be known as one of the "association provisions" of the ADA. *Schneider v. County of Will*, 190 F. Supp. 2d 1082, 1088 (N.D. Ill. 2002). As the husband of Ms. Doud, a person with a known disability, Mr. Doud's right to transportation is protected by equal measure with that of his wife.

---

[14] "Whether a person is "substantially limited in a major life activity" requires a fact-specific, case-by-case inquiry. See *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198-99 (2002). In *Williams*, the Supreme Court noted that, among other things, "substantially limited" means "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" as compared to the ability of a person in the general population to perform the same activity. *Williams*, 534 U.S. at 195-96 (quoting 29 C.F.R. § 1630.2(j) (2001)). Walking is obviously a major life activity. 29 C.F.R. § 1630.2(i). "Substantial limitation" also presumes that the condition is permanent or long term. *Williams,* 534 U.S. at 198 (citing 29 C.F.R. §§ 1630.2(j)(2) (ii)–(iii) (2001)). Having one leg amputated obviously impairs one's ability to walk, a major life activity.

**2.**     **Yellow Cab Must Comply with the ADA's Mandate Concerning Private Taxi Services**

The ADA protects the rights of persons with disabilities to full and equal enjoyment of private transportation providers, which includes Yellow Cab:

> No individual shall be discriminated against on the basis of disability in the ***full and equal enjoyment*** of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce.

42 U.S.C. § 12184(a) (emphasis added). "Specified public transportation" is defined as "transportation by bus, rail, or any other conveyance (other than aircraft) provided by a private entity to the general public, with general or special service (including charter service) on a regular and continuing basis." 49 C.F.R. § 37.3. Yellow Cab taxis fall within this definition. Yellow Cab is a private entity, and not a public one. It provides "specified public transportation services" in that it provides taxicab services to the public. It provides these services on a regular and continuing basis. That is all it does. As a provider of specified public transportation, Yellow Cab is held to the ADA's nondiscrimination mandate. Yellow Cab and its drivers ***must*** provide its services in a manner that allows full and equal enjoyment of its transportation services by persons with disabilities.

**3.**     **Yellow Cab Denied Ms. Doud "Full and Equal Enjoyment" of its Transportation Services Based on her Disability**

The facts giving rise to the Douds' complaint against Yellow Cab for violations of the ADA Title III are simple. Ms. Doud had a portable scooter, which she used for mobility. The scooter easily disassembled into five lightweight components, none of which weighed more than 36 pounds. Ms. Doud also had two service dogs with her. Yellow Cab drivers repeatedly refused Ms. Doud taxi rides from the airport along with Mr. Doud. The Douds had to call the airport authority. They had to involve the airport police. On both occasions, they were exhausted from their travels. It took an extra forty-five minutes for them to obtain a taxi ride home. They were outraged. They were humiliated. They had to wait far longer for a ride home than fellow passengers who were not disabled. They had to fight tooth and nail for what everyone else gets to expect will happen automatically: for the right to get in a an ordinary taxi and go home. What Yellow Cab and its

1  drivers subjected them to was the opposite of "full and equal enjoyment" of its transportation

2  services.

3      The Code of Federal Regulations lists discriminatory acts by taxi companies and their

4  drivers that are prohibited under the ADA Title III:

5      • the company or the driver denying service to individuals with disabilities who
           can use taxi vehicles;
6
7      • the driver refusing to assist with stowing wheelchairs or other mobility
           devices;
8
       • the company or the driver charging higher fares or fees to passengers with
9          disabilities; and

10     • the company or the driver denying a ride to a customer using a service
           animal.
11
   49 C.F.R. 37.29(c). The list is but examples of what is prohibited. The list is not exhaustive.

12     Yellow Cab repeatedly violates these prohibitions, and it has done so more than once. First,

13  company drivers have repeatedly refused Ms. Doud transportation even though she is a disabled

14  person who can use a regular taxi vehicle.  There can be no dispute:  She does not need a wheelchair

15  adapted van. Her portable scooter is easily disassembled. It comes apart into five components, none

16  of which weighs more than 36 pounds, less an ordinary 50 pound suitcase. Ms. Doud did not want

17  or need a wheelchair adapted van. She could happily and easily have used the Toyota Sienna

18  taxicab that Mr. Parvez drove. Interestingly, the Douds have a Toyota Sienna and utilize it all the

19  time. Mr. Parvez was told the taxi he was driving was the same make and model as the one she

20  regularly uses—and still he refused her.

21     Thus by refusing to transport Ms. Doud on April 9 and May 19, 2013, Yellow Cab's driver

22  Parvez engaged in repeated, illegal disability discrimination against someone who can use a regular

23  taxi. This is the very definition of unlawful conduct under the Code of Federal Regulations. Also,

24  when he refused to transport Ms. Doud, he also discriminated against her husband by association.

25     Second, under the ADA, Yellow Cab's driver was required to assist with stowing Ms.

26  Doud's mobility device. The Code of Federal Regulations is also clear on this point: Taxicab

27  drivers are not free to refuse to store wheelchairs or other mobility devices. 49 C.F.R. 37.29(c).

28

Once again, assisting with stowing the scooter would have been no different than assisting with stowing an ordinary suitcase. Mr. Parvez admits he denied service.

Yellow Cab's drivers are not trained to follow disability discrimination law. Mr. Doud testified he had never had any training in his obligations towards persons with disabilities during his approximately fourteen years with the company. Similarly, road boss Mukesh Sharma testified that the only such training he received was when he first arrived at the company fourteen years before and typically the company does not provide any training on disability requirements to its regular drivers. For all of these reasons: that the Douds have standing, they have stated a claim under the ADA, they are highly likely to prevail on the merits of their ADA Title III claim, and the without a court order the situation is likely to reoccur in the future—injunctive relief should be granted. certainty.

## C.   Ms. and Mr. Doud Will Suffer Irreparable Harm in the Absence of Preliminary Relief

Mr. and Ms. Doud allege present, ongoing discriminatory conduct and a high likelihood the conduct will continue absent the requested court order. "ADA plaintiffs seeking injunctive relief must demonstrate that they themselves face a real and immediate threat of future harm." *Molski v. Kahn Winery*, 405 F. Supp. 2d 1160, 1164 (C.D. Cal. 2005), see also *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004). This they have done. The Douds in fact have concrete plans to return to Reno: they will fly into the Reno airport and will need a taxicab upon their return. Yellow Cab is a major provider of taxi services to and from the Reno airport, and it provides a service they expect to use upon their return. They have family, friends, and property in the Reno area and they want to return on a regular basis. Both fear a repeat event where Yellow Cab drivers will reject Ms. Doud, and Mr. Doud along with her, in blatant violation of the ADA. Without a preliminary injunction, they will again be at high risk of discriminatory refusal of service. Accordingly, Ms. and Mr. Doud have standing to seek the requested relief and they very much need that relief.[15] Ms. Doud cannot return to Reno without fear of a repeated rejection by Yellow Cab, and Mr. Doud cannot return with his wife or he will predictably face the same fate.

---

[15] "Where a plaintiff lacks 'concrete plans to return,' the Court must satisfy itself that a plaintiff's professed intent to return is sincere and supported by the facts." *Id.* It is maintained here

C.      **The Balance of Equities Tips Sharply in Ms. Doud's Favor**

What the Douds are asking is simply what the ADA regulations require: A court order forbidding Yellow Cab from unlawful discrimination based on Ms. Doud's disability, specifically her utilization of a portable electric scooter and service dogs. Yellow Cab can provide this accommodation free of cost to it. It is a fact that on both April 9, 2013, and May 19, 2013, Mr. and Ms. Doud were eventually transported home via regular taxicabs – with the portable scooter and with the service animals – at no extra cost to the company and without any incident.

This is not a matter of requiring the company to provide specially equipped vehicles. It is not a matter of having its drivers do anything different from what they typically do with any other passengers. A court order would simply require the company to treat the Douds with the same dignity as it treats its nondisabled customers and avoid treating them differently based on Ms. Doud's physical disability. They want full and equal enjoyment of Yellow Cab's taxi services in accordance with the law. It will not require Yellow to buy additional taxis or retrofit their existing taxis—all that is asked is that Melodie Doud be permitted to use Yellow's taxi in a manner enjoyed by able bodied persons. She requires nothing special.

Yellow Cab does not have to go to any expense in modifying any cabs. There is nothing the company need to except do what the law already requires: to educate its drivers on the ADA's requirements as to persons with disabilities and insure they do not discriminate against the Douds in the future. Absent the requested injunctive relief, Ms. and Mr. Doud will continue to be denied full and equal enjoyment of Yellow Cab's taxi services. Yellow Cab's wall of exclusion is a painful reminder for Ms. Doud of how the world can be without the ADA's protections. For Mr. Doud, he is impaired by association with his wife.

An injunction is all the more required because Yellow Cab has made it clear to that its drivers remain free to reject the Douds based on Ms. Doud's disability.  It matters not whether Yellow Cab has an actual intent to discriminate or whether its discriminatory animus is the result of

---

that the Douds' have concrete plans to return, which plans are articulated in their respective declarations. Said plans are sincere and they are supported by the facts, including but not limited to, the fact that they continue to own real estate in the Reno area that they manage and they continue to socialize with their Reno friends.

1  "thoughtlessness," "indifference," or "benign neglect." No matter its motivation, Yellow Cab with

2  its repeated, rude refusals to transport the Douds based on Ms. Doud's disability has denied them

3  "full and equal enjoyment" of its transportation services.

4       **D.**    **The Public Interest Favors a Grant of Preliminary Relief to the Douds**

5       In passing the ADA, Congress acknowledged a strong public interest in tearing down the

6  shameful wall of exclusion for persons with disabilities. Yellow Cab is doing its part in erecting a

7  wall of exclusion for Ms. Doud, and her husband, despite the law's clear mandate. There is a strong

8  public interest in making certain that laws like the ADA have meaning, that they cannot be swept

9  aside out of carelessness, ignorance or simple disregard for the law's requirements. There is a strong

10  public interest in preventing marginalization of persons with disabilities and those associated with

11  them, in tearing down the wall of prejudice and exclusion from life's ordinary pleasures.

12  **VI.**    **CONCLUSION AND RELIEF REQUESTED**

13       For all the above reasons, plaintiffs respectfully request that defendant Yellow Cab of Reno

14  be enjoined from refusing them transportation services based on the fact that Ms. Doud utilizes a

15  portable scooter upon their return to Reno and that they be allowed the equal enjoyment of Yellow

16  Cab's taxi services on the same terms and conditions as any other passenger.

17

18  DATED:    This 18th day of March 2014.

19

20                       /s/_____

21                       TERRI KEYSER-COOPER

                     DIANE K. VAILLANCOURT

22                       *Attorneys for Plaintiffs James and Melodie Doud*

23

24

25

26

27

28