UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JAMES DOUD and MELODIE DOUD<br><br>　　　　　　　　　　Plaintiffs,<br>　v.<br>YELLOW CAB COMPANY OF RENO, INC.<br><br>　　　　　　　　　　Defendant. | Case No. 3:13-cv-00664-MMD-WGC<br><br>ORDER<br><br>(Motion for Preliminary Injunction – dkt. no. 9) |

**I.　SUMMARY**

Before the Court is a Motion for Preliminary Injunction ("PI Motion") filed by Plaintiffs James Doud and Melodie Doud ("the Douds") (dkt. no. 9). The Court has also reviewed Defendant's opposition (dkt. no. 22) and the Douds' reply (dkt no. 25). For the following reasons, the PI Motion is granted.

**II.　BACKGROUND**

This case arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12184. Melodie Doud is an amputee who uses a motorized scooter for mobility. (Dkt. no. 25-7, Exh. 3 ¶ 1.) She and her husband, James Doud, allege that Defendant Yellow Cab Company of Reno, Inc. ("Yellow") violated the ADA by refusing to transport them in a standard taxi because Mrs. Doud uses a motorized scooter.[1] (Dkt. no. 9 at 18.)

---

[1] The Douds also allege that Yellow violated NRS §§ 706.361 and 706.366, and that the company tortiously failed to furnish facilities to a member of the public. (Dkt. no. 1 ¶¶ 78-97.) Mr. Doud, who lost his job as a Yellow driver after the incidents at issue here, also alleges employment retaliation in violation of the ADA. (*Id.* ¶¶ 62-77.) The Douds do not seek remedies based on the retaliation and state-law claims in the PI Motion.

The Douds allege that Yellow refused them service from Reno-Tahoe International Airport ("Reno Airport") on April 9, 2013, and May 19, 2013. (Dkt. no. 9 at 3, 5-6, 7-9.) On both occasions, Mrs. Doud used her motorized scooter, and the couple traveled with their two service dogs. (*Id.* at 5, 7.) Mrs. Doud's motorized scooter breaks down into five pieces, the heaviest of which weighs fifty pounds. (Dkt. no. 25-1; dkt. no. 25-7, Exh. 3 ¶ 5.) Except for the service refusals at issue, the Douds have never had trouble using taxis that are not wheelchair-adapted ("standard taxis") while traveling with the scooter or the dogs. (Dkt. no. 9 at 5; dkt. no. 25-7, Exh. 3 ¶ 3, Exh. 4 ¶ 5.) Mrs. Doud's motorized scooter, when disassembled, fits in the trunk of a standard taxi. (Dkt. no. 25-7, Exh. 3 ¶ 2.)

During the incident in April 2013 ("First Incident"), two Yellow taxis — and a third from a different company — refused to pick the Douds up from Reno Airport's taxi line. (Dkt. no. 25-3 at 31:20-24, 32:8-10, 33:18-22; dkt. no. 25-4 at 69:1-7.)[2] As the Douds arrived at the airport taxi line, the first available taxi was a Yellow taxi driven by Mohammed Parvez ("Yellow 132"). (Dkt. no. 9-2, Exh. 2 ¶ 8; dkt. no. 25-4 at 73:5-7.) Mr. Doud approached Yellow 132, but Mr. Parvez insisted that he could not transport the Douds because his taxi was not equipped to transport people with physical disabilities. (Dkt. no. 25-4 at 73:23-74:1.) Next, Mr. Doud approached the second taxi in line, which was another Yellow taxi driven by a different driver. (Dkt. no. 25-7, Exh. 4 ¶ 10.) This driver also refused to serve the Douds because, allegedly, his religious beliefs forbade him from transporting their service animals. (Dkt. no. 25-3 at 32:8-10.) Mr. Doud then

---

[2]For the PI Motion, both the Douds and Yellow include excerpts of sworn testimony from a hearing convened by the Nevada Transportation Authority ("NTA") on Yellow's allegedly discriminatory service. (*See* dkt. nos. 9-1, 22-1, 25-2 to 25-6, 29-1.) For clarity, this Order refers to the full transcript (dkt. nos. 25-2 to 25-6). The Court considers these exhibits, along with declarations from Melodie Doud and James Doud (dkt. no. 9-2, Exhs. 2-3; dkt. no. 25-7, Exhs. 3-6) and other exhibits (dkt. no. 9-3, Exhs. 4-6; dkt. no. 25-1; dkt. no. 25-7, Exh. 7), in deciding this matter. *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (holding that a trial court did not abuse its discretion by relying on "'exhibits, affidavits, declarations, and factual allegations'" in issuing a preliminary injunction). The Douds mislabeled Exhibits 3 and 4 in their reply as declarations supporting a motion for summary judgment, rather than as declarations supporting the PI Motion. Nevertheless, the Court considers them here.

approached the third taxi in line, which was a Whittlesea taxi. (*Id.* at 33:18-19.) The Whittlesea driver also refused to serve the Douds. (*Id.*) After this third refusal, Mr. Doud flagged down a nearby airport police vehicle. (Dkt. no. 25-7, Exh. 4 ¶ 12.) One of the police officers approached a fourth taxi, which agreed to transport the Douds. (*Id.*) The fourth taxi was a Yellow taxi, but the Douds did not identify its driver or its number. (Dkt. no. 25-3 at 33:20-22.) In all, the Douds allege that they waited 45 minutes before they were able to secure a standard taxi during the First Incident. (Dkt. no. 25-7, Exh. 3 ¶ 14, Exh. 4 ¶ 13.) They describe this experience as disgusting and humiliating. (*Id.*)

The Douds experienced a similar service refusal at Reno Airport on May 19, 2013 ("Second Incident"). (Dkt. no. 25-3 at 33:23-34:8; dkt. no. 25-4 at 58:1-20.) When the Douds reached the airport taxi line, the only available taxi was Yellow 132, one of the taxis they encountered during the First Incident. (Dkt. no. 25-7, Exh. 3 ¶¶ 19-22.) Mr. Parvez, a driver involved in the First Incident, drove Yellow 132. (Dkt. no. 25-4 at 73:22-74:21.) Mr. Parvez refused to transport the Douds, telling Mrs. Doud that it was "against the law" to take them, despite her assurance that her scooter would fit in his taxi.[3] (Dkt. no. 25-4 at 58:13-20, 60:1-6, 74:8-9.) Mr. Doud then called Mukesh Sharma, a Yellow driver who serves as a "Road Supervisor" for the company. (Dkt. no. 25-7, Exh. 4 ¶ 23; dkt. no. 25-5 at 84:7-10.) He agreed to pick up the Douds. Next, Mr. Doud called the airport parking authority and the airport police. (Dkt. no. 25-7, Exh. 4 ¶ 23.) Although the airport police called a taxi capable of transporting the scooter intact, the Douds chose to ride in Mr. Sharma's standard taxi.[4] (Dkt. no. 25-4 at 59.)

After the Second Incident, Mr. Doud relocated from Reno to Colorado Springs, Colorado. (Dkt. no. 25-7, Exh. 4 ¶ 7.) Mrs. Doud lives primarily in Ontario, Canada. (*Id.*) The Douds assert that they plan to return to Reno regularly because they own property

---

[3] Mr. Parvez testified that he did not know that Mrs. Doud's scooter disassembled, and that he did not recall being told that it disassembled. (Dkt. no. 25-5 at 76:18-22.)

[4] On May 21, 2013, the Douds filed a complaint with the NTA. (Dkt. no. 9 at 9.) The NTA held that Yellow violated NRS § 706.361 by refusing to transport the Douds. (*Id.* at 11.) Yellow appealed this decision. (Dkt. no. 22 at 2-3.)

in Reno, and because they have family and friends in the area. (*Id.*, Exh. 3 ¶ 8.) Upon returning to Reno, the Douds plan to fly into Reno Airport, and they hope to use standard taxis when they arrive. (Dkt. no. 9-2, Exh. 2 ¶ 7, Exh. 3 ¶ 6.) Because Yellow is a primary provider of taxis at Reno Airport, the Douds fear future service refusals when they return to the area. (*Id.*, Exh. 3 ¶¶ 6-7.) These refusals are "humiliating, discouraging, demoralizing, and maddening" for the Douds. (Dkt. no. 25-7, Exh. 3 ¶ 8.)

The Douds seek a preliminary injunction to stop Yellow from refusing them service in the company's standard taxis. (Dkt. no. 9 at 21; dkt. no. 25 at 2.) The Douds ask the Court to require Yellow to "incorporate[] into [its] training that drivers must not prohibit Mrs. Doud from riding in its ordinary taxis." (Dkt. no. 25 at 3.) Through this preliminary injunction, the Douds seek "the equal enjoyment of Yellow Cab's taxi services on the same terms and conditions as any other passenger." (Dkt. no. 9 at 21.)

**III.   LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). When seeking a preliminary injunction, a plaintiff must, "'*by a clear showing*, carr[y] the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (*quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Additionally, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The trial court has discretion in deciding whether to grant a preliminary injunction. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

**IV.   ANALYSIS**

The Douds seek a preliminary injunction that stops Yellow from refusing to transport them. (Dkt. no. 9 at 21.) The Douds contend that Yellow violated Title III of the ADA, which protects individuals with disabilities and individuals associated with them

///

4

from discrimination by private entities offering public transportation, along with other forms of transportation and public accommodation. 42 U.S.C. §§ 12181-12189.

A preliminary injunction is appropriate because the Douds demonstrate that their ADA claims are likely to succeed on the merits, that they will likely suffer irreparable harm unless Yellow's practice of refusing them service is stopped, that the narrow relief they seek will not burden Yellow, and that prohibiting Yellow from refusing to transport them will serve the public interest.

**A.    Standing**

The Douds must have standing to obtain injunctive relief, which requires a showing that they are "under threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent [;] . . . fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011) (*quoting Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)) (internal quotation marks omitted). Under Title III of the ADA, as long as the Douds establish the requisite injury, they will necessarily demonstrate causation and redressability — Yellow's alleged "noncompliance with Title III has caused [the Douds'] injury, and an injunction requiring [Yellow] to comply with the ADA would redress it." *Pickern v. Holiday Quality Foods*, 293 F.3d 1133, 1137 (9th Cir. 2002).

Additionally, because they seek injunctive relief, the Douds must establish a "real and immediate threat of repeated injury" for standing. *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004) (*quoting O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)) (internal quotation marks omitted). The Douds may demonstrate such a threat if they "intend[] to return to a noncompliant place of public accommodation where [they] will likely suffer repeated injury," or, alternatively, if they show that the First and Second Incidents "deter [them] from returning to a noncompliant accommodation." *Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 948, 950 (9th Cir. 2011).

///

By alleging that she was denied service because of her disability, and that she fears future service refusals, Mrs. Doud articulates a concrete and particularized injury. *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1040 (9th Cir. 2008) (holding that plaintiff described a concrete and particularized injury by alleging that he "personally suffered discrimination" prohibited by the ADA). Similarly, by alleging that Yellow refused him service because of his wife's disability, Mr. Doud asserts a concrete and particularized injury. 42 U.S.C. § 12182(b)(1)(E).

The Douds also demonstrate a real and immediate threat of repeated injury because they are likely to suffer future service refusals from Yellow. Yellow twice refused them service because Mrs. Doud travels with a scooter and service dogs. The Douds intend to return to Reno and use Yellow taxis when they visit. (Dkt. no. 25-7, Exh. 5 ¶ 3, Exh. 6 ¶ 3.) Moreover, the Douds point to testimony indicating that the company directs its drivers to call wheelchair-adapted vehicles from its sister company, Reno Sparks, for all customers using motorized scooters. (*See* dkt. no. 25-5 at 98:4-13.) Yellow's "ongoing policy coupled with [the Douds'] past injur[ies] establishes a 'real and immediate threat' of [their] injury occurring again." *Fortyune*, 364 F.3d at 1082. Accordingly, the Douds have standing to seek a preliminary injunction.

### B.    Likelihood of Success on the Merits

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of specified public transportation services." 42 U.S.C. § 12184(a). Title III also includes "various, more specific requirements," including that entities providing public transportation "must make 'reasonable modifications in policies, practices, or procedures, when such modifications are necessary' to provide disabled individuals full and equal enjoyment." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005) (*quoting* 42 U.S.C. § 12182(b)(2)(A)(ii)). An entity, however, need not make modifications that "fundamentally alter the nature of . . . goods, services, facilities, privileges, advantages, or accommodations" it provides. 42 U.S.C. § 12182(b)(2)(A)(ii). Regulations implementing these provisions specify that "[p]rivate entities providing taxi

6

service" discriminate against disabled individuals if they "refus[e] to provide service to individuals with disabilities who can use taxi vehicles." 49 C.F.R. § 37.29. "[A]ny person who is being subjected to discrimination on the basis of disability in violation of [Title III]" may seek an injunction or other preventive relief. 42 U.S.C. §§ 12188(a)(1), 2000a-3(a). These provisions also protect from discrimination individuals associated with a person with disabilities. § 12182(b)(1)(E).

To succeed on their ADA claim within this statutory framework, the Douds must demonstrate that (1) Mrs. Doud is disabled; (2) Mr. Doud is "known to have a relationship or association with" an individual with a "known disability," § 12182(b)(1)(E); (3) Yellow is "a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce," § 12184(a); (4) Yellow "employed a discriminatory policy or practice; [and (5) Yellow] discriminated against the [Douds] based upon [Mrs. Doud's] disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate [Mrs. Doud's] disability." *Fortyune*, 364 F.3d at 1082. The Douds are likely to establish these factors.

Yellow does not dispute that the Douds are protected from discrimination under the ADA.[5] (*See* dkt. no. 22 at 7-10.) Nor does Yellow dispute that it must comply with Title III and its corresponding regulations.[6] (*See id.*) Yellow, however, contends that it offered the Douds a reasonable accommodation by asking them to ride in vehicles
///

---

[5] Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A). Walking is a major life activity. § 12102(2)(A). After losing a leg to cancer, Mrs. Doud requires a battery-operated scooter and two crutches for mobility. (Dkt. no. 25-7, Exh. 3 ¶ 1.) The Douds are thus likely to succeed in establishing that Mrs. Doud has a disability as defined by the ADA and that her husband is associated with a person with a disability.

[6] "Providers of taxi service" must comply with provisions in the ADA and accompanying regulations that apply to "private entities primarily engaged in the business of transporting people which provide demand responsive service." 49 C.F.R. § 37.29(a). Demand responsive services do not operate vehicles "along a prescribed route according to a fixed schedule." § 37.3. Thus, the Douds will likely succeed in claiming that the ADA extends to Yellow. Indeed, Yellow contends that it "acted in accordance with the ADA laws," despite its drivers' repeated refusals to serve the Douds. (Dkt. no, 22 at 7.)

specially equipped for disabled passengers who use motorized scooters. (*Id.* at 7-8.) Yellow misstates the ADA's requirements.

In *Fortyune*, the Ninth Circuit affirmed an injunction requiring the defendant movie theater to modify an internal policy that limited the number of seats available to disabled patrons' companions. 364 F.3d at 1079, 1087. During sold-out showings, the theater allowed any guest to use seats reserved for companions of patrons in wheelchairs, who, according to the policy, had to "share[] the same risk of being unable to sit together." *Id.* at 1079 n. 2. The plaintiff, a quadriplegic, "asked both [the theater] and the district court to ensure that he could be seated next to" a companion, including "tak[ing] steps to remove" any patron who is not a companion and who refuses to vacate a companion seat he or she occupies. *Id.* at 1083. The court concluded that the policy discriminated against the plaintiff because without a companion, he could not enjoy the theater's "goods, services, facilities, privileges, advantages, [and] accommodations." *Id.* at 1082 (*quoting* 42 U.S.C. § 12181(a)) (alteration in original) (internal quotation marks omitted).

The *Fortyune* court further reasoned that the theater's failure to modify its discriminatory policy violated Title III because the modification was necessary, reasonable, and did not "fundamentally alter the theater." *Id.* at 1082-85. First, because the plaintiff "require[d] an attendant to enjoy the viewing of a film," the modification was necessary. *Id.* at 1083. Second, the modification was reasonable because it "require[d] no less and no more of" the theater, which regularly took steps — including "resort[ing] to the proper authorities" — to ensure compliance with local, state, and federal laws, and internal policies. *Id.* at 1083-84. The modification at issue thus posed "neither excessive financial costs nor an extensive administrative burden." *Id.* at 1084. Finally, the modification would have "a negligible effect" on the theater's service provision. *Id.* Only those patrons required to change seats would experience a film differently, which, the court reasoned, was merely a "modest" shift in service. *Id.*

Here, the Douds challenge Yellow's practice of refusing to transport disabled individuals who use motorized scooters in standard taxis when their disassembled

mobility equipment fits in the trunk of a standard taxi. The Douds argue that this practice undermines the dignity of disabled individuals by stripping them of the "full and equal enjoyment" of Yellow's services and is therefore discriminatory. 42 U.S.C. § 12184. The Douds assert that this practice is "humiliating, discouraging, demoralizing, and maddening." (Dkt. no. 25-7, Exh. 3 ¶ 8). They highlight testimony from two Yellow drivers and the company's trainer indicating that Yellow prefers the Douds to ride in wheelchair-adapted vehicles.[7] (*See* dkt. no. 25 at 7-9; dkt. no. 25-5 at 78, 94; dkt. no. 25-6 at 102.) In light of this evidence, the Douds are likely to succeed in demonstrating that Yellow's practice denies them "full and equal enjoyment" of Yellow's service and is discriminatory.

Moreover, the Douds will likely show that the requested modification is necessary. Similar to the plaintiff in *Fortyune*, the Douds cannot enjoy Yellow's taxi services if the company insists that Mrs. Doud — and, by association, Mr. Doud — ride "strapped in [a] car" that accommodates her scooter intact. (Dkt. no. 25-5 at 97:5); *see Fortyune*, 364 F.3d at 1083; *see also Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135-37 (9th Cir. 2012) (concluding that a modification allowing plaintiff to use a Segway in defendant's theme park was necessary, even though plaintiff could access the theme park with discomfort by using a wheelchair or scooter). Because denying the Douds service in a standard taxi subjects them to embarrassment and humiliation, the modification is necessary.

The modification also appears reasonable, such that it will not "impose[] undue financial and administrative burdens" on Yellow. *Fortyune*, 364 F.3d at 1083 (*quoting School Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987)) (internal quotation

---

[7]For example, Mr. Parvez, the driver involved in the First and Second Incidents, testified that his understanding that he could not transport the Douds "come[s] from [his] company." (Dkt. no. 25-5 at 78:17.) Mr. Sharma, another Yellow driver, testified that Yellow refers patrons to Reno Sparks, Yellow's sister company, for wheelchair-adapted vehicles because "they can tie the whole scooter up with the passenger . . . . And you don't have to disassemble anything." (*Id.* at 94:22-25.) Yellow's trainer testified that "all the drivers know that" Yellow refers customers in "scooters or oversized wheelchairs or just electric wheelchairs" to Reno Sparks for a wheelchair-adapted vehicle. (Dkt. no. 25-6 at 102:12-21.)

9

marks omitted). Like the theater in *Fortyune*, Yellow must comply with applicable state and federal disability rights laws. *See, e.g.*, 49 C.F.R. § 37.173 (requiring entities to train personnel to "assist and treat individuals with disabilities . . . in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities"); NRS § 706.361(3). The Douds demonstrate that the requested modification — that is, requiring Yellow to stop refusing them service — will not unduly burden Yellow. Indeed, the Douds' modification poses no more of an administrative or financial burden than Yellow's chosen form of accommodation — requiring all passengers who use a motorized scooter to wait for a wheelchair-adapted vehicle even if the scooter fits in a standard taxi — already creates.

Finally, Yellow has not suggested that the requested modification will "fundamentally alter" the nature of its service. 42 U.S.C. 12182(b)(2)(A)(ii). Contrarily, Yellow asserts that its drivers "frequently assist disabled individuals and those with service animals." (Dkt. no. 22 at 8.) Because, as Yellow stresses, its drivers already accommodate other disabled passengers, the requested modification does not appear to have anything more than a "negligible effect" on Yellow's service. *Fortyune*, 364 F.3d at 1084. Accordingly, the Douds will likely succeed in demonstrating that Yellow discriminated against them by failing to implement a necessary and reasonable modification to its practice.

In response, Yellow points to 42 U.S.C. § 12182(b)(3), which relieves entities from accommodating disabled individuals when a modification would pose "a significant risk to the health or safety to others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." § 12182(b)(3). Yellow "bears a heavy burden" of demonstrating that transporting the Douds would pose such a significant risk to others' health and safety. *Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007). Yellow argues that its drivers would be at risk of injury if they are required to transport Mrs. Doud's disassembled scooter because of its weight. (*See* Dkt. no. 22 at 5, 7.) The Douds, however, do not ask the Court to require

1  Yellow drivers to lift the disassembled scooter; Mr. Doud testified that he can lift each
2  piece without assistance. (Dkt. no. 25-3 at 48:10-12; *see* dkt. no. 25 at 3 ("If a cab driver
3  chooses not to lift the heaviest piece of the scooter, Mr. Doud will do so.").) The Court
4  further notes that the weight of the heaviest disassembled piece is the same as the
5  weight limit that airlines place on standard-size luggage. (*See* dkt. no. 25-7, Exh. 1.)
6  Presumably, Yellow's drivers may occasionally assist passengers with their 50-pound
7  luggage. (*See* dkt. no. 25-5 at 99:1-9.) Thus, Yellow has not met its heavy burden of
8  demonstrating that this preliminary injunction will pose a significant risk to its drivers. *See*
9  *Lockett*, 496 F.3d at 1066. The Douds are therefore likely to succeed on the merits.

### C. Likelihood of Irreparable Harm

"The basis of injunctive relief in the federal courts is irreparable harm and inadequacy of legal remedies." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). Irreparable harm cannot be remedied by monetary damages. *Id.* (*citing Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough.") (alteration in original) (citation and internal quotation marks omitted)). Intangible injuries, however, may constitute irreparable harm. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Irreparable harm must be immediate. *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988). The "possibility of some remote future injury . . . or a conjectural or hypothetical injury" will not suffice. *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (citation and internal quotation marks omitted).

The Douds are likely to suffer irreparable harm in the absence of a preliminary injunction. The First and Second Incidents were "humiliating, discouraging, demoralizing and maddening" for the Douds. (Dkt. no. 25-7, Exh. 3 ¶ 8.) They fear future

///
///

discrimination and further emotional injuries upon returning to Reno.[8] (Dkt. no. 9-2, Exh. 3 ¶¶ 6-7.) The emotional injuries caused by Yellow's discrimination qualify as irreparable — they are not monetarily compensable, nor can they be measured in terms of "time [or] energy necessarily expended." *L.A. Mem'l Coliseum Comm'n*, 634 F.2d at 1202; *see Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709-710 (9th Cir. 1988) (concluding that plaintiff's emotional problems arising from disability discrimination were irreparable); *Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1087 (N.D. Cal. 2013) (separating plaintiff from her service animal was irreparable harm because plaintiff was deprived of her independence).

These harms are also immediate. Although the Douds do not reside in Reno, they intend to return often. (Dkt. no. 25-7, Exs. 5-6.) The Douds allege that "Yellow Cab is a major provider of taxi services in Reno," (*id.*, Exh. 3 ¶ 8), and that they "want to be able to take a taxi from Yellow Cab" from Reno Airport. (*Id.*, Exh. 5 ¶ 3; Exh. 6 ¶ 3.) The Douds also offer uncontested evidence that they own property in Reno, which requires trips to the area "to make repairs and [deal] with business related to the house." (*Id.*, Exh. 3 ¶ 8.) They note that they will return to Reno to visit friends and family, including Mr. Doud's brother. (*Id.*) Similarly, in *Tamara v. El Camino Hospital*, a court in the Northern District of California concluded that the plaintiff would likely suffer irreparable harm because her allegations of deteriorating health indicated that her return to the defendant hospital was probable. 964 F. Supp. 2d at 1087. During an earlier hospitalization, the defendant did not allow the plaintiff's service dog to accompany her, causing the plaintiff to suffer emotional injuries. *Id.* at 1080-81. Although, as here, the plaintiff in *Tamara* did not specify when her next hospitalization would occur, her undisputed allegations regarding her health were sufficient to show a likelihood of

---

[8]Indeed, when the Douds filed the PI Motion in March 2014, they anticipated returning to Reno for an Early Neutral Evaluation meeting on April 16, 2014. (Dkt. no. 9 at 13.) The Douds attended that meeting while the PI Motion was pending. (Dkt. no. 25-7, Exhs. 5-6.) Rather than experience the humiliation of another service refusal by Yellow, the Douds rented a car. (*Id.*)

12

irreparable harm. *Id.* at 1087. Similarly, the Douds' allegations demonstrate a likelihood of returning to Reno and facing discriminatory service refusals from Yellow.

Yellow, however, contends that the Douds are not likely to face discrimination upon their return. (Dkt. no. 22 at 8-9.) Yellow stresses that the First and Second Incidents were isolated, noting that Yellow drivers testified that they often transport individuals with disabilities. (*Id.* at 9-10.) Yellow also points to Mr. Doud's testimony, indicating that, on about six occasions before the First and Second Incidents, the Douds had no trouble taking taxis from Reno Airport. (*See* dkt. no. 25-4 at 53:4-14, 55:11-21.) This argument is unavailing. First, accepting Yellow's argument would undermine its claim of hardship under 42 U.S.C. § 12182(b)(3). If Yellow's drivers regularly transport individuals with disabilities, Yellow's argument that the requested modification would threaten the health and safety of its drivers rings hollow. Second, Yellow ignores evidence suggesting that Yellow makes a practice of requiring individuals in motorized scooters to ride in wheelchair-adapted vehicles, even if the scooter disassembles. (*See* dkt. no. 25-5 at 78, 94; dkt. no. 25-6 at 102.) Finally, Yellow does not rebut that its drivers refused to serve the Douds during the First and Second Incidents, and offers no evidence indicating that future discriminatory refusals will not occur.[9] (*See* dkt. no. 22 at 8-9.) The Douds thus show a likelihood of irreparable harm.

### D. Balance of Equities

A preliminary injunction may issue only if the balance of equities tips in the movant's favor. *Winter*, 555 U.S. at 20. The Court must "balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n*, 634 F.2d at 1203.

///

---

[9] Yellow argues that during the Second Incident, Mr. Parvez noted that he would drive the Douds if they assumed responsibility. (*See* dkt. no. 25-5 at 74:7-21.) The parties dispute this exchange. (*See* dkt. no. 25-4 at 70:24-71:2.) Moreover, Mr. Parvez's offer to drive the Douds only came after he refused to transport them. (*See* dkt. no. 25-5 at 74:7-21.) Even in light of this testimony, the Douds' evidence shows a likelihood of discriminatory service refusals upon their return to Reno.

The balance of equities tips in the Douds' favor. Yellow contends that this preliminary injunction could harm the safety of its drivers by requiring them to lift heavy pieces of Mrs. Doud's disassembled scooter. (Dkt. no. 22 at 7-8.) As defined, the preliminary injunction would not require Yellow drivers to lift the scooter. (*See* dkt. no. 25 at 3.) Therefore, at most, the Douds' requested relief will require Yellow to modify its existing training, which, according to testimony from Yellow's trainer, already includes instruction on serving customers with disabilities. (*See* dkt. no. 25-5 at 96:1-10.) Conversely, the Douds face a likelihood of discriminatory service refusals, humiliation, and embarrassment in the absence of a preliminary injunction. Because the equities tip in the Douds' favor, a preliminary injunction is appropriate.

### E.  Public Interest

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis . . . .'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009) (*quoting Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003)). When a preliminary injunction reaches beyond the parties, a court must "consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009) (*quoting Hybritech, Inc. v. Abbott Labs*, 849 F.2d 1446, 1458 (Fed. Cir. 1988)), *vacated and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204 (2012).

The Douds contend that this preliminary injunction serves the public interest because it requires Yellow to comply with the ADA, which helps curb discrimination against disabled people and those associated with them. (Dkt. no. 9 at 21; dkt. no. 25 at 16-17.) As requested, however, this preliminary injunction extends only to the Douds and Yellow — the Douds request that Yellow stop refusing to transport them, not other customers who use similar mobility devices. (Dkt. no. 25 at 2.) But even narrowly construed, this injunction may affect non-parties by changing Yellow's practices toward

other customers who use scooters that disassemble. By encouraging Yellow to comply with the ADA, non-parties may benefit from this preliminary injunction; Yellow fails to show how this remedy would harm non-parties. (*See* dkt. no. 22 at 9-10 (contending that because Yellow already complies with the ADA, the public interest would not be served by this injunction).) To the contrary, non-parties with similar motorized scooters will be offered the option of traveling in a standard taxi so they may experience the "full and equal enjoyment" of Yellow's services. 42 U.S.C. § 12184. The Douds' requested preliminary injunction thus serves the public interest. Accordingly, this preliminary injunction should issue.

## V.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion or reconsideration as they do not affect the Motion's outcome.

It is ordered that Plaintiffs' Motion for Preliminary Injunction (dkt. no. 9) is granted.

Therefore, it is ordered that, pending the resolution of this case, Yellow must not refuse to transport the Douds on the basis of Mrs. Doud's disability. Yellow must provide the Douds with taxi services on the same terms and conditions as any other passenger. If, however, any portion of Mrs. Doud's disassembled scooter is too heavy to lift, Yellow's drivers need not lift it. Yellow must also incorporate into its existing driver training that the Douds may ride in Yellow's standard taxis.

ENTERED THIS 28th day of August 2014.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE