UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JAMES DOUD and MELODIE DOUD,

                              Plaintiffs,

       v.

YELLOW CAB OF RENO, INC.,

                             Defendants.

3:13-cv-00664-WGC

**ORDER**

Re: Doc. # 21

Before the court is the Motion for Partial Summary Judgment filed by Plaintiffs James Doud and Melodie Doud (the Douds). (Doc. # 21.) Defendant Yellow Cab of Reno, Inc. (Yellow Cab) filed a response (Doc. # 26) and the Douds filed a reply (Doc. # 27). For the reasons set forth below, the motion is granted in part and denied in part.

## I. BACKGROUND

The Douds filed their Complaint on December 4, 2013, asserting claims under Title III of the Americans With Disabilities Act (ADA) (James and Melodie Doud), associational discrimination under Title I of the ADA (James Doud), retaliation under Title I of the ADA (James Doud), as well as a claims under Nevada Revised Statutes sections 706.361, *et. seq.* (Melodie Doud) and 706.366 (Melodie and James Doud), Nevada's statutes regulating motor carriers and pertaining to the rights of persons with service dogs, and a State law claim for tortious failure to furnish facilities (Melodie and James Doud). (Compl., Doc. # 1.)

Specifically, the Complaint alleges that Melodie Doud is an amputee with one leg, is considered disabled for purposes of the ADA, and is married to James Doud. (Doc. # 1 at 2 ¶¶ 5-6.) Her disability requires that she utilize a portable electric scooter and crutch for mobility, and is frequently accompanied by her two service dogs. (*Id*. at 3 ¶ 11.) She avers that the scooter is small and comparatively light; is made up of five individual components; can be disassembled

quickly and easily without tools; and, readily fits into the trunk of any standard passenger vehicle when disassembled. (*Id.*) James Doud alleges that he was a long-term employee (and not independent contractor)[1] of Yellow Cab. (*Id.* ¶ 12.)

The Douds allege that they were denied transportation by two Yellow Cab taxis at the Reno airport on April 9, 2013, and again on May 20, 2013, because of Melodie Doud's disability. They complained to Yellow Cab, but got no response. They claim that Yellow Cab does not train its drivers on complying with laws applicable to those with disabilities. James Doud contends that he was terminated from his employment with Yellow Cab on May 26, 2013, because of his complaints that Yellow Cab refused to transport the Douds on the basis of Melodie Doud's disability. They filed a complaint with the Nevada Transportation Authority (NTA), who issued a citation to Yellow Cab for violation of Nevada Administrative Code (NAC) 706.365 (later amended to reflect a violation of Nevada Revised Statute (NRS) 706.361) and a subsequent citation under NRS 701.366. A hearing was held, and the NTA confirmed that one or more Yellow Cab drivers denied transportation services to a person with a disability in violation of NRS 706.361(1), (4).

The Douds filed a Motion for Preliminary Injunction on March 19, 2014, related to their claim under Title III of the ADA. (Doc. # 9.) On August 28, 2014, United States District Judge Miranda M. Du entered an order granting Plaintiff's motion. (Doc. # 30.) Judge Du ordered that, pending resolution of the case, Yellow Cab must not refuse to transport the Douds on the basis of Mrs. Doud's disability, and must provide the Douds with taxi services on the same terms and conditions as any other passenger; if, however, any portion of Mrs. Doud's scooter is too heavy to lift, Yellow Cab's drivers need not lift it. (*Id.* at 15.) Judge Du also ordered that Yellow Cab incorporate into its existing driver training that the Douds may ride in standard Yellow Cab taxis. (*Id.*) Yellow Cab has appealed this order, but did not request a stay of this proceeding while the

---

[1] James Doud's status within Yellow Cab—whether he was an employee or independent contractor—is the subject of a pending motion for partial summary judgment filed by the Douds. (Doc. # 31.) The court recently had a status conference concerning this motion, and discussed that it was inclined to certify to the Nevada Supreme Court the question of whether Chapter 706 of the Nevada Revised Statutes was intended to supplant the traditional common law criteria for determining independent contractor versus employee status. (*See* Minutes of February 24, 2015 at Doc. # 68.) The parties agreed that the court should defer certifying the question until after the scheduled March 5, 2015 settlement conference.

1    appeal is pending. (*See* Doc. # 36.)

2         The Douds filed the instant motion on May 28, 2014. (Doc. # 21.) The Douds assert that

3    they are entitled to summary judgment as to liability on their First, Fourth and Sixth causes of

4    action, which relate to the denial of service, because there are no material facts in dispute as the

5    NTA already resolved all issues of fact and law in a parallel state administrative proceeding.

6    (*Id.*)[2] They contend that it is established that on April 9, 2013, and May 19, 2013, Yellow Cab

7    taxi driver Mohammed Parvez refused to transport them because of Mrs. Doud's handicap.

8         On November 21, 2014, the parties agreed to enter into the court's Short Trial program.

9    (Doc. # 49.) Judge Du approved the request, and the parties consented to the undersigned being

10   assigned this case for all purposes. (*See* Docs. # 51, # 52, # 53.)

11                                   **II. LEGAL STANDARD**

12        "The purpose of summary judgment is to avoid unnecessary trials when there is no

13   dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

14   F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

15   judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

16   525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

17   (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine

18   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

19   Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at

20   issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

21   250 (1986).

22        A party asserting that a fact cannot be or is genuinely disputed must support the
          assertion by:

23        (A) citing to particular parts of materials in the record, including depositions,
          documents, electronically stored information, affidavits or declarations,

24        stipulations (including those made for purposes of the motion only), admissions,
          interrogatory answers, or other materials; or

25

26   ――――――――――――――――――――

27   [2] The motion requested summary judgment as to the second cause of action, Mr. Doud's associational claim
     related to the termination from his job with Yellow Cab; however, The Douds clarified that this was in error in their

28   reply brief, and acknowledged that Yellow Cab's response presented a genuine dispute of fact as to this claim.
     Therefore, the Douds withdrew the second cause of action for consideration in connection with this motion. (*See*
     Doc. # 27 at 5 n. 3, 15.)

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact

conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id.* Instead, the opposition must go  beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249-50 (citations omitted).

### III. DISCUSSION

**A. Federal Rule of Civil Procedure 56(d)**

Yellow Cab argues that the Douds' motion is premature and that the transcript from the NTA hearing on which the Douds rely is incomplete. (Doc. # 26 at 13.) It asserts that it anticipates the testimony of Frank Street and other witnesses, along with the full testimony of Cathleen Brown and a person most knowledgeable regarding ADA compliance training will be obtained. (*Id.*)

Yellow Cab's counsel, Ms. Bumgarner, provides a declaration stating that additional discovery is needed to refute many of the Douds' claims, including obtaining records from the Douds, obtaining additional information regarding that Yellow Cab offers to independent contractor drivers, information regarding the risk associated with lifting heavy objects from the ground to load into taxis, deposition testimony from the parties and other witnesses, interrogatories, and information regarding the motorized scooter in question. (Doc. # 26-4 at 2.) She states that this discovery is necessary to fully respond to the Douds' motion. (*Id*.)

The Douds respond that this case is unique as a result of the NTA hearing, where all persons with knowledge of the denial of service were present and testified under oath. (Doc. # 27 at 4.) The Douds argue that Yellow Cab fails to point out *what* additional evidence it seeks or *who* the additional witnesses might be. (*Id*.) The Douds maintain that they only seek a determination on claims relating to denial of taxi service. (*Id*.) They assert that Yellow Cab made the same case before the NTA as it does now: arguing that Mr. Parvez did not deny service; that instead, he offered a reasonable accommodation in attempting to get the Douds transported in a wheelchair accessible van.(*Id*. at 5-6.) Therefore, the Douds assert the issue is ready for adjudication before this court. (*Id*. at 6.)

> Under Federal Rule of Civil Procedure 56(d):
> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The party seeking a Rule 56(d) continuance bears the burden of proffering facts sufficient to satisfy the requirements of 56(d). *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th Cir. 1996). In ruling on a motion pursuant to Rule 56(d), courts have considered: whether the movant had sufficient opportunity to conduct discovery, *see Qualls By and Through Qualls v. Blue Cross of Calif., Inc.,* 22 F.3d 839, 844 (9th Cir. 1994); whether the movant was diligent, *see Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1005 (9th Cir. 2002); whether the information sought is based on mere speculation, *see Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436-37 (9th Cir. 1995); and whether allowing additional discovery would preclude summary judgment, *see Michelman v. Lincoln Nat. Life Ins. Co.*, 685 F.3d 887,

1   892 (9th Cir. 2012). There is no bright-line rule based on the timing of the summary judgment

2   motion. *See, e.g., Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of the Ft. Peck*

3   *Reservation*, 323 F.3d 767, 773 (9th Cir. 2003).

4        The stipulated joint discovery plan and scheduling order in this action was issued on

5   May 13, 2014. (Doc. # 18.) The parties were to exchange initial disclosures on or before June 23,

6   2014, and discovery was to be completed by November 12, 2014. (*Id.*) While this motion was

7   filed shortly after the entry of the stipulated discovery plan and scheduling order, on May 28,

8   2013, the Douds are correct that this case is unique in that there was a prior administrative

9   hearing where all of the key witnesses (including the Douds, Mr. Parvez, Mr. Sharma, and Ms.

10  Brown) testified and were cross-examined under oath. Ms. Bumgarner represented Yellow Cab

11  in that proceeding and Mr. Street was present, though Yellow Cab declined to present his

12  testimony.

13       Ms. Bumgarner asserts that Yellow Cab would like to conduct discovery regarding

14  certain generalized categories, she does not specifically describe how these generalized topics of

15  discovery are necessary to respond to the Douds' motion. First, she states that she would like to

16  obtain records from the Douds; however, she does not state what records she seeks to obtain or

17  how they would assist in opposing the Douds' motion. From the court's review of the facts of this

18  matter, this case does not hinge on any documentary evidence; instead, it is dependent on the

19  testimony of the percipient witnesses.

20       Next, Ms. Bumgarner asserts that she wants to obtain additional information regarding

21  Yellow Cab offers to independent contractors; however, she does not state how this is relevant to

22  this motion. She has access to the form lease agreement used by Yellow Cab for its drivers.

23  Moreover, this motion is about the denial of service. While Yellow Cab argues it is absolved of

24  liability because the driver who allegedly refused service was an independent contractor, this is

25  contrary to established legal authority, as will be discussed *infra*.

26       Ms. Bumgarner wishes to gather information regarding the risk associated with lifting

27  heavy objects from the ground into a taxi, but the Douds make clear they do not seek assistance

28  in lifting the scooter or its component parts. The weight of the scooter is not a material fact,

1   because the Douds have confirmed they simply want an order that Yellow Cab transport

2   Mrs. Doud in an ordinary taxi, and Mr. Doud will take care of disassembling and loading the

3   scooter if Yellow Cab's drivers do not wish to offer their assistance.

4          Counsel contends that she must obtain deposition testimony from the parties and other

5   witnesses as well as propound interrogatories, but she does not specify what information she

6   would elicit from these witnesses or explain why it is necessary to oppose the Douds' motion.

7   The three witnesses identified by Yellow Cab (Mr. Street, Ms. Brown, and a person most

8   knowledgeable regarding ADA compliance) as persons on whom it would rely for evidence to

9   support its opposition to the Douds' motion are persons within its organization and under its

10  control. Yellow Cab provided a declaration on behalf of Mr. Street in support of its response to

11  the Doud's motion, but does not explain why the other persons referenced (Ms. Brown, and a

12  person most knowledgeable at Yellow Cab regarding ADA compliance training) did not simply

13  provide declarations under penalty of perjury in support of Yellow Cab's opposition to the

14  Douds' motion. As far as the Douds are concerned, Ms. Bumgarner had an opportunity to cross-

15  examine them at the NTA hearing. With respect to the Yellow Cab personnel identified, she

16  could have presented evidence in the form of declaration, as she did for Mr. Street.

17         Finally, Ms. Bumgarner does not state what additional information she needs regarding

18  this scooter. Both parties have provided specifications for the scooter. She was provided with

19  photographs of the scooter and its disassembly in connection with the NTA hearing.

20  Furthermore, the Douds and Mr. Sharma were questioned about the ease of disassembly and

21  loading the scooter at the NTA hearing.

22         She further states that while she was counsel for Yellow Cab at the NTA hearing, because

23  of its nature she did not focus on developing certain factual issues such as the training of drivers.

24  (*Id*.)  Her client is the source of information on this topic; therefore, there is no need to delay this

25  matter further to conduct any discovery on the issue of driver training.

26         For these reasons, Yellow Cab's request to delay ruling on this motion under Rule 56(d)

27  is denied.

28  ///

**B. First Cause of Action**

In the first cause of action, the Douds assert that Yellow Cab violated Title III of the ADA when it discriminated against them on the basis of Mrs. Doud's disability by denying them full and equal enjoyment of their taxi services. (Doc. # 1 at 13-15.)

**1. Facts**

The record reveals the following facts which the court will view in the light most favorable to Yellow Cab, the nonmoving party, in analyzing the Douds' motion:

Melodie Doud is an amputee, considered disabled under the ADA. She uses a mobility device, namely, a Revo portable battery powered scooter which disassembles into five pieces, the heaviest of which is approximately fifty pounds. (Douds' Scooter specs., Doc. # 21-2 at 2-3; Melodie Doud Decl., Doc. # 21-2 at 2 ¶¶ 1-2; Yellow Cab's Scooter specs., Doc. # 26-3 at 3[3].)

On April 9, 2013, the Douds returned to Reno from a trip and exited the Reno airport with their baggage and went to obtain a taxi cab to go home. (Melodie Doud Decl., Doc. # 21-2 at 4 ¶ 9; James Doud Decl., Doc. # 21-2 at 11 ¶ 8; James Doud NTA testimony, Doc. # 21-4 at 7:20-24.)[4] They approached the first taxi in the taxi line, a Yellow Cab taxi, which they subsequently learned was driven by Mohammed Parvez. (Melodie Doud Decl., Doc. # 21-2 at 4 ¶ 9; James Doud Decl., Doc. # 21-2 at 11 ¶ 8.) According to Mrs. Doud, the driver made it clear he would not transport them because she was disabled. (Melodie Doud Decl., Doc. # 21-2 at 4 ¶ 9.) The driver said he was not licensed to take the handicapped. (James Doud Decl., Doc. # 21-2 at 11 ¶ 8; James Doud NTA testimony, Doc. # 21-4 at 7:20-24.) On cross-examination at the NTA hearing, Mr. Doud confirmed that they only conversation he had with the driver of the first taxi on April 9, included the driver saying that he needed a special permit to take handicap

---

[3] Yellow Cab asserts that there is a dispute as to the weight of the component parts. The specifications provided by the Douds for her scooter indicate that the heaviest component part is 50 pounds. (Doc. # 21-1 at 2.) Yellow Cab also submitted scooter specifications to the court which state that the heaviest piece when disassembled is 51.5 pounds. (Doc. # 26-3 at 3.) In their reply, the Douds assert that the specifications provided by Yellow Cab are not for Mrs. Douds' particular model of scooter. The heaviest component part under either set of specifications is between 50 and 51.5 pounds, which is not a significant enough difference to create a genuine dispute of material fact as to the weight of the heaviest component part. Nor is this fact even material considering that the Douds are not requesting that any Yellow Cab driver lift any component of the scooter.

[4] All citations to the testimony will refer to the docketed page number (not the transcript's original page number), and then the specific line numbers of the testimony to which the court is referring.

1    people. (James Doud NTA testimony, Doc. # 21-4 at 17:12-16.)

2          They approached a second taxi, also a Yellow Cab, and the second driver also refused

3    them. (Melodie Doud Decl., Doc. # 21-2 at 4 ¶ 11; James Doud Decl., Doc. # 21-2 at 11 ¶ 10.)

4    The driver said he would not accept Mrs. Doud's service dogs because he thought they were dirty

5    and it was against his religion.[5] (Melodie Doud Decl., Doc. # 21-2 at 4 ¶ 11; James Doud Decl.,

6    Doc. # 21-2 at 11 ¶ 10.) Mr. Doud then approached a third taxi, a Whittlesea taxi, and that driver

7    also waved the Douds off. (Melodie Doud Decl., Doc. # 21-2 at 4 ¶ 13; James Doud Decl., Doc.

8    # 21-2 at 12 ¶ 12.) They were eventually able to get a ride home from another taxi. (Melodie

9    Doud Decl., Doc. # 21-2 at 4 ¶ 13; James Doud Decl., Doc. # 21-2 at 12 ¶ 12.) They assert that

10   the whole event took them approximately forty-five minutes, and they felt humiliated. (Melodie

11   Doud Decl., Doc. # 21-2 at 4-5 ¶ 11; James Doud Decl., Doc. # 21-2 at 12 ¶ 13.)

12         Mr. Parvez testified at the NTA hearing regarding the April 9, 2013 incident, and said

13   that he told the Douds that he just had a regular van that was not equipped for the handicap

14   scooter, and the Douds called the company and Mr. Mukesh Sharma came and took care of the

15   situation. (Parvez NTA testimony, Doc. # 21-5 at 23:21-25, 24:1-3.)

16         Mr. Sharma also testified at the NTA hearing. (Sharma NTA testimony, Doc. # 26-2 at 4-

17   15.) He worked at Yellow Cab as a driver and "road supervisor." (Sharma NTA testimony,

18   Doc. # 26-2 at 4:4-8.) As a "road supervisor" he handles all customer complaints and customer

19   relations for Yellow Cab. (*Id.* at 4:8-10.) He testified that he was not present for the first incident

20   and only talked to Mr. Doud on the telephone about it. (*Id.* at 4:20-25, 5:1.) He told Mr. Doud he

21   would talk to the driver about why he refused them service as he did not know all of the facts.

22   (*Id.* at 5:1-3.) Mr. Sharma testified that he talked to the driver following the incident and the

23   driver told him: "you know, what had happened, you know, meeting his wife on the scooter.

24   That's why (inaudible) take her in his cab." (*Id.* at 5:6-9.) He later testified: "The first incident I

25   understand. Okay, fine. Driver refused it. Okay. I give him the number. Call me. He doesn't call

26   me, you know." (*Id.* at 9:9-12.)

27         Mr. Sharma arrived to pick the Douds up in a Toyota Sienna Van, similar to Mr. Parvez's

28   _____

     [5] This alleged denial of service is not the subject of this motion.

vehicle. (*Id*. at 13:11-15.)

The Douds assert that the next day they went to Yellow Cab's office to confirm whether Frank Street had been made aware of the refusal of service. (Melodie Doud Decl., Doc. # 21-2 at 5; James Doud Decl., Doc. # 21-2 at 12 ¶ 14.) Frank Street was the son of Yellow Cab's owner Roy Street, and general manager of day-to-day operations. (*Id*.) Mrs. Doud asked Mr. Street whether he had heard about the incident the prior evening, and he said he had not, and she told him she was refused service by a Yellow Cab taxi. (Melodie Doud Decl., Doc. # 21-2 at 5 ¶ 16; James Doud Decl., Doc. # 21-2 at 12 ¶ 15.).) Mr. Street recalls the Douds arriving to his office unannounced, but he was leaving the office for a scheduled appointment and informed them he did not have time to discuss matters with them in detail at that time. (Street Decl., Doc. # 26-1 at 2 ¶ 2.) He asserts that he did inform the Douds that the alleged denial would be looked into. (*Id*.)

That same day Mr. Doud asserts that he contacted Yellow Cab's "road manager," Mukesh Sharma, and advised him of the incident. (Melodie Doud Decl., Doc. # 21-2 at 5 ¶ 17; James Doud Decl., Doc. # 21-2 at 12-13 ¶ 16.) Mr. Sharma said he would look into it. (*Id*.)

Mr. Sharma testified that he spoke to Mr. Doud and provided him with his number, and told him to tell let him know the next time they would be traveling and he would be able to pick them up at the airport. (Sharma NTA testimony, Doc. # 26-2 at 5:10-18.)

On May 19, 2013, the Douds again arrived at the Reno airport and exited with their baggage to obtain a taxi cab to take them home. (Melodie Doud Decl., Doc. # 21-2 at 5-6 ¶ 19; James Doud Decl., Doc. # 21-2 at 13 ¶ 18; James Doud NTA testimony, Doc. # 21-4 at 10:1-4; Melodie Doud NTA testimony, Doc. # 21-5 at 7: 24-25, 8:1.) On this occasion, the Douds contend that when they approached the taxi line, Mr. Parvez's taxi stopped several feet from where they were standing, and when a second cab approached behind him, he was forced to move forward, but did not stop directly in front of the Douds, and instead drove a few feet past them. (Melodie Doud Decl., Doc. # 21-2 at 6 ¶ 20; James Doud Decl., Doc. # 21-2 at 13 ¶ 19; James Doud NTA testimony, Doc. # 21-4 at 10:4-6; Melodie Doud NTA testimony, Doc. # 21-5 at 8:1-10.) Mr. Doud approached Mr. Parvez and asked whether he was going to help them into the taxi, and Mr. Parvez said no, that he did not take handicapped passengers and they would

have to call for a special handicapped vehicle. (Melodie Doud Decl., Doc. # 21-2 at 6 ¶ 21; James Doud Decl., Doc. # 21-2 at 13 ¶ 20; James Doud NTA testimony, Doc. # 21-4 at 10:6-8; Melodie Doud NTA testimony, Doc. # 21-5 at 8:10-12.) Mrs. Doud wheeled her scooter into the street and asked Mr. Parvez if he was refusing to transport them, and he responded that he was because it was against the law to take handicapped people; he needed a special permit to transport them; he did not have a handicapped vehicle; and her scooter would not fit in his vehicle. (Melodie Doud Decl., Doc. # 21-2 at 6 ¶ 22; James Doud Decl., Doc. # 21-2 at 14 ¶ 21; Melodie Doud NTA testimony, Doc. # 21-5 at 8:13-24, 9:18-22, 1(:17-24.) Mrs. Doud maintains that she told Mr. Parvez that she had the same vehicle as he was driving, a Toyota Sienna, and the scooter easily fit into her vehicle. (Melodie Doud Decl., Doc. # 21-2 at 6 ¶ 22; James Doud Decl., Doc. # 21-2 at 14 ¶ 22; Melodie Doud NTA testimony, Doc. # 21-5 at 10:1-3, 20:4-7.) She also contends she advised him that Mr. Doud could easily disassemble the scooter and put it in the taxi, but Mr. Parvez responded that he did not have a license to take handicapped people, and that they needed a special cab. (*Id*.)

Mr. Parvez testified at the NTA hearing that he encountered the Douds on May 19, 2013, and first told them: "my car is just a regular van. It's not equipped for the handicap scooter" and that it would be "against the law" to transport them because his "car is not equipped for the handicap scooter." (Parvez NTA testimony, Doc. # 21-5 at 23:21-25, 24:4-9.) Mr. Parvez claims that the Douds then  began yelling at him and threatened to sue him, and he told them: "I'm not refusing you. I'm just telling you it's against the law. But if you want to go with me, it's your responsibility, not my responsibility." (Parvez NTA testimony, Doc. # 21-5 at 24:9-16.) He testified that when he said "it's your responsibility" what he meant was that the scooter was too heavy, and he had been concerned about the weight of the scooter. (*Id*. at 24:22-23, 25:1-3; 25:7-9, Doc. # 21-6 at 2:12-14.) He testified he was not aware the scooter came apart, and did not recall being told that it did by Mrs. Doud. (*Id*. at 2:18-21.)

Mrs. Doud disputes that Mr. Parvez offered to transport them if they took responsibility to load the scooter. (Melodie Doud NTA testimony, Doc. # 21-5 at 20:24-25, 21:1-2.)

On cross-examination at the NTA hearing, Mr. Parvez testified that when he said it was

against the law for him to take the Douds, he meant that his car was not equipped for the scooter, and he did not have a license for that. (Parvez NTA testimony, Doc. # 21-6 at 4:9-14.) He testified that he got the idea that he needed to have a special license to transport scooters "from [his] company." (*Id*. at 4:15-17.) He also testified that in training he was told that when a disabled person presents with a scooter, the driver is to call dispatch and request a handicap vehicle. (*Id*. at 5:20-24, 6:1-3, 7:13-17.)

Mr. Doud contacted Mr. Sharma and advised him that they had been refused service again, and Mr. Sharma promised to come and pick them up himself. (Melodie Doud Decl., Doc. # 21-2 at 7 ¶ 23; James Doud Decl., Doc. # 21-2 at 14 ¶ 23; James Doud NTA testimony, Doc. # 21-4 at 12:1-3; Sharma NTA testimony, Doc. # 26-2 at 6:4-9.) Mr. Sharma arrived and the scooter was disassembled and loaded into the taxi and took them home. (Melodie Doud Decl., Doc. # 21-2 at 7 ¶ 24; James Doud Decl., Doc. # 21-2 at 14 ¶ 24; James Doud NTA testimony, Doc. # 21-4 at 12:17-20; Melodie Doud NTA testimony, Doc. # 21-5 at 10:15-16; Sharma NTA testimony, Doc. # 26-2 at 6:10-23.)

According to Mr. Sharma, when he arrived at the main terminal, he saw Mr. Doud and his luggage, and Mrs. Doud had already gone to the parking office. (Sharma NTA testimony, Doc. # 26-2 at 6:14-18.) He loaded Mr. Doud and took him over to where his wife was, and there was already a Reno Sparks cab there. (*Id*. at 6:18-20.) He testified that he told Mr. Doud: "Why don't you take the, you know, handicap van when we can load the whole scooter with his wife on it, you know, on the ramp." (*Id*. at 6:20-22.) Mr. Doud refused and said he wanted to go with a Yellow Cab. (*Id*. at 6:22-23.) Mr. Sharma testified that Mr. Doud took the scooter apart, and helped him loaded it into the trunk of the taxi. (*Id*. at 7:1-4.) He testified that the airport supervisor commented that it was hard lifting the motor component up because it weighed more than fifty to sixty pounds. (*Id*. at 7:7-13.) Mr. Sharma stated: "I think picking it from the flat floor, it'd be really hard for a regular person, you know, (inaudible) it would hurt your back. (*Id*. at 7:13-15.) Mr. Sharma loaded that component with the airport authority supervisor. (*Id*. at 7:16-23.)

Mr. Doud asserts that he complained to Mr. Sharma regarding the incidents, and gave

him a copy of the incident report he had filled out at the airport. (James Doud Decl., Doc. # 21-2 at 15 ¶ 25.) Mr. Sharma testified that he asked Mr. Doud: "why do you keep resisting on taking a Yellow Cab, when he is working for Yellow Cab and he knows, you know, we are not able to, you know, we don't equip the Yellow Cab with a handicap, you know, the scooters, you know, because that's why we have Reno Sparks." (Sharma NTA testimony, Doc. # 26-2 at 8:11-16.) Mr. Doud responded that he wanted to give his business to Yellow Cab because he worked for them. (*Id*. at 8:16-19.) Mr. Sharma later testified that if Plaintiff would have just called him he could have avoided the incident. (*Id*. at 9: 9-17.) Mr. Doud did not call Mr. Sharma, and then the same driver (Mr. Parvez) was at the airport. (*Id*. at 9:15-18.) When they arrived at the Douds' destination, Mr. Sharma testified that both he and Mr. Doud unloaded the scooter. (*Id*. at 11:1-3.) They took the main part (the motor) out together, but the rest of the parts were easy to carry. (*Id*. at 11:4-7.) Mr. Sharma also testified that he would have been able to lift the motor from the ground into his van on his own, but he thought "to some extent it would damage your back." (*Id*. at 11:14-17.)

Mr. Sharma then testified that it is his understanding that when Yellow Cab needs a wheelchair accessible van, they call a Reno Sparks Cab handicap van. (*Id*. at 10:13-16.) He stated that as a driver he had loaded people with disabilities. (*Id*. at 12:9-11.)

On May 21, 2013, the Douds filed a complaint with the NTA. (James Doud NTA testimony, Doc. # 21-4 at 13:19-25.) On June 17, 2013, Yellow Cab was issued a citation for refusal of service under Nevada Administrative Code (NAC) 706.365 (amended to reflect a violation of NAC 706.361), stating that Yellow Cab's driver refused to provide transportation on two occasions. (Doc. # 21-2 at 18; Doc. # 21-3 at 9.)[6] A hearing was held before the NTA on September 5, 2013. (*See* Doc. # 21-3.) Yellow Cab was represented at the hearing by Ms. Bumgarner. (*Id*. at 3.) Testimony was given on behalf of Yellow Cab by Mr. Parvez, Mr. Sharma, and Cathleen Brown (Yellow Cab's driver manager and trainer). (*Id*. at 4.) Frank

_____

[6] A second citation was also issued under NAC 706.366 related to a denial of transportation because of the service animals, but the NTA did not find sufficient evidence to support a refusal of service predicated on the presence of a service animal. (*See* Doc. # 21-3 at 11-13; Doc. # 21-8 at 5.) While the alleged service animal refusal is mentioned in the Douds' Complaint in this proceeding, it is not the subject of this motion.

1    Street, Yellow Cab's general manager, was also present at the hearing on behalf of Yellow Cab,

2    but did not testify. (Id. at 7.) James and Melodie Doud testified on behalf of the State, along with

3    supervisory investigator Reasoner. (*Id*. at 4.)

4        Mr. Doud testified at the NTA hearing that in his fourteen years of working for Yellow

5    Cab he had never had training regarding how to handle transporting individuals with disabilities.

6    (James Doud NTA testimony, Doc. # 21-4 at 14:12-20.)

7        On cross-examination at the NTA hearing, Mr. Doud was asked if he was aware that the

8    Street family also owned Reno Sparks Cab. (James Doud NTA testimony, Doc. # 21-4 at 17:17-

9    19.) He also testified that he was aware that Reno Sparks Cab has "handicap vehicles." (*Id*. at

10   17:20-22.)

11       Yellow Cab's driver manager and trainer, Cathleen Brown, also testified at the NTA

12   hearing. (Brown NTA testimony, Doc. # 21-6 at 10:8-22.) She testified that she provides training

13   regarding people with disabilities. (*Id*. at 11:1-3.) She indicated that Reno Sparks Cab has five

14   handicap vans that are modified to handle wheelchairs, and electric powered wheelchairs so that

15   the client is actually strapped in the car. (*Id*. at 12:3-5.) Those cars are dedicated to handling all

16   sorts of disabilities. (*Id*. at 12:23-25.)

17       Ms. Brown was asked about training and the practice of Yellow Cab "when [a driver]

18   experience[es] someone that has -- needs equipment or whatever lifted that can't be done by a

19   person (inaudible) by a driver" and she responded:

20       They are to call our sister company to pick up (inaudible) transport a wheelchair
         or if they can do it, I mean if they have a folding wheelchair then, by all means,
         they can transport the person. But if it is a motorized vehicle or a powered
21       wheelchair, I feel more confident with a driver that knows how to handle these
         things. And if something was to happen that this driver knows what to do and
22       knows how to drop the client properly.

23   (*Id*. at 13:4-15.) She further testified that their drivers are trained that if they are asked to lift

24   something that they think is going to cause injury, they can refuse to lift the object. (*Id*. at 13:24-

25   25, 14:1-13.) She later testified that she instructs drivers on obligations to assist a person with a

26   disability to store a mobility device, but stated: "[i]f it's too heavy, I do not want them to do that."

27   (Doc. # 21-7 at 6:18-21.) She confirmed she trains drivers to assist people with storing mobility

28   devices if they can lift them. (*Id*. at 8:3-11.)

1    Ms. Brown confirmed that it is Yellow Cab's policy when they need a handicap

2    accessible van to contact Reno Sparks cab and "all the drivers know that." (Brown NTA

3    testimony, Doc. # 21-7 at 3:9-17.)

4    Mr. Sharma testified that he received training at Yellow Cab regarding how to handle

5    individuals with disabilities at the beginning of his tenure with Yellow Cab (fourteen years

6    prior). (Sharma NTA testimony, Doc. # 26-2 at 13:19-23.) When he was asked how handicapped

7    people are handled, he stated that if a passenger has a "folding chair" then it folds in and is put in

8    the trunk. (Sharma NTA testimony, Doc. # 26-2 at 14:14-17.) With respect to a scooter, he

9    testified:

10       Coming across the scooter, okay, it's not you're refusing the service to them, you
         know, but it's not easy to, you know, put everything -- disassemble it and put it in
         the trunk. And I don't think it's safe for the passenger either, because they are on
11       the scooter for a reason, you know. And that's why we have the vans to do so, you
         know, where they can tie the whole scooter up with the passenger in the back, you
12       know. And you don't have to disassemble anything and --

13   (*Id.* at 14:17-25.)

14   The NTA rendered its findings of fact and conclusions of law on October 23, 2013. (Doc.

15   # 21-8 at 2-7.) The NTA specifically found that Mr. Doud credibly testified that on April 9,

16   2013, a Yellow cab driver refused to transport the Douds, stating that he needed a special

17   handicap permit to transport them. (*Id.* at 3 ¶ 6.) The NTA also found that Mr. Doud credibly

18   testified that on May 19, 2013, a Yellow Cab driver again refused to transport the Douds, and

19   that Mrs. Doud's motorized scooter breaks into components that fit into standard passenger

20   vehicles such as the Yellow Cab at issue. (*Id.* at 4 ¶ 7.) The NTA found that Mr. Parvez credibly

21   testified that he was involved in both the April 9 and May 19 incidents as a driver for Yellow

22   Cab and that he refused service to the Douds because he could not load the cab due to his lack of

23   special equipment to accommodate a mobility scooter. (*Id.* ¶ 8.)

24   The NTA concluded that on both April 9 and May 19, 2013, one or more Yellow Cab

25   drivers denied transportation services to a person with a disability in violation of Nevada Revised

26   Statute 706.361, and pursuant to Nevada Revised Statute 706.473(3), Yellow Cab is jointly and

27   severally liable for the violation committed by its driver/lessee. (*Id.* at 4-5.) Yellow Cab was

28   fined $1500, with half of the fine suspended pending no further violations related to refusal of

1   service within two years and timely payment of the fine. (*Id.* at 6.)

2       Yellow Cab filed a petition requesting judicial review of the NTA's decision. (Doc. # 21-

3   1 at 5.) According to the Second Judicial District Court's online docket information, the petition

4   was denied on September 2, 2014. It does not appear the matter was appealed further to the

5   Nevada Supreme Court.

6       In his declaration filed in support of Yellow Cab's response to the Douds' motion,

7   Mr. Street states: Yellow Cab has a policy of encouraging all drivers to assist all passengers in

8   loading their luggage, within the constraints of safety for individual drivers, and it has a policy of

9   following all laws applicable to it by the State of Nevada. (Street Decl., Doc. # 26-1 at 3 ¶¶ 12-

10  13.) He asserts that Yellow Cab's fleet consists of approximately thirty-eight vehicles, while its

11  sister company, Reno Sparks Cab, has a fleet of approximately ninety vehicles and eight

12  handicapped vans. (*Id.* ¶¶ 14-15.)

13      **2. The ADA**

14      "Congress enacted the ADA in 1990 to remedy widespread discrimination against

15  disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). "The Act responds to

16  what Congress described as a 'compelling need' for a 'clear and comprehensive national

17  mandate' to eliminate discrimination against disabled individuals." *Fortyune v. American Multi-

18  Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004) (quoting *PGA Tour*, 532 U.S. at 675). "To

19  effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in

20  major areas of public life, among them employment (Title I of the Act), public services (Title II),

21  and public accommodations (Title III)." *Id.* (internal quotation marks omitted).

22      Title III of the ADA protects individuals with disabilities and individuals associated with

23  them from discrimination by private entities offering public transportation, along with other

24  forms of transportation and public accommodation. 42 U.S.C. § 12181-12189. More specifically,

25  Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal

26  enjoyment of specified public transportation services provided by a private entity that is

27  primarily engaged in the business of transporting people and whose operations affect

28  commerce." 42 U.S.C. § 12184(a). Title III also includes "various, more specific requirements,"

1   including that entities providing public transportation "must make 'reasonable modifications in

2   policies, practices, or procedures, when such modifications are necessary' to provide disabled

3   individuals full and equal enjoyment." *Spector v. Norweigan Cruise Line Ltd.*, 545 U.S. 119, 128

4   (2005) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)). An entity, however, need not make

5   modifications that "fundamentally alter the nature of … goods, services, facilities, privileges,

6   advantages, or accommodations" it provides. 42 U.S.C. § 12182(b)(2)(A)(ii).

7       "Congress entrusted the Attorney General with the responsibility of promulgating Title

8   III's implementing regulations." *Fortyune*, 364 F.3d at 1079 (citing 42 U.S.C. § 12186(b).)

9   Insofar as this case is concerned, the implementing regulations specify that "[p]rivate entities

10  providing taxi service" discriminate against disabled individuals if they "refus[e] to provide

11  service to individuals with disabilities who can use taxi vehicles." 49 C.F.R. § 37.29. "[A]ny

12  person who is being subjected to discrimination on the basis of disability in violation of [Title

13  III]" may seek an injunction or other preventive relief. 42 U.S.C. § 12188(a)(1), 2000a-3(a). As

14  noted above, Title III also protects individuals associated with a person with a disability or

15  disabilities from discrimination. 42 U.S.C. § 12182(b)(1)(E).

16      In granting the Douds' motion for preliminary injunction, District Judge Du determined

17  that the Douds have standing to bring this action, *i.e.*, that they suffered an injury in fact, that it is

18  traceable to the challenged action of Yellow Cab, that it can be redressed by a favorable decision,

19  and there is a likelihood that they will be again wronged in a similar way. *(See* Doc. # 30 at 5-6;

20  *see also* standing requirement in *Fortyune*, 364 F.3d at 1081 (citations omitted).)

21      Having met this prerequisite, in order to succeed on their ADA claim within this statutory

22  framework, the Douds must demonstrate: (1) Mrs. Doud is disabled; (2) Mr. Doud is "known to

23  have a relationship or association with" an individual with a "known disability" (42 U.S.C.

24  § 12182(b)(1)(E)); (3) Yellow Cab is a "private entity that is primarily engaged in the business of

25  transporting people and whose operations affect commerce" (42 U.S.C. § 12184(a)); (4) Yellow

26  Cab "employed a discriminatory policy or practice; and (5) Yellow Cab discriminated against the

27  Douds based on Mrs. Doud's disability by (a) failing to make a requested reasonable

28  modification that was (b) necessary to accommodate Mrs. Doud's disability. *Fortyune v.*

1  *American Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004) (citing *PGA Tour*, 532 U.S.

2  683 n 38; *Dudley v. Hannaford Bros Co.*, 333 F.3d 299, 307 (1st Cir. 2003); *Amir v. St. Louis*

3  *Univ.*, 184 F.3d 1017, 1027 (8th Cir. 1999); 42 U.S.C. §§ 12182(a) and (b)(2)(A)(ii)). If they

4  make this showing, Yellow Cab "must make the requested modification unless it proves that

5  doing so would alter the fundamental nature of its business." *Id.* (citing *PGA Tour*, 532 U.S. at

6  683, n. 38).

7      Here it is undisputed that Mrs. Doud is disabled, that Mr. Doud has a relationship or

8  association with her, and that Yellow Cab is a private entity primarily engaged in the business of

9  transporting people and its operations affect commerce. Thus, the court must determine whether

10  the record shows that Yellow Cab employed a discriminatory policy or practice and

11  discriminated against the Douds on the basis of Mrs. Doud's disability.

12      Thr court finds that Yellow Cab employed a discriminatory policy or practice that denied

13  the Douds full and equal enjoyment of Yellow Cabs service, *i.e.*, requiring disabled individuals

14  who utilize motorized scooters ride in special wheelchair accessible vans when their

15  disassembled motorized scooter fits into the trunk of a standard taxi.

16      There is no dispute that on April 9, 2013, Yellow Cab driver Mr. Parvez refused to

17  transport the Douds. Mrs. Doud testified at the NTA hearing that he told them he was not

18  licensed to take the handicapped. Mr. Doud testified that Mr. Parvez told them he needed a

19  special permit to take a handicapped person. Mr. Parvez himself testified that he told the Douds

20  on that occasion that he had a regular van and was not equipped for the handicapped scooter.

21      With respect to the May 19, 2013 incident, Mr. Doud testified that Mr. Parvez said he

22  would not help them into the taxi, that he did not take handicapped passengers, and they would

23  have to call a special handicapped vehicle. Mrs. Doud testified that she then wheeled out to ask

24  Mr. Parvez if he was refusing to transport them, and he said he was, that it was against the law

25  for him to take a handicap person, that he needed a special permit to transport them, that he did

26  not have a handicap vehicle, and that her scooter would not fit in his vehicle. She told him she

27  had the same vehicle as his taxi, and that Mr. Doud could easily disassemble it and it would fit

28  into the trunk of the vehicle. He still stated that he did not have a license to take handicapped

1    people, and that they needed a special taxi.

2        Mr. Parvez testified that on this occasion, he first told the Douds again that he had a

3    regular van and was not equipped for the scooter, and that it was against the law for him to

4    transport the handicap scooter. He then said that the Douds started to yell at him and he said:

5    "I'm not refusing you. I'm just telling you against the law. But if you want to go with me, it's

6    your responsibility, not my responsibility." He later testified that what he meant by that was that

7    the scooter was too heavy, and he was concerned about its weight. He also testified that he was

8    not aware the scooter came apart.

9        Yellow Cab argues that Mr. Parvez's testimony demonstrates a genuine dispute of

10   material fact as to whether there was a refusal of service in violation of the ADA. While counsel

11   argues that Mr. Parvez told the Douds that he would take them if they took responsibility for

12   putting the scooter in the taxi, that is not what he testified to telling them. After telling them

13   several times that it was illegal and that they needed a special cab, he said "but if you want to go

14   with me, it's your responsibility, not my responsibility." He did not testify that he offered to

15   transport them if they placed the scooter in the vehicle. Even if he did say this, it is undisputed

16   that the Douds had to contact Mr. Sharma to transport them to their home. His testimony made it

17   clear that he believed that people with motorized scooters had to go in wheelchair accessible

18   vans, and that he got this information from his company.

19       The court does not find that Mr. Parvez's testimony creates a genuine dispute of material

20   fact. Even if it created a genuine dispute of material fact as to the May 19, 2013 incident, it is

21   undisputed that there was a denial of service on April 9, 2013.

22       Moreover, there is ample testimony that it was Yellow Cab's practice to have handicap

23   patrons utilize special wheelchair accessible vans from its sister company, Reno Sparks Cab.

24   Mr. Sharma, Yellow Cab's "road supervisor," testified that he told Mr. Doud: "we are not able to,

25   you know, we don't equip the Yellow Cab with a handicap, you know the scooters, you know,

26   because that's why we have Reno Sparks. When Yellow Cab needs a wheelchair accessible van,

27   they call a Reno Sparks handicap van." He further testified that when a person presents with a

28   scooter, "that's why we have the vans to do so, you know, where they can tie the whole scooter

1    up with the passenger in the back, you know. And you don't have to disassemble anything[.]"

2    Ms. Brown, Yellow Cab's driver manager and driver trainer, testified that she provided

3    Yellow Cab drivers training regarding people with disabilities.  She testified that Reno Sparks

4    Cab has five handicap vans modified to handle wheelchairs and electric powered vehicles so the

5    client is actually strapped into them in the vehicle. She confirmed that it is Yellow Cab's policy

6    when they need a handicap accessible vehicle to contact Reno Sparks cab and "all the drivers

7    know that."

8    Yellow Cab argues that no person with authority to speak for Yellow Cab or its policies

9    provided testimony at the NTA hearing, and therefore, there is a genuine dispute of material fact

10   as to the existence of a Yellow Cab policy regarding the ADA. (Doc. # 26 at 19.)

11   The testimony from Yellow Cab's driver manager and trainer (Ms. Brown), its "road

12   supervisor" (Mr. Sharma) and drivers (Mr. Sharma and Mr. Parvez) is clear that when a person

13   presents with a scooter, the driver is to contact a special handicap van from its sister company

14   Reno Sparks Cab. Whether or not it has a written policy to this effect is irrelevant, because there

15   is ample undisputed evidence that this was Yellow Cab's practice. Notably, Yellow Cab did not

16   submit a declaration refuting this was its practice.

17   The court also finds that Yellow Cab discriminated against the Douds on the basis of

18   Mrs. Doud's disability by failing to make a requested reasonable modification that was necessary

19   to accommodate her disability.

20   The Douds have sufficiently established that the requested modification (allowing them

21   to ride in a standard taxi with Mrs. Doud's disassembled scooter in the trunk) is necessary. The

22   Douds cannot have full and equal enjoyment of Yellow Cab's taxi services if it insists that

23   Mrs. Doud, and therefore Mr. Doud, ride in a vehicle that loads the scooter intact, with

24   Mrs. Doud strapped into it. This is consistent with both *Fortyune* and *Baughman v. Walt Disney*

25   *World Co.* First, in *Fortyune*, the Ninth Circuit concluded that the plaintiff "require[d] an

26   attendant to enjoy the viewing of a film;" therefore, the requested modification in that instance

27   (that the theatre ensure that the disabled patron's companion be able to sit next to him) was

28   necessary. *Fortyune*, 364 F.3d at 1083. As the Ninth Circuit later explained in *Baughman,* while

1   "[t]he attendant seat was obviously not necessary for Fortyune to see the movie, ... moviegoers

2   expect to sit with their friends and family during the show; their enjoyment is diminished if they

3   are forced to sit apart." *Baughman*, 685 F.3d at 1135. "'Because Fortyune require[d] an attendant

4   to *enjoy* the viewing of a film, the modification that he requested, *i.e.,* that [the theatre] ensure

5   that his companion could be seated next to him, was necessary.'" *Id*. (quoting *Fortyune*, 364 F.3d

6   at 1083) (emphasis original in *Baughman*)).

7       In *Baughman*, the plaintiff suffered from limb girdle muscular dystrophy, which made it

8   difficult for her to walk or stand from a seated position. *Baughman*, 685 F.3d 1131, 1132 (9th

9   Cir. 2012). Nevertheless, she wanted to take her daughter to visit Disneyland for her eighth

10  birthday, and requested permission to use a Segway. *Id*. Disney allowed wheelchairs and

11  motorized scooters, but denied Baughman's request to use the Segway ("a two-wheeled mobility

12  device operated while standing"). *Id*. Baughman brought suit under the ADA, arguing she had

13  been denied full and equal access to Disneyland. *Id*. The district court "held that Disney is not

14  required to modify its policy because it permits motorized scooters and wheelchairs." *Id*. at 1134.

15  Disney argued that a Segway was not "necessary" for Baughman to use the part, because she

16  could access it using a wheelchair or motorized scooter. *Id*.

17      The Ninth Circuit rejected Disney's argument. As mentioned, the court first reviewed its

18  prior decision in *Fortyune*, pointing out that because having an attendant seated next to him, the

19  theatre patron plaintiff had requested a necessary modification. *Id*. at 1135. Next, the court

20  emphasized that "the ADA guarantees the disabled more than mere access to public facilities; it

21  guarantees them 'full and equal enjoyment.'" *Baughman*, 685 F.3d 1131, 1135 (9th Cir. 2012)

22  (citing 42 U.S.C. § 12182(a)). It instructed: "Public accommodations must start by considering

23  how their facilities are used by non-disabled guests and then take reasonable steps to provide

24  disabled guests with a like experience." *Id*. (citing *Spector*, 545 U.S. at 128-29).)

25      Baughman had difficulty standing up from a seated position and the Segway would make

26  it easier to enjoy her visit to Disneyland. *Id*. at 1135-36. Using a wheelchair or scooter, on the

27  other hand, would be painful for her and require her to sit and stand many times. *Id*. at 1136. She

28  would be more comfortable and feel more dignified using a Segway. *Id*. Thus, the court

1    concluded that the modification requested by Baughman was also necessary.

2         Yellow Cab contends that its utilization of Reno Sparks Cab's handicapped vehicles is a

3    reasonable accommodation compliant with the ADA. (Doc. # 26 at 18-19.) Yellow Cab

4    misapprehends the ADA's requirements. The Douds are entitled to full and equal enjoyment of

5    Yellow Cab's service. Mrs. Doud *could* travel in a special handicapped van with her scooter

6    loaded intact, and her strapped to it (or not); however, there is unrefuted evidence that she can

7    ride in a standard taxi, with her scooter disassembled and loaded into the taxi by her husband,

8    and to do otherwise would require her to wait for one of the few special vans from Reno Sparks

9    Cab and would cause her to feel humiliated and embarrassed. While Mr. Sharma testified that on

10   the one occasion he took the Douds home, he assisted Mr. Doud in unloading the motor piece of

11   the scooter, he did not refute Mr. Doud's testimony that he easily loads and unloads all of the

12   component pieces whenever they travel. While the Douds could travel in the special vans, like in

13   *Fortyune* and *Baughman*, this does not mean their requested modification is not necessary. Their

14   requested modification would guarantee them "full and equal enjoyment" of Yellow Cab's

15   services; therefore, it is necessary.

16        Second, the Douds have established that the requested modification is reasonable. "'[T]he

17   determination of whether a particular modification is 'reasonable' involves a fact-specific, case-

18   by-case inquiry that considers, among other factors, the effectiveness of the modification in light

19   of the nature of the disability in question and the cost to the organization that would implement

20   it.'" *Fortyune*, 364 F.3d at 1083 (quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir.

21   1995); *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999)). An

22   accommodation is unreasonable if it imposes "undue financial and administrative burdens." *Id.*

23   (citing *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 288 n. 17 (1987); *Chalk v. United*

24   *States Dist. Court Cent. Dist of Cal*., 840 F.2d 701, 705 (9th Cir. 1988)). In *Fortyune*, the court

25   found the requested modification-ensuring that he could be seated next to his wife or another

26   companion-was reasonable. *Id*. at 1083-84.  The court pointed out that the theatre had to make

27   sure that its patrons "acted reasonably and responsibly with regard to an array of company, state,

28   and federal laws or policies" on a daily basis. *Id*. at 1083 (*i.e.,* keeping aisles clear of patrons to

1    comply with fire regulations, enforcing rules regarding use of cell phones and other disruption).

2    The requested modification "require[d] no less and no more" of the theatre. *Id*. at 1084.

3        *Baughman* reiterated that "[f]acilities are not required to make any and all possible

4    accommodations that would provide full and equal access to disabled patrons; they need only

5    make accommodations that are reasonable." *Baughman*, 685 F.3d at 1135. "In deciding what's

6    reasonable, facilities may consider the costs of such accommodations, disruption of their

7    business and safety." *Id*. "[T]hey must also take into account evolving technology that might

8    make it cheaper and easier to ameliorate the plight of the disabled." *Id*. There, the Ninth Circuit

9    held that if Disney could "make Baughman's experience less onerous and more akin to that

10   enjoyed by its able-bodied patrons, it must take reasonable steps to do so." *Id*. at 1136 (citation

11   omitted).

12       Here, the modification requested by the Douds is reasonable. There is no evidence it will

13   pose an undue burden on Yellow Cab. The Douds merely request that they be allowed to ride in

14   a standard taxi. They do not require that Yellow Cab drivers disassemble, assemble, or load or

15   unload the scooter's component parts if they deem them to be too heavy. It would not require that

16   Yellow Cab's taxis be retrofitted. Yellow Cab merely need allow the Douds to ride in an ordinary

17   taxi with Mrs. Doud's disassembled scooter. (*See* Doc. # 27 at 13-14.)

18       Third, there is no evidence that the requested modification will "fundamentally alter" the

19   nature of Yellow Cab's service. In *Fortyune*, the court concluded that requiring the theatre to

20   "ensure that companion seats are available to the companions of wheelchair-bound patrons until

21   ten minutes prior to showtime, even if a person not accompanying a wheelchair-bound patron

22   refuses to move" would have only a "negligible effect", and certainly not a fundamentally

23   altering effect, on the service provided by the theatre. *Fortyune*, 364 F.3d at 1084. Here, Yellow

24   Cab stresses that its drivers already accommodate other disabled passengers; therefore, the

25   requested modification will have only a "negligible" effect on Yellow Cab's service.

26       Finally, the court finds unavailing Yellow Cab's assertion that it should be relieved from

27   accommodating the Douds because to do so would pose "a significant risk to the health or safety

28   of others" under 42 U.S.C. § 12182(b)(3). In making this argument, Yellow Cab bears a "heavy

- 24 -

1  burden" of demonstrating that transporting the Douds would pose such a significant risk to the

2  health and safety of others. *See Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066

3  (9th Cir. 2007). Yellow Cab cannot meet this heavy burden in light of the Douds' confirmation

4  that they do not seek an accommodation that Yellow Cab's drivers be required to assemble,

5  disassemble, load or unload the component parts of Mrs. Doud's scooter.

6          In sum, the court finds that the Douds have met their burden of establishing the absence

7  of a genuine dispute of material fact on each issue material to their claim under Title III of the

8  ADA. In responding to the motion, Yellow Cab has not raised a genuine dispute of material fact;

9  therefore, the Douds' motion for summary judgment should be granted as to this claim.

10         It should be noted that contrary to Yellow Cab's argument (Doc. # 26 at 15), it is

11  immaterial whether or not Mr. Parvez was an independent contractor or employee. Even if it

12  were established that Mr. Parvez was an independent contractor[7], the ADA's prohibitions against

13  discrimination apply to lessors. 42 U.S.C. § 12182(a); *see also Botosan v. Paul McNally Realty*,

14  216 F.3d 827 (9th Cir. 2000) (finding that landlord had independent obligation to comply with

15  ADA that may not be eliminated by contract). Moreover, the testimony is clear that it was

16  Yellow Cab's practice to require patrons utilizing motorized scooters to call a special van from

17  its sister company, Reno Sparks Cab.

18  **C. Fourth Cause of Action**

19         The Douds' fourth cause of action is for violation of NRS 706.361 *et. seq.* In this cause of

20  action the Douds assert that under NRS 706.361, it is unlawful for any person to deny a person

21  with a disability the full and equal enjoyment of the services of a common motor carrier of

22  passengers. (Doc. # 1 at 17.) They allege that Yellow Cab did just that on April 9, 2013 and

23  May 19, 2013. (*Id*. at 17-18.) They contend these facts are undisputed pursuant to the findings of

24  fact and conclusions of law of the NTA. (*Id*. at 18.)

25         In addition, they state that NRS 706.361 states that carrier employees have an obligation

26  to assist a person with a disability to store a mobility device, and Mr. Parvez refused to do so.

27  _____

28         [7] As alluded to earlier, this determination appears to require the certification of a question to the Nevada
Supreme Court.

- 25 -

1    (*Id.*)

2         Finally, they allege that NRS 706.361 requires motor carriers to designate a person to

3    provide training in the requirements of the ADA and associated regulations and to provide

4    training sessions to all employees to ensure compliance with the ADA. (*Id.*) The Douds allege

5    that Yellow Cab failed to designate a person with knowledge of the ADA to provide training in

6    the requirements of the ADA and associated regulations, and that it failed to provide training to

7    its drivers on the requirements of the ADA and associated regulations. (*Id.*)

8         Yellow Cab argues that summary judgment should be denied as to this cause of action

9    because it has appealed the NTA's determination of this issue to the Second Judicial District

10   Court. (Doc. # 26 at 22, 24-25.) The Second Judicial District Court's records indicate that Yellow

11   Cab's petition for review of the NTA's decision was denied on September 2, 2014; therefore, this

12   does not provide a basis to defeat the Douds' motion as to this cause of action.

13        More important, however, is whether a plaintiff can even bring a private civil action for a

14   violation of Chapter 706 of the NRS. (*See* Doc. # 26 at 22-23.) NRS 706.771 addresses the

15   potential penalties for a violation of any provision of Chapter 706 and states, in pertinent part:

16        1. Any person or any agent or employee thereof, who violates any provision of
     this chapter, any lawful regulation of the Authority or any lawful tariff on file
     with the Authority or who fails, neglects or refuses to obey any lawful order of the

17        Authority or any court order for whose violation a civil penalty is not otherwise
     prescribed is liable to a penalty of not more than $10,000 for any violation. The

18        penalty may be recovered in a civil action upon the complaint of the Authority in
     any court of competent jurisdiction.

19        2. If the Authority does not bring an action to recover the penalty prescribed by
     subsection 1, the Authority may impose an administrative fine of not more than

20        $10,000 for any violation of a provision of this chapter or any rule, regulation or
     order adopted or issued by the Authority or Department pursuant to the provisions

21        of this chapter. A fine imposed by the Authority may be recovered by the
     Authority only after notice is given and a hearing is held pursuant to the

22        provisions of chapter 233B of NRS.

23        Chapter 706 does not provide that an aggrieved individual may bring a private cause of

24   action against a taxi company to enforce its provisions. Instead, according to NRS 706.771, only

25   the NTA may enforce the provisions referenced by Plaintiff, and pursuant to this section, the

26   NTA has the option of bringing a civil action or imposing an administrative fine.

27        The Nevada Supreme Court reached a similar conclusion in evaluating the possible

28   remedies available to a plaintiff under another different provision of Chapter 706 in *In re System*

1    *99*, 847 P.2d 741, 742, 109 Nev. 66, 68 (Nev. 1993).

2    The Douds' arguments that the court should imply a private right of action into Chapter

3    706 because such an action is authorized in connection with Chapter 651 and that Nevada

4    Revised Statute 706.361 imposes statutory tort liability are unavailing. If the Nevada Legislature

5    intended to provide a private right of action in connection with Chapter 706, it would have

6    explicitly provided for such an action, as it did in connection with Chapter 651. It did not, and

7    the Douds did not assert a claim for relief under Chapter 651. If they believed the action taken by

8    the NTA under Chapter 706 was insufficient, and that Chapter 651 was applicable to them, they

9    could have asserted such a claim, but it is not before the court now.

10    Accordingly, the Douds' motion for summary judgment as to their fourth cause of action

11    is denied as the claim fails as a matter of law and will be dismissed with prejudice.

12    **D. Sixth Cause of Action**

13    In their sixth cause of action, the Douds assert a claim for tortious failure to furnish

14    facilities to a member of the public. (Doc. # 1 at 20.) Here, they allege that Yellow Cab was

15    under a duty to furnish the public with its facilities without discrimination, but violated this duty

16    on April 9, 2013 and May 20, 2013, when the Douds were denied the full and equal enjoyment

17    of Yellow Cab's services. (*Id.*)

18    Yellow Cab's response to the Douds' motion with respect to this claim is two-fold:

19    (1) there are genuine disputes as to material facts regarding the alleged service refusals that

20    preclude the entry of summary judgment as to this claim; and (2) there is no legal authority for

21    making such a claim.

22    More important to the court is Yellow Cab's second argument—whether this is a viable

23    claim under Nevada law. The Douds certainly have provided no authority that this is a

24    recognized common law tort claim under Nevada law. They merely cite to the Restatement of

25    Torts which, in turn, cites a 1994 case from the District of Columbia and a 1979 case from the

26    District of South Carolina. (Doc. # 27 at 19.) The court's research revealed no authority in

27    Nevada supporting such a claim. Therefore, the court finds that the Douds have not met their

28    initial burden of establishing that this is a recognized claim for relief in Nevada. For this reason,

1   their motion for summary judgment as to this claim is denied without prejudice.

2      When there is no controlling precedent for a question of Nevada law, the United States

3   District Court may sua sponte invoke Nevada Rule of Appellate Procedure 5 to certify the

4   question of law to the Nevada Supreme Court. NRAP 5(a), (b). The court will hold a status

5   conference to discuss whether the Douds still wish to pursue this claim; and if so, whether the

6   court should certify to the Nevada Supreme Court the question of whether this tort should be

7   recognized in Nevada. The denial of the motion for summary judgment is without prejudice

8   because the motion *may* be renewed depending on the Nevada Supreme Court's response to the

9   certified question, if the court agrees to seek such a determination.

10                **IV. CONCLUSION**

11      Yellow Cab's request to defer consideration of this motion pursuant to Federal Rule of

12   Civil Procedure 56(d) is **DENIED**.

13      The Douds' Motion for Partial Summary Judgment (Doc. # 21) is **GRANTED IN PART**

14   **AND DENIED IN PART** as follows:

15      (1) the motion is **GRANTED** as to the Douds' first cause of action under Title III of the

16   ADA;

17      (2) the motion is **DENIED** as to the Douds' fourth cause of action for violation of NRS

18   706.361, as this cause of action fails as a matter of law and is **DISMISSED WITH**

19   **PREJUDICE**;

20      (3) the motion is **DENIED** as to the Douds' sixth cause of action for tortious failure to

21   furnish facilities to a member of the public. The court will hold a status conference to determine

22   whether the Douds wish to pursue this claim, and if so, will discuss whether or not to certify to

23   the Nevada Supreme Court the question of whether this is a recognized tort claim in Nevada.

24   **IT IS SO ORDERED**.

25   DATED:  March 3, 2015.

26                     *William G. Cobb*
                  WILLIAM G. COBB

27                     UNITED STATES MAGISTRATE JUDGE

28