1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JAMES DOUD and MELODIE DOUD,                 3:13-cv-00664-WGC

                                 Plaintiffs,     **ORDER**

        v.

YELLOW CAB OF RENO, INC.,

                                 Defendant.

11

12

13

14

         Before the court is the Motion for Partial Summary Judgment on Defendant's 25th Affirmative Defense filed by Plaintiff James Doud. (Doc. # 31.)[1] Defendant Yellow Cab of Reno, Inc. filed a response (Doc. # 38), and Mr. Doud filed a reply (Doc. # 42). For the reasons set forth herein, the motion is granted.

15

## I. BACKGROUND

16

17

18

19

20

21

         Plaintiffs James and Melodie Doud filed their Complaint on December 4, 2013, asserting claims under Title III of the Americans with Disabilities Act (ADA) (James and Melodie Doud), associational discrimination under Title I of the ADA (James Doud), retaliation under Title I of the ADA (James Doud), as well as claims under Nevada Revised Statutes (NRS) 706.361, *et. seq*. (Melodie Doud) and 706.366[2] (Melodie and James Doud), and a State law claim for tortious failure to furnish facilities (Melodie and James Doud). (Compl., Doc. # 1.)

22

23

24

25

26

         Specifically, the Complaint alleges that Melodie Doud is an amputee with one leg, is considered disabled for purposes of the ADA, and is married to James Doud. (Doc. # 1 at 2 ¶¶ 5-6.) Her disability requires that she utilize a portable electric scooter and crutch for mobility, and is frequently accompanied by her two service dogs. (*Id*. at 3 ¶ 11.) James Doud alleges that he

27

28

_____

[1] Refers to court's docket number.

[2] These are Nevada statutes regulating motor carriers and pertaining to the rights of persons with service dogs.

was a long-term employee (and not independent contractor) of Yellow Cab. (*Id*. ¶ 12.)

The Douds allege that they were denied transportation by two Yellow Cab taxis at Reno's airport on April 9, 2013, and again on May 20, 2013, because of Melodie Doud's disability. They filed a complaint with the Nevada Transportation Authority (NTA), who issued a citation to Yellow Cab for violation of Nevada Administrative Code (NAC) 706.365 (later amended to reflect a violation of NRS 706.361) and a subsequent citation under NRS 701.366. A hearing was held, and the NTA confirmed that one or more Yellow Cab drivers denied transportation services to a person with a disability in violation of NRS 706.361(1), (4). They subsequently filed this action.

The Douds filed a Motion for Preliminary Injunction on March 19, 2014, related to their claim under Title III of the ADA. (Doc. # 9.) On August 28, 2014, United States District Judge Miranda M. Du entered an order granting Plaintiff's motion. (Doc. # 30.) Yellow Cab has appealed this order, but did not request a stay of this proceeding while the appeal is pending. (*See* Doc. # 36.)

The Douds then filed a partial motion for summary judgment related to the denial of service claims, which the court has since granted in part and denied in part. (*See* Mtn. at Doc. # 21; Order at Doc. # 69.) In that motion, the Douds sought summary judgment as to liability on their first (Title III ADA claim related to denial of service), fourth (NRS provisions) and sixth (tortious failure to furnish facilities) causes of action. The court granted the motion as to the first cause of action—the Title III ADA denial of service claim—but denied it as to the fourth and sixth causes of action brought under State law. (Doc. # 69.)[3]

James Doud filed the instant motion for partial summary judgment related to Yellow Cab's twenty-fifth affirmative defense on September 1, 2014. (Doc. # 31.) This affirmative defense asserts that pursuant to NRS 706.473, James Doud was an independent contractor and

---

[3] With respect to the fourth cause of action, the court concluded that Chapter 706 of the NRS does not provide a private right of action for violations of its provisions, and denied the Douds' motion as to that claim and dismissed it with prejudice. (Doc. # 69 at 25-27.) As for the sixth cause of action, the court concluded there was no authority supporting the Douds' argument that tortious failure to furnish facilities is a recognized claim for relief in Nevada; as such, their motion was denied as to this claim. The denial was without prejudice insofar as the Douds may elect to move to certify the question of whether this states a cognizable Nevada claim to the Nevada Supreme Court. (Doc. # 69 at 27-28.)

not an employee; therefore, he is excluded from the ADA's protections. (Yellow Cab's Answer, Doc. # 20 at 16.) Mr. Doud argues that regardless of nomenclature, based on Yellow Cab's practices James Doud was in fact an employee, entitled to the protections of the Title I of the ADA. (Doc. # 31.)

On November 21, 2014, the parties agreed to enter into the court's Short Trial Program. (Doc. # 49.) Judge Du approved the request, and the parties consented to the undersigned being assigned this case for all purposes. (*See* Docs. # 51, # 52, # 53.)

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary:

(1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual

data. *Id*. Instead, the opposition must go  beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### III. DISCUSSION

**A. The Motion is Not Premature**

In its opposition to Mr. Doud's motion, Yellow Cab briefly argues that this motion is premature because discovery is in its beginning phases.

If a non-moving party demonstrates through an affidavit or declaration that it does not have sufficient facts to justify its opposition, the court may defer consideration of the motion or deny it, allow time for discovery, or issue another appropriate order. Fed. R. Civ. P. 56(d). The party seeking a Rule 56(d) continuance bears the burden of proffering facts sufficient to satisfy its requirements. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th Cir. 1996).

Yellow Cab does not include a formal request under Federal Rule of Civil Procedure 56(d). Nor does Yellow Cab specify what discovery it needs to undertake in order to oppose this motion. Moreover, there is no declaration from counsel attesting to this issue. As a result, Yellow Cab has not met its burden under Rule 56(d), and to the extent its brief statement that discovery is only just beginning can be construed as a request for continuance under Rule 56(d), that

1    request is denied.

2    **B. Federal Common Law Principles of Agency Law are Used to Determine Employee**

3    **Versus Independent Contractor Status Under the ADA**

4    "Congress enacted the ADA in 1990 to remedy widespread discrimination against

5    disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). "The Act responds to

6    what Congress described as a 'compelling need' for a 'clear and comprehensive national mandate'

7    to eliminate discrimination against disabled individuals." *Fortyune v. American Multi-Cinema,*

8    *Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004) (quoting *PGA Tour*, 532 U.S. at 675). "To effectuate

9    its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas

10   of public life, among them employment (Title I of the Act), public services (Title II), and public

11   accommodations (Title III)." *Id.* (internal quotation marks omitted).

12   Title I of the ADA  governs discrimination against individuals with disabilities in

13   employment. 42 U.S.C. § 12111, *et. seq.* A "covered entity" under Title I includes an employer,

14   who is generally defined as "a person engaged in an industry affecting commerce who has 15 or

15   more employees for each working day in each of 20 or more calendar weeks in the current or

16   preceding calendar year[.]" 42 U.S.C. § 12111(2), (5)(A). Title I precludes a covered entity from

17   "discriminat[ing] against a qualified individual on the basis of disability in regard to job

18   application procedures, the hiring, advancement, or discharge of employees, employee

19   compensation, job training and other terms, conditions and privileges of employment." 42 U.S.C.

20   § 12112(a). Discrimination includes "excluding or otherwise denying equal jobs or benefits to a

21   qualified individual because of the known disability of an individual with whom the qualified

22   individual is known to have a relationship or association[.]" 42 U.S.C. § 12112(b)(4). The ADA

23   likewise prohibits retaliation against an individual "because such individual has opposed any act

24   or practice made unlawful by this chapter or because such individual made a charge, testified,

25   assisted, or participated in any manner in any investigation, proceeding, or hearing under this

26   chapter." 42 U.S.C. § 12203(a).

27   Mr. Doud concedes that in order to state a claim under Title I of the ADA for retaliatory

28   termination, he must be considered an employee of Yellow Cab under the ADA. (Doc. # 31 at

1:21-22.) Conversely, his claim fails if he is deemed to be an independent contractor. Mr. Doud maintains that he was an employee of Yellow Cab, while Yellow Cab asserts in its twenty-fifth affirmative defense that he was an independent contractor. Thus, the court's inquiry here focuses on whether Mr. Doud was an employee or independent contractor of Yellow Cab in the context of an action brought pursuant to the ADA.

Mr. Doud argues that regardless of the nomenclature used to describe his relationship with Yellow Cab, under the federal common law criteria used to determine employee versus independent contractor status, he should be considered an employee of Yellow Cab. Yellow Cab, on the other hand argues that Nevada law is determinative of the relationship because Yellow Cab asserted into a valid lease with him pursuant to NRS 706.473 that was approved by the NTA. (*See, e.g.,* Doc. # 38 at 5:14-16.)

After the court undertook its initial review of the briefing on this motion, it was swayed by the parties' focus on the implication of Chapter 706 of the NRS, and specifically NRS 706.473, which permits taxicab operators to enter into lease agreements with taxicab drivers. If, as Yellow Cab argued, NRS 706.473 was controlling, the court was concerned that it had been presented with an issue of first impression in Nevada law—whether NRS 706.473 supplants the traditional common law determination of independent contractor versus employee status when a taxicab operator elects, with approval from the NTA, to lease a taxicab to an individual pursuant to NRS 706.473. As such, the court held a status conference on February 24, 2015, to discuss with the parties whether this issue should be certified to the Nevada Supreme Court for resolution. (*See* Docs. # 67, # 68.)

This court noted that the Nevada Supreme Court had been presented with the issue in the context of respondeat superior liability in another case involving Yellow Cab, *Yellow Cab of Reno, Inc. v. Second Jud. Dist. Ct.*, 262 P.3d 699 (Nev. 2011). There, the Nevada Supreme Court commented that "the statute is silent ... as to whether the creation of the independent contractor relationship under that statute acts to bar the application of respondeat superior liability as is the case under traditional independent contractor relationships. *Id*. at 704. The Nevada Supreme Court confirmed it has held "that such liability can be avoided when a traditional independent

contract relationship is found to exist, [but] the issue of whether an NRS 706.473-statutory-independent-contract relationship bars respondeat superior liability" had not been addressed by the Nevada Supreme Court. The Nevada Supreme Court declined to consider the issue in the first instance and remanded the matter to the district court; however, the district court never addressed the question because after the case was remanded the parties entered into a settlement.

This court determined that it would proceed with resolving the Douds' motion for partial summary judgment with respect to the denial of service claims (Doc. # 31) and their motion for an interim award of attorneys' fees (Doc. # 32), and then would return to this motion to determine whether to certify the issue to the Nevada Supreme Court. (*See* Minutes at Doc. # 68 at 2.)

Upon further reflection on the briefing filed with respect to the instant motion and after conducting additional research, the court retracts its preliminary impression and concludes that certification to the Nevada Supreme Court is not necessary. Instead, the court concludes that the federal common law of agency applies to determine whether or not Mr. Doud was an employee or independent contractor of Yellow Cab.

Yellow Cab cites no authority in support its position that Nevada law, and not federal common law, applies to the determination of Mr. Doud's status as an employee or independent contractor for a claim brought pursuant to the ADA.

There is no dispute that Mr. Doud brings these claims pursuant to Title I of the ADA. As stated above, the parties agree that for Mr. Doud to maintain these claims, he must be found to be an employee of Yellow Cab. *See also Fleming v. Yuma Reg'l Med. Ctr.,* 587 F.3d 938, 939 (9th Cir. 2009) (Title I of the ADA does not cover discrimination claims by independent contractors).[4] Therefore, by way of this motion, the court is tasked with determining whether Mr. Doud is an employee of Yellow Cab so that the ADA's protections under Title I apply to him. The ADA defines the term "employee" as "an individual employed by an employer." 42 U.S.C. § 12111.

---

[4] Section 504 of the Rehabilitation Act, on the other hand, does cover discrimination claims by independent contractors. *Fleming,* 587 F.3d at 939.

In *Community for Creative Non-Violence v. Reid*, the Supreme Court was confronted with construing the term "employee" in the context of the "work made for hire" provision of the Copyright Act of 1976, which did not define the term. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730. 738-39 (1989). The Supreme Court sought to resolve a split among circuits as to the meaning of the term. It pointed out that "[t]he starting point for [its] interpretation of a statute is always its language." *Id*. at 739 (*citing Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)). The Copyright Act of 1976 did not define "employee," but the Supreme Court instructed that it is "well established that '[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" *Id*. (quoting *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981); *Perrin v. United States*, 444 U.S. 37, 42 (1979).) "In the past, when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common law agency doctrine." *Id*. (citing *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 322-23 (1974); *Baker v. Texas & Pacific R. Co.*, 359 U.S. 227, 228 (1959) (per curiam); *Robinson v. Baltimore & Ohio R. Co.*, 237 U.S. 84, 94 (1915)). Nothing in the Copyright Act of 1976 indicated an intent to adopt anything other than this traditional employer-employee relationship, the Supreme Court applied traditional common law principles of agency. *Id*. at 740. Importantly, the Supreme Court stated, "when we have concluded that Congress intended terms such as 'employee,' 'employer,' and 'scope of employment' to be understood in light of agency law, *we have relied on the general common law of agency, rather than on the law of any particular State, to give meaning to these terms.*" *Id*. (emphasis added) (citation omitted).

Here, as in *Reid*, it seems apparent that with Congress's express objective of providing a "national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), (2), that the court should apply the federal common law of agency in determining whether Mr. Doud is an employee or independent contractor of

1  Yellow Cab.

2  The Supreme Court confronted the issue of construing the term "employee" once again in

3  *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318 (1992), where it was tasked

4  with determining the meaning of the term as it appears in § 3(6) of the Employee Retirement

5  Income Security Act of 1974 (ERISA). *Id.* at 319. The court concluded as it did in *Reid*, and is it

6  would subsequently in the context of the ADA in *Clackamas Gastroenterology Associates, P.C.*

7  *v. Wells*, that traditional common law principles of agency should be utilized. *Id.* ERISA contains

8  the same "nominal" definition of "employee" as the ADA: "any individual employed by an

9  employer." *Darden*, 503 U.S. at 323. As the Supreme Court put it, this definition "is completely

10  circular and explains nothing." *Id.* ERISA, like the ADA, gives no "specific guidance on the

11  term's meaning." *Id.* Nor did it suggest "that construing it to incorporate traditional agency law

12  principles would thwart the congressional design or lead to absurd results." *Id.*

13  *Darden* adopted the common-law test for determining who qualifies as an employee

14  under ERISA (which the Supreme Court had also utilized in *Reid* in the context of the Copyright

15  Act of 1976):

16  > In determining whether a hired party is an employee under the general common
   > law of agency, we consider the hiring party's right to control the manner and
   > means by which the product is accomplished. Among the other factors relevant to

17  > this inquiry are the skill required; the source of the instrumentalities and tools; the
   > location of the work; the duration of the relationship between the parties; whether

18  > the hiring party has the right to assign additional projects to the hired party; the
   > extent of the hired party's discretion over when and how long to work; the method

19  > of payment; the hired party's role in hiring and paying assistants; whether the
   > work is part of the regular business of the hiring party; whether the hiring party is

20  > in business; the provision of employee benefits; and the tax treatment of the hired
   > party. ... Since the common-law test contains 'no shorthand formula or magic

21  > phrase that can be applied to find the answer, ... all of the incidents of the
   > relationship must be assessed and weighed with no one factor being decisive.'

22  *Darden*, 503 U.S. at 323-24 (internal citations and quotation marks omitted).

23  More recently, in *Clackamas Gastroenterology Associates, P.C. v. Wells,* 538 U.S. 440

24  (2003), the Supreme Court was asked to construe the meaning of the term "employee" as it

25  appears in the ADA. Specifically, it was asked to construe the term "employee" to allow the

26  parties to determine whether the ADA applied to the medical clinic because under its terms the

27  ADA only covers "employers" with a work force of "15 or more employees for each working

28  day in each of 20 or more calendar weeks in the current or preceding calendar year." *Id.* at 442

(citing 42 U.S.C. § 12111(5)). The issue in *Clackamas* was whether four physicians who were actively engaged in medical practice in the clinic, but were also shareholders and directors of the professional corporation, should be counted as "employees." *Id.*

Clackamas* noted that the ADA, like ERISA, contains a circular definition of employee. *Id.* at 444. As such, the Supreme Court found in this context, as it had in *Reid* under the Copyright Act of 1976, and in *Darden* under ERISA, that the common law principles of agency provided helpful guidance for construing the term. *Id.* at 448. First, the Court referenced the Restatement (Second) of Agency's definition of "servant" as 'a person whose work is 'controlled or is subject to the right to control by the master.'" *Id.* (citing Restatement (Second) of Agency § 2(2) (1957)). In addition, the Court noted that the more specific definition of the term "servant" in the Restatement contains a list of factors to be considered when one distinguishes between servants and independent contractors, the first of which is "the extent of control," which the Supreme Court instructed "is the principal guidepost" to be followed in that case. *Id.*[5] It further stated that this position was supported by the Equal Employment Opportunity Commission's (EEOC) compliance manual. *Id.* at 448-49.

While the Supreme Court in *Clackamas* was construing the term "employee" in the context of determining whether shareholder-physicians were employees such that the clinic was a covered entity under the ADA, when taken together with *Reid* and *Darden,* it is clear that the term should be construed in view of common law agency principles here.

The Nevada legislature has stated in NRS 706.473 that a taxicab operator may, upon approval from the NTA, lease a taxicab to an independent contractor; however, the fact that a taxicab operator chooses to enter into an arrangement with a driver described as an independent contractor is not controlling as to whether or not the driver is an independent contractor or employee as that term is used in the ADA. Instead, this is just one factor among many that must be considered in determining the relationship status between the parties under common law principles of agency. The parties will have to wait for Nevada's courts to determine whether

---

[5] It noted additional factors which were relevant to the inquiry of whether a shareholder-director of an entity is also an employee. *Clackamas*, 538 U.S. at 449-50.

1  NRS 706.473 supplants the general common law criteria for determining employee versus

2  independent contractor status with respect to a claim brought under Nevada law.

3  It does not appear the Ninth Circuit has had occasion to apply the common-law agency

4  principles from *Reid* and *Darden* in a published opinion in an ADA case. It has applied these

5  principles, however, in cases brought under Title IV and in cases brought under the National

6  Labor Relations Act (NLRA). The Ninth Circuit's analysis of the factors in those cases is

7  instructive here.

8  In *Murray v. Principal Financial Group, Inc.*, 613 F.3d 943 (9th Cir. 2010), the Ninth

9  Circuit was asked to determine independent contractor versus employee status in a case where

10  the plaintiff alleged sex discrimination against his employer under Title VII. The Ninth Circuit

11  noted that several tests had been utilized to make this determination, including: the "economic

12  realities" test from *Adcock v. Chrysler Group*, 166 F.3d 1290, 1292 (9th Cir. 1999), the "hybrid"

13  common law test of *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cir. 1980),

14  and the traditional common law agency test from *Darden*. *Murray*, 613 F.3d at 945. The Ninth

15  Circuit clarified that "there is no functional difference between the three formulations," and even

16  if there were, *Darden's* common law test is controlling. *Id*. Because Title VII defined "employee"

17  in a circular manner, as it is defined in ERISA and the ADA, and the statute did not suggest that

18  something other than common law agency principles should be applied, those principles also

19  applied to construe "employee" in Title VII. *Id*.

20  In 2008, the Ninth Circuit applied common law agency principles to determine whether a

21  taxicab company's drivers were employees or independent contractors under the NLRA.

22  *N.L.R.B. v. Friendly Cab Co., Inc.*, 512 F.3d 1090, 1096 (9th Cir. 2008). While not brought

23  under the ADA, it, along with other NLRB cases, are instructive insofar as they apply the same

24  common law agency principles as will be utilized here to determine whether Mr. Doud was an

25  employee or independent contractor. *Friendly* presents many factual similarities to this case, and

26  as a result, the court refers to it with some frequency in its analysis. In applying the common law

27  agency principles, *Friendly* confirmed that while "courts must look to the totality of the

28  circumstances, '[t]he essential ingredient of the agency test is the extent of control exercised by

- 12 -

the 'employer". It rests primarily upon the amount of supervision that the putative employer has a right to exercise over the individual, particularly regarding the details of the work.'" *Id.* at 1096-97 (quoting *SIDA of Hawaii, Inc. v. NLRB*, 512 F.2d 354, 357 (9th Cir. 1975)). The court must, however, "assess and weigh all of the incidents of the relationship with the understanding that no one factor is decisive ... and that '[i]t is the rare case where the various factors will point with unanimity in one direction or the other.'" *Id.* at 1097 (quoting *Merchants Home Delivery Serv., Inc. v. NLRB*, 580 F.2d 966, 973 (9th Cir. 1978)). While some factors tipped in favor of finding independent contractor status, the Ninth Circuit ultimately upheld the National Labor Relations Board's (NLRB) conclusion that Friendly's drivers were employees as there was "substantial evidence in the record that Friendly exercise[d] significant control over the means and manner of its drivers' performance." *Id.*

The court will apply now undertake the fact-based inquiry applying traditional common law principles of agency to determine whether Mr. Doud was an employee or independent contractor of Yellow Cab, or alternatively, whether a genuine dispute as to material fact(s) precludes the court from making the determination.

**C. Analysis**

**1. Lease Agreement**

Mr. Doud, like Friendly's drivers, entered into a lease agreement with Yellow Cab which provides that Mr. Doud was an independent contractor. (Doc. # 38-1 at 2.)  *See Friendly*, 512 F.3d at 1098. The Ninth Circuit said this factor weighs in favor of independent contractor status. *Id.* In *Friendly*, it nevertheless found that the evidence that Friendly exercised control over its drivers substantially outweighed the evidence indicating that the drivers were independent contractors.

**2. Method of Payment**

As the Ninth Circuit noted in *Friendly*, "[t]he payment by taxicab drivers of a fixed rental rate to an employer where drivers retain all fares collected without accounting to that employer typically creates a "strong inference" that the employer does not exert control over the means and manner of the drivers' performance." *Friendly*, 512 F.3d at 1097 (citing *NLRB v. Associated*

*Diamond Cabs, Inc.*, 702 F.2d 912, 924 (11th Cir. 1983); *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. NLRB*, 603 F.2d 862, 879 (D.C. Cir. 1978); *City Cab of Orlando, Inc.*, 285 N.L.R.B. 1191, 1194 (1987) ("City Cab of Orlando I"). This is because "the employer does not have an incentive to control the means and manner of the drivers' performance when the employer makes the same amount of money irrespective of the fares received by the drivers." *Id.* (citing *Associates Diamond Cabs*, 702 F.2d at 924; *Local 777, Seafarers*, 603 F.2d at 879; *City Cab of Orlando*, 285 N.L.R.B. at 1194).

Nevertheless, the Ninth Circuit noted in *Friendly* that the NLRB need not have given this inference to *Friendly* since the fee varied among drivers between $450 and $600, depending on cab model, driving record, ability and prior accidents. *Id*. Therefore, the Ninth Circuit concluded the rental fee did reflect that Friendly exercised some control over the drivers' performance. *Id*.

Here, the evidence demonstrates that Mr. Doud paid $650 per week to Yellow Cab. (Doud Decl., Doc. # 31-1 at 20 ¶ 4.) According to Yellow Cab's discovery responses, the lease payment other drivers pay varies depending on the age and mileage of the vehicle leased, the term leased, and other considerations between each driver in negotiating with the Company. (Doc. # 38-2 at 8-9.) This appears to reflect that Yellow Cab did exercise some control insofar as it could determine the rate of the driver's lease payment based on a variety of factors.

In addition, Mr. Doud asserts that he was required by Yellow Cab to accept flat fee vouchers from customers where Yellow Cab had pre-negotiated the rate. (Doud Decl., Doc. # 31-1 at 24 ¶ 30.) He turned the vouchers into Yellow Cab and if the pre-negotiated rate was below the metered rate, he would only receive the pre-negotiated rate. (*Id.*) The amount of the voucher was deducted from his weekly payment to Yellow Cab, and he did not receive a tip. (Id.) While Yellow Cab's "road boss," Mr. Sharma, states that when he received vouchers he was credited the full metered amount, he does not dispute that Mr. Doud received less than the metered amount on occasion. (*See* Sharma Decl., Doc. # 38-3 at 2 ¶ 9.) Moreover, Yellow Cab does not dispute that the voucher payments were credited toward Mr. Doud's weekly payment and not paid to him in cash which Mr. Doud could then spend as he saw fit.

In addition, Mr. Doud contends that he was occasionally required to take people from a

1   medical center at pre-set amounts. (Doud Decl., Doc. # 31-1 at 24 ¶ 31.) He sometimes had to

2   accept credit card payments, which were made to Yellow Cab and then deducted from his

3   weekly payment. (*Id.* ¶ 29.) Yellow Cab does not dispute these facts.

4       These facts evidence some exercise of control on the part of Yellow Cab. Therefore this

5   factor weighs in favor of finding Mr. Doud was an employee.

6       **3. Benefits**

7       Here, Mr. Doud was not provided with benefits and Yellow Cab did not withhold social

8   security or other taxes on Mr. Doud's behalf. (Doud Decl., Doc. # 31-1 at 20 ¶ 3; Doc. # 38-1 at 5

9   ¶ 11(a), (b), (c).) In *Friendly*, the fact that Friendly did not provide benefits to its drivers and did

10  not withhold social security or other taxes on behalf of its drivers weighed in favor of

11  independent contractor status. *Friendly*, 512 F.3d at 1098. Therefore, this factor weighs in favor

12  of independent contractor status.

13      **4. Duration of Relationship**

14      Mr. Doud asserts that this factor weighs in favor of finding he was an employee of

15  Yellow Cab. (Doc. # 31 at 17-18.) He worked for Yellow Cab for approximately fourteen years,

16  and signed a lease agreement that renewed automatically every week. (Doud Decl., Doc. # 31-1

17  at 20 ¶¶ 1, 4.)

18      Yellow Cab, on the other hand, asserts that this factor weighs in favor of finding

19  Mr. Doud was an independent contractor. (Doc. # 38 at 9.) Yellow Cab contends that the fact

20  that the lease is automatically renewed does not indicate employment status, because the NTA

21  approves all leases before they are enforceable. (*Id.*)

22      The automatic renewal of the lease every week tends to demonstrate an employment

23  relationship rather than an independent contractor status, regardless of whether the NTA

24  approved the lease. The automatic renewal of the lease every week indicates that it was not

25  intended that Mr. Doud was hired to perform a task for a defined period of time, such as one

26  week, one month, or even one year, but instead, the relationship continued for a period of

27  approximately fourteen years. Thus, this factor weighs in favor of employment status.

28      **5. Skill Required**

1  Mr. Doud argues that there is no skill involved in this position other than the ability to

2  drive; therefore, this factor militates in his favor. (Doc. # 31 at 26.)

3  Yellow Cab, on the other hand, asserts that this factor weighs in favor of finding

4  Mr. Doud was an independent contractor. (Doc. # 38 at 9.) It points to the fact that the Nevada

5  Legislature recently enacted a statute, NRS 706.476, which requires an NTA permit before an

6  individual can drive a taxicab. (*Id*.)

7  In his reply, Mr. Doud points out that NRS 706.462 merely requires that taxi drivers

8  submit fingerprints, a valid state driver's license, and proof they are either employees or

9  independent contractors of a taxi company, but does not demonstrate any particular skill is

10  associated with the occupation. (Doc. # 42 at 6.)

11  In *Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir. 2010), the Ninth Circuit found that truck

12  drivers' job did not require a high level of skill when they were not required to possess any

13  special license and no skill beyond the ability to drive. *Narayan*, 616 F.3d at 903 (citations

14  omitted). The job of a taxicab driver is analogous. The fact that a permit is now required by the

15  Nevada legislature does not change the fact that this job requires no special skill beyond the

16  ability to drive. As Mr. Doud points out, the State permit merely requires taxi drivers to submit

17  fingerprints, proof of valid Nevada driver's license and that they are an employee or independent

18  contractor of a taxi company. Therefore, the court finds that this factor weighs in favor of

19  employee status.

20  **6. Source of Instrumentalities and Tools**

21  Yellow Cab supplied the taxi cab driven by Mr. Doud, and he contends he was not

22  allowed to pick the vehicle. (Doud Decl., Doc. # 31-1 at 20 ¶ 5.) It also supplied all equipment

23  necessary for Mr. Doud to do his job, including a computer, a taxi meter, a radio, identifying

24  decals. (*Id*. ¶ 7.) Yellow Cab maintained the taxi, licensed it and paid for its insurance. (*Id*. ¶ 8.)

25  Yellow Cab required that maintenance be performed at its facility and did not allow its drivers to

26  service the vehicle on their own. (*Id*. ¶ 9.) It kept the maintenance file on the vehicle driven by

27  Mr. Doud. (*Id*. ¶12.)

28  Yellow Cab acknowledges that it does not require its drivers to bring any equipment or

tools to lease a taxicab. (Doc. # 38-2 at 10.) It states that any driver may request a certain vehicle and that request will be considered if it is available, and with the proviso that it only utilizes minivans in its fleet. (*Id*. at 11.)

Because Yellow Cab provides the instrumentalities and tools for Mr. Doud to perform his job, including the taxi, computer, taxi meter, radio, identifying decals, licensure, and insurance, this factor weighs in favor of employee status. *See Friendly*, 512 F.3d at 1099 (fact that Friendly's taxicab drivers did not own taxis indicated lack of entrepreneurship (citing *Corporate Express*, 292 F.3d at 780 (stating "[t]ypically an entrepreneur not only supplies his own equipment or tools; he may also hire subordinates and work for more than one party")).

**7. Whether the Work is Part of the Business of the Hiring Party**

The work performed by Mr. Doud was undoubtedly part of the regular business of Yellow Cab, which weighs in favor of finding employee status. In addressing this factor, Yellow Cab asserts that it only exerted as much control as it was required under the NAC (Doc. # 38 at 10), but provides no evidence to dispute the fact that operating taxi cabs is part of its business.

**8. Intent of the Parties**

Yellow Cab argues that the parties both intended to enter into an independent contract relationship when they signed the lease agreement. (Doc. # 38 at 15.) Mr. Doud disagrees, arguing that the label placed on the relationship is immaterial. (Doc. # 42 at 18.) Instead, he asserts that he was provided with a "take it or leave it" adhesion contract that he had to sign in order to gain employment. (*Id*.) In light of these facts, this factor does not tip in favor of finding Mr. Doud was either an independent contractor or employee.

**9. Ability to Operate Independent Business & Develop Entrepreneurial Opportunities**

This category encompasses several of the factors outlined by *Darden and Friendly*, as well as other important facts surrounding the relationship between the parties in this case; therefore these factors will be analyzed together here.

The ability to operate an independent business and develop entrepreneurial opportunities is "significant in any analysis of whether an individual is an 'employee' or an 'independent

contractor' under the common law agency test." *Friendly*, 512 F.3d at 1098 (citations omitted). If drivers are permitted to engage in entrepreneurial opportunities, this factor "tip[s] decidedly in favor of independent contractor status." *Id*. (citations omitted).

In *Friendly*, the Ninth Circuit found that Friendly's restrictions on its drivers' ability to operate an independent business or develop entrepreneurial opportunities "strongly support[ed]" the determination that Friendly's drivers were employees. *Id*. Friendly drivers could only respond to dispatches from Friendly dispatchers, and were precluded from obtaining outside business. *Id*. Drivers were not permitted to solicit customers as "'all calls for service [had to] be conducted over company provided communications system and telephone number.'" *Id*. Drivers were required to "maintain company business cards at all times" and could not distribute private business cards or telephone numbers. *Id*. Drivers were not allowed to accept service calls on personal cellular phones. *Id*. In light of these facts, the Ninth Circuit found that Friendly drivers did not have "the entrepreneurial freedom to develop their own business interests like true independent contractors." *Id*. The court found it telling that the lease agreement mandated that Friendly drivers "operate the taxis 'in such a manner as to protect the goodwill that exists between the company and its customers.'" *Id*. at 1098-99.

The Ninth Circuit contrasted the circumstances present in *Friendly* with those in *SIDA* where the drivers were "generally free to work or not work for SIDA when they [chose]," were permitted to "'moonlight' by working for other cab companies;" were "free to make their own arrangements with clients and to develop their own goodwill[.]" *Id*.

The ability to employ others and substantial investment in property are also significant factors indicating independent contractor status. *See Friendly*, 512 F.3d at 1099 (citing *Merchants*, 580 F.2d at 975 (finding ownership and ability to employ others as important factors indicating independent contractor status); *SIDA*, 512 F.2d at 357 (finding ownership as an important factor indicating independent contractor status); *Corporate Express*, 292 F.3d at 780 (stating, "[t]ypically an entrepreneur not only supplies his own equipment or tools; he may also hire subordinates and work for more than one party")).

For the reasons set forth below, the court finds the facts here are more analogous to those

present in *Friendly* than in *SIDA*, and concludes that these factors by and large weigh in favor of finding Mr. Doud was an employee of Yellow Cab.

### a. Ownership of Taxi

*Friendly* concluded that this tipped in favor of employee status because Friendly's drivers did not own their taxicabs, but leased them from Friendly. *Friendly,* 512 F.3d at 1099. The same is true here (Doc. # 38-1 at 3 ¶ 4); as such, consistent with *Friendly,* the court finds this fact tips in favor of employee status.

### b. Subleasing

In addition, Friendly prohibited drivers from subleasing their taxicabs to others. *Friendly*, 512 F.3d at 1099. The lease between the parties here similarly precludes a sublease. (Doc. # 38-1 at 3 ¶ 7.) Yellow Cab argues that the reason Yellow Cab precludes subleasing is because NAC 706.3753(i) does not permit taxi drivers to sublease their vehicles. (Doc. # 38 at 10.)

NAC 706.3753(i) does state that an independent contractor taxi driver cannot transfer, assign, sublease or otherwise enter into an agreement to lease the taxicab to another person.

Mr. Doud asserts, however, that Yellow Cab does allow its drivers to sublease taxis as long as they go through Yellow Cab and do not profit from the arrangement, but the drivers cannot, on their own hire a subleasing driver to work part of their shift. (Doc. # 42 at 7.) The reason that drivers cannot do so, however, is because the NAC precludes such an arrangement. In light of this NAC provision, the fact that Yellow Cab does not allow its drivers to sublease their vehicles does not tip either toward independent contractor or employee status. *See Friendly*, 512 F.3d at 1101 (noting that "incorporation of government regulations into a company's manual is not evidence of any employer-employee relationship"; contrasting with *SIDA*, 512 F.2d at 359, stating that where requirements exceed government regulations it evidences some degree of control).

### c. "Moonlighting"

In *SIDA*, the drivers were found to be independent contractors where they could "moonlight" or work for other cab companies. *SIDA*, 512 F.2d at 357-58. Mr. Doud asserts that he could not "moonlight" by working for another taxi company, which is indicative of his

1   employee status. (*Id*. at 22 ¶ 14i.)

2       Yellow Cab states that it does not regulate what other activities the drivers engage in so

3   long as they come within the law, *i.e.*, they do not exceed the number of hours permitted per day

4   as provided by Nevada law. (Doc. # 38-2 at 9-10.) Yellow Cab contends that State law precludes

5   drivers from driving for more than twelve hours in any twenty-four hour period, so they would

6   violate this regulation if they were "moonlighting" as Mr. Doud suggests. (Doc. # 38 at 10.)

7       If it is true that Yellow Cab does not preclude "moonlighting" for another taxi company

8   so long as the driver is compliant with NAC 706.3761's regulation of a driver's hours of service,

9   then this factor weighs in favor of independent contractor status. Since, however, Yellow Cab

10  seems to suggest that it would have been virtually impossible for Mr. Doud to complete his shift

11  with Yellow Cab and "moonlight" for another taxi company in any event, this factor is actually

12  neutral and does not weigh in favor of employee or independent contractor status.

13              **d. No Use of Taxi for Outside Business**

14      Friendly only allowed drivers to use taxicabs to respond to dispatches from Friendly, and

15  not for outside business. *Friendly*, 512 F.3d at 1098.

16      The lease agreement provides that the taxicab could not be used by Mr. Doud for

17  "personal use." (Doc. # 38-1 at 6 ¶ 14.) As will be discussed below, if a Yellow Cab driver opted

18  to utilize its dispatch service, it was obligated to pick up passengers through the dispatch system.

19  This factor weighs in favor of finding employee status.

20              **e. Soliciting Customers**

21      Friendly's drivers were prohibited from soliciting customers, and "all calls for service

22  [had to] be conducted over company provided communications system and telephone number."

23  *Friendly*, 512 F.3d at 1098.

24      The lease agreement here states that Yellow Cab would make available to Mr. Doud a

25  dispatch service as a means of referring prospective passengers, which Mr. Doud had the option

26  to use, and if he did so, he had to pick up passengers through the dispatch system. (Doc. # 38-1 at

27  12 ¶ 29.) Mr. Doud was not obligated to respond to dispatch calls if he opted not to utilize the

28  dispatch service. (*Id*.) He was not obligated to report his location to Yellow Cab or to remain in

1    any specific place at any fixed hours. (*Id*.)

2          The fact that Yellow Cab utilized a dispatch system and made it available to its drivers

3    does indicate the exertion of some control by Yellow Cab; but, on the other hand, the lease states

4    that use of the dispatch system is at the option of the drivers. Nevertheless, Mr. Doud contends

5    that he could be disciplined for not accepting dispatch calls. (Doud Decl., Doc. # 31-1 at 24

6    ¶ 28.) He recounts that if he were unable to accept a dispatch calls, he would not be given

7    dispatch calls for the following day. (*Id*.) Yellow Cab does not dispute this, but states that it and

8    Mr. Doud, by choosing to use the dispatch service, have an obligation to serve the traveling

9    public. (Doc. # 38 at 14.) It does not dispute that Mr. Doud was punished for rejecting dispatch

10   calls by not being given additional dispatch calls for a period of time. This is evidence of control

11   on the part of Yellow Cab; therefore, this factor weighs in favor of finding Mr. Doud was an

12   employee.

13                    **f. Business Cards**

14         *Friendly* noted that the taxicab company required its drivers to carry company business

15   cards, and precluded them from distributing private business cards of telephone numbers.

16   *Friendly*, 512 F.3d at 1098. This was an indicator of lack of entrepreneurship which indicated

17   employee status. *Id*.

18         Mr. Doud contends that Yellow Cab similarly precluded him from utilizing personal

19   business cards. (Doud Decl., Doc. # 31-1 at 22 ¶ 14h.) He was provided Yellow Cab's company

20   business cards to use, which contained Yellow Cab's name and number, and a space where he

21   could write his name to indicate he was the driver for Yellow Cab. (*Id*. at 23 ¶ 16.) He was

22   precluded from advertising his services as a driver for Yellow Cab on the internet, telephone,

23   television, radio, through business cards or print media which would indicate to anyone that he

24   was a taxi driver in his name. (*Id*. at 22 ¶ 14g.)

25         Yellow Cab argues that pursuant to NAC 706.376, only the company may approve

26   advertising and certain items must be included on all advertisements; therefore, Yellow Cab is

27   not exercising control over Mr. Doud in precluding personal business cards, but only ensuring

28   compliance with regulations. (Doc. # 38 at 14-15.)

1    NAC 706.376 states that a driver cannot display or distribute advertising that has not

2    been authorized by his or her employer, but that would not preclude Yellow Cab from

3    authorizing a driver to utilize personal business cards. NAC 706.376(12). In addition, Yellow

4    Cab could still approve the content of the business cards and be compliant with the regulations.

5    Therefore, this fact weighs in favor of employee status.

6    **g. Goodwill**

7    In *SIDA*, the Ninth Circuit concluded that the drivers were independent contractors, based

8    in part on the fact that the drivers were able "to make their own arrangements with clients and to

9    develop their own goodwill." *SIDA*, 512 F.2d at 357-58. In *Friendly*, on the other hand, one of

10   the factors supporting the Ninth Circuit's conclusion that the drivers were employees was the fact

11   that Friendly's policy mandated that "its drivers must operate the taxis 'in such a manner as to

12   protect the goodwill that exists between the company and its customers.'" *Friendly*, 512 F.3d at

13   1098-99.

14   The lease agreement between Mr. Doud and Yellow Cab similarly required Mr. Doud to

15   maintain Yellow Cab's goodwill. (Doc. # 31-1 at 15-16 ¶ 31 ("It is understood between

16   LEASING COMPANY and LESSEE that it is in each party's best interest to maintain the

17   reputation and goodwill of LEASING COMPANY and LESSEE.").)  Yellow Cab argues that it

18   is in Mr. Doud's best interest to maintain Yellow Cab's goodwill. (Doc. # 38 at 13.) This may

19   well be the case; however, the court concludes, consistent with *Friendly*, that because the

20   agreement required Doud to maintain Yellow Cab's reputation and goodwill, this is some

21   evidence of a lack of entrepreneurship. Therefore, this factor tips in favor of employee status.

22   **10. Control**

23   *Friendly* concluded that a factor that supported the determination that Friendly's drivers

24   were employees was:

25   > Evidence that Friendly sought to control the means and manner of its drivers'
   > performance by regulating the manner in which they drive, imposing a strict
   > disciplinary regime, requiring drivers to carry advertisements without receiving

26   > revenue, requiring drivers to accept vouchers subject to Friendly's 'processing
   > fees,' imposing a strict dress code, and requiring training in excess of government

27   > regulations.

28   *Friendly*, 512 F.3d at 1099.

**a. Discipline**

"In assessing control, courts have also focused on the presence, or lack thereof, of discipline imposed by a taxicab company on its drivers." *Id*. (citing *City Cab Co. of Orlando, Inc. v. NLRB*, 628 F.2d 261 (D.C. Cir. 1980) ("City Cab of Orlando II"). Courts have found it "significant that drivers were reluctant to refuse either a dispatcher's call for fear of not receiving future dispatches or an airport assignment because they would have to return to the end of the airport taxicab line." *Id*. (citing *City Cab of Orlando II*, 628 F.2d at 265 (concluding taxicab drivers were employees); *NLRB v. O'Hare-Midway Limousine Serv.*, 924 F.2d 692, 695 (7th Cir. 1991) (finding company's "right to fine or reprimand the drivers for failure to comply with company procedures" as support for concluding limousine drivers were employees); *Stamford Taxi, Inc.*, 332 N.L.R.B. 1372, 1384 (2000) (finding taxicab drivers that refused dispatch calls were "subject to discipline, denial of further dispatched calls, or lease termination" as support for concluding taxicab drivers were employees).

In *Friendly*, the Ninth Circuit found substantial control was exerted by Friendly over its drivers through a "strict disciplinary regime" where drivers were disciplined for refusing to cooperate with its dispatcher because the manual required the drivers to "service all reasonable customer calls from dispatcher" and drivers testified they were disciplined if they were late or refused a dispatch. *Id*. at 1100. Friendly employed a "road boss" to monitor drivers' appearance and compliance with Friendly policies with authority to warn drivers and suspend/terminate lease agreements. *Id*.

On the other hand, the absence of a disciplinary regime can be evidence of a lack of control and of independent contractor status. *Id*. (citing *Yellow Taxi Co. of Minneapolis v. NLRB*, 721 F.2d 366, 276-77 (D.C. Cir. 1983)). For example, in *Yellow Taxi of Minneapolis*, the D.C. Circuit concluded that the drivers were "free to refuse orders for runs, without penalty, and dispatchers were so instructed." *Yellow Taxi Co. of Minneapolis*, 721 F.2d at 377.

Mr. Doud asserts that Yellow Cab had a disciplinary system. (Doud Decl., Doc. # 31-1 at 23 ¶ 2.) He claims that the discipline was generally in the form of an order for him to "park" the vehicle for a certain number of hours during which he could not make money but was still

required to pay the rental fee. (*Id.*) He could be disciplined for failing to keep his vehicle clean, failing to be courteous to passengers, taking a call from another driver, aggressive driving, arguing with a dispatcher, failing to accept calls from dispatch, not following the dress code, failing to maintain Yellow Cab's goodwill and failing to respond to a call, and for a host of other reasons. (*Id.* at 24 ¶ 27.)

Insofar as dispatch is concerned, while the lease agreement specified that he did not have to utilize Yellow Cab's dispatch service, as was noted above, Mr. Doud maintains that in reality he was penalized if he did not. (Doc. # 31 at 12.) He states that if he rejected two calls from dispatch within a twenty-four hour period, he would not be given any calls for next twenty-four hours. (Doud Decl., Doc. # 31-1 at 24 ¶ 28.) This would occur even when he was on a call and was unable to accept the dispatch call. (*Id.*) Mr. Scott Dunlap, another former Yellow Cab driver, states that if he rejected a job from the dispatcher he was required to explain why and was penalized for thirty minutes during which time dispatch would not forward him any calls. (Dunlap Decl., Doc. # 31-1 at 29 ¶ 25.)

Yellow Cab's response is that under its certificate of public convenience and necessity it has an obligation to meet the needs of the traveling public and respond to calls for service; therefore, drivers who are not otherwise engaged in active or personal calls are required to also meet the needs of the traveling public. (Doc. # 38 at 14.)

Mr. Doud also contends that Yellow Cab employed a "road boss" who drives around Reno and looks at Yellow Cab drivers utilizing as GPS device to see how they are performing, and if the drivers are not performing to his specifications they can be terminated. (Doud Decl., Doc. # 31-1 at 23 ¶ 18.) Mr. Dunlap attests to this as well. (Dunlap Decl., Doc. # 31-1 at 28 ¶ 18.)

Mr. Sharma acknowledges that he took the position of "road boss" for Yellow Cab beginning in 2011. (Sharma Decl., Doc. # 38-3 at 2 ¶ 3.) He asserts that he assists other drivers and talks to other drivers if he sees them perform an action in violation of Chapter 706 of the NRS or NAC. (*Id.* ¶ 5.) He is also sometimes involved with assisting the company with other issues, including customer complaints, driver issues and driver questions. (*Id.* ¶ 6.) He disputes

1   that he ever talked with Mr. Doud regarding any violations and never "parked" either Mr. Doud

2   or Mr. Dunlap. (*Id*. ¶¶ 7-8.)

3         The lease agreement states that Yellow Cab shall make a dispatch service available to

4   Mr. Doud as a means of referring prospective passengers, which he had the option of using, and

5   if he elected to utilize it by logging into the digital dispatch system, he was required to pick up

6   passengers through the dispatch system. (Doc. # 38-1 at 12 ¶ 29.) Mr. Doud and his fellow

7   driver, Mr. Dunlap, state that they was penalized for rejecting calls from dispatch, and Yellow

8   Cab's only response is that it has an obligation to meet the needs of the traveling public. It

9   provides no evidence to dispute that drivers were in fact penalized if they rejected calls from

10  dispatch. Here, as the Ninth Circuit did in *Friendly*, the court concludes that this is evidence of

11  Yellow Cab exerting control over Md. Doud and weighs in favor of finding Mr. Doud was an

12  employee.

13        Yellow Cab does not provide evidence to create a genuine dispute of material fact as to

14  the other methods of discipline raised by Mr. Doud. While Mr. Sharma states that he did not

15  personally discipline Mr. Doud by "parking" him, he did not dispute that this is a disciplinary

16  measure invoked by Yellow Cab, which shows the exertion of control. Therefore, the discipline

17  factor weighs in favor of employee status.

18                              **b. Personalization**

19        Mr. Doud claims he was prohibited from using the taxi for personal use, personal travel,

20  errands, or parking the vehicle for an extended period of time for sleeping. (Doud Decl., Doc.

21  # 31-1 at 22 ¶ 14e; Doc. # 31-1 at 9 ¶ 14.) He could not make any alterations or changes to the

22  taxi or personalize it in any way. (*Id*. ¶ 14a, b.)

23        Yellow Cab responds that it is the owner of the vehicle and it did not permit alterations or

24  personalization of the taxi to ensure compliance with NAC 706.3742. (Doc. # 38 at 14.) It states

25  that it did not prohibit drivers from non-permanent changes that would not violate the

26  regulations. (*Id*.)

27        NAC 706.3742 requires, *inter alia,* the taxicab certificate holder to equip the taxi with an

28  approved cruising light on the roof of the taxi; display the unit number of the taxi in various

- 25 -

1  locations; display the telephone number of unit number of the taxi cab; and display the certificate

2  number. NAC 706.3742(1)(a)-(d).

3       Yellow Cab's response leaves in play permanent changes to the taxi that are not contrary

4  to NAC 706.3742. To the extent Mr. Doud was precluded from making such alterations or

5  personalization, this can be viewed as the exertion of control over the driver, and tips slightly in

6  favor of employee status.

7       **c. Report Daily Conditions Requiring Repairs/Maintenance/Daily Inspection**

8  **Sheet**

9       Mr. Doud asserts that he was required to inspect the vehicle at the beginning of each

10  twelve hour period, and document and submit to Yellow Cab a daily inspection sheet noting any

11  condition that required repair or maintenance to the vehicle. (*Id.* at 21 ¶ 13a, b.) All vehicle

12  maintenance, including regularly scheduled service was Yellow Cab's responsibility and was

13  required to be performed at Yellow Cab. (Doc. # 38-4 at 3 ¶ 3.)

14       The lease agreement required Mr. Doud to inspect the taxi at the beginning and end of

15  each shift and document on a daily inspection sheet and report any condition requiring repair or

16  maintenance to Yellow Cab on a daily basis. (Doc. # 38-4 at 5 ¶ 12.)

17       Yellow Cab states that NTA's model lease agreement requires this language in

18  accordance with NAC 706.3753(h)(2). (Doc. # 38 at 11.) Yellow Cab also argues that NAC

19  706.3753 requires that the vehicle be inspected at the beginning of each twelve hour shift, that

20  the driver document and submit a daily inspection sheet and report daily conditions regarding

21  repair and maintenance. (Doc. # 38 at 11.) With regard to the daily inspection sheets, Yellow

22  Cab's discovery response states that it includes a "daily inspection" section on every trip sheet to

23  comply with chapter 706 of both the NRS and NAC. (Doc. # 38-2 at 5.)

24       In his reply, Mr. Doud asserts that Nevada law does not require him to inspect his taxi at

25  the start of each twelve-hour shift, and in requiring that Mr. Doud do this Yellow Cab goes

26  above and beyond the State's regulations. (Doc. # 42 at 5.) He similarly argues that Yellow Cab

27  goes beyond Nevada's requirements by requiring that Doud report any condition requiring repair

28  or maintenance at the start of his twelve-hour shift. (*Id.*)

1    While Yellow Cab argues that NAC 706.3753(h)(2) requires that the taxi be inspected at

2   the beginning of each twelve-hour shift, this section merely states that the independent

3   contractor's lease must provide that the taxicab "[i]s in good mechanical condition that will meet

4   the requirements for operating taxicabs set forth by this State or the county or municipality in

5   which the taxicab will be operated." It does not require the inspection of the vehicle at the

6   beginning of each twelve hour shift. Nor does this section require that conditions requiring repair

7   or maintenance be reported on a daily basis, as Yellow Cab suggests. NAC 706.379 governs

8   inspection and maintenance of taxicabs. It provides that taxicabs shall be inspected regularly, but

9   does not specifically require the inspection take place prior to the start of each twelve hour shift,

10   or even that it occur daily. NAC 706.379(1). NAC 706.380 does state that taxicab's shall be

11   withdrawn from service at the end of the day, and not placed back into service unless structurally

12   sound; it has only minimal noise and vibration; does not have cracked, broken or badly dented

13   fenders; and is painted with reasonable protection against structural deterioration. This section

14   does not require inspection at the beginning of a shift. Nor does it require a report on conditions

15   requiring repair on a daily basis.

16    Therefore, the fact that Yellow Cab requires the inspection of the vehicle at the beginning

17   of each twelve-hour shift and a daily inspection sheet is evidence of control exerted by Yellow

18   Cab over Mr. Doud.

19    **d. Regulation of Driver Hours of Operation**

20    Mr. Doud asserts that he could not operate the taxicab for more than twelve hours in any

21   twenty-four hour period. (Doud Decl., Doc. # 31-1 at 22 ¶ 14c.) He had to return the vehicle to

22   Yellow Cab's premises at the end of the twelve hour period with keys and a full tank of gas.

23   (Doud Decl., Doc. # 31-1 at 21 ¶ 13d, e, f.) This is consistent with the provisions of the lease

24   agreement. (Doc. # 38-4 at 4 ¶ 5.)

25    Yellow Cab points out that the NAC mandates that drivers not be allowed to drive for

26   more than twelve hours in a twenty-four hour period. (Doc. # 38 at 10, citing NAC 706.3761,

27   Doc. # 38 at 14, citing NAC 706.3753.) Yellow Cab also states that this is required by NRS

28   706.380, and that the return of the vehicle to Yellow Cab cannot be achieved without it receiving

1   the keys to the vehicle. (Doc. # 38 at 11.) The reason for the return with a full tank of gas is that

2   Yellow Cab drivers receive the vehicle with a full tank of gas. (*Id.*) Therefore, it asserts this is

3   not evidence of control. (*Id.*) It further contends that NRS 706.380 requires the return of the

4   vehicle with the keys and full tank of gas. (*Id.*)

5          In *Friendly*, the Ninth Circuit discussed that the NLRB found an indicia of independent

6   contractor status in the fact that Friendly drivers did not work set hours or a minimum number of

7   hours. *Friendly*, 512 F.3d at 1097. Friendly did start to restrict driver leases to ten hour days

8   because this was required under the California Vehicle Code, and the Ninth Circuit concluded

9   that this did "not constitute any degree of control since it [was] mandated pursuant to

10  government regulations." *Id.* at 1097, n. 7.

11          According to Mr. Doud, he was not permitted to operate the taxi for more than 12 hours

12  in any twenty-four hour period, and had to return the taxi to Yellow Cab at the end of the twelve

13  hour shift. (Doud Decl., Doc. # 31-1 at 22 ¶ 14c.) Yellow Cab is correct that this is required by

14  State law. NAC 706.3753 states that a lease agreement must specifically state that an

15  independent contractor "[s]hall not operate the taxicab for more than 12 hours in any 24-hour

16  period" and "return the taxicab to the certificate holder at the end of each shift to enable the

17  certificate holder to comply with the provisions of NAC 706.380." NAC 706.3753(1)(j)(1), (2).

18  NAC 706.3761 provides, however, that a taxicab driver can exceed the twelve hours when he or

19  she is under a charter or trip that commenced within a reasonable period before the end of the

20  driver's shift. NAC 706.3761(1). Mr. Doud contends that Yellow Cab goes beyond State law

21  because it does not provide him the flexibility the law does in that he could go beyond the twelve

22  hour shift limit if he commenced a charter or trip within a reasonable period before the end of his

23  shift. The court agrees, but finds that this fact only weighs slightly in favor of employee status.

24          Yellow Cab asserts that NRS 706.380 requires the driver to return the keys and vehicle to

25  Yellow Cab with a full tank of gas at the end of each shift. (Doc. # 38 at 11.) Mr. Doud argues

26  that NRS 706.380 was repealed in 1971 and has not been replaced. (Doc. # 42 at 11.) It appears

27  that Yellow Cab was referring to NAC 706.380, and not the repealed section of the NRS. NAC

28  706.380 states that a taxi must be withdrawn from service at the end of every day and not placed

1   back into service unless "structurally sound and operates with a minimum of noise and

2   vibration," "[d]oes not have any cracked, broken or badly dented fenders," and "[i]s painted to

3   provide reasonable protection against structural deterioration." It does not define what constitutes

4   "the end of the day," and whether that coincides with the end of a twelve-hour shift. It does not

5   require that the cab be returned with a full tank of gas. NAC 706.3753 further states that the

6   taxicab is to be returned to the operator at the end of each shift to enable the certificate holder to

7   comply with the provisions of NAC 706.380. NAC 706.3753(1)(j)(2). To the extent that Yellow

8   Cab's requirement that the taxi be returned at the end of the shift is consistent with State law, it

9   does not militate in favor of either independent contractor or employee status. This does not

10  change because Mr. Doud had to return the keys with the vehicle, as requiring the return of the

11  keys does not evidence any more control when the vehicle is also being returned pursuant to

12  State law. The court does not find that requiring Mr. Doud to return the car with gas is evidence

13  of the exertion of control over Mr. Doud when he received the car with a full tank of gas.

14                          **e. Trip Sheet**

15          Mr. Doud asserts that he had to date and time stamp a trip sheet provided by Yellow Cab

16  at the beginning and end of each twelve hour lease period. (*Id.* ¶ 13.i.) This is consistent with the

17  the lease agreement, which provides that at the beginning of each daily shift, Yellow Cab must

18  provide Mr. Doud with a date and time stamped trip sheet, and at the end of each daily shift,

19  Mr. Doud must provide Yellow Cab with the completed date and time stamped trip sheet. (Doc.

20  # 38-4 at 4-5.)

21          Yellow Cab responds that NAC 706.3747 requires all drivers to maintain trip sheets to

22  document all fares taken. (Doc. # 38 at 12; Doc. # 38-2 at 5.)

23          Yellow Cab is correct that NAC 706.3747 requires taxicab drivers to keep a daily trip

24  sheet which includes the following: "(a) At the beginning of each shift: (1) The driver's name;

25  (2) The unit number of his or her taxicab; (3) The time stamp required by subsection 5 of NAC

26  706.3761 to indicate the time at which the shift began; and (4) the odometer reading of the

27  taxicab." NAC 706.3747(2)(a)(1)-(4).) In addition, it is to reflect during each shift: "(1) The time,

28  place of origin, requested destination and actual destination, if different from the requested

1  destination, of each trip; and (2) The number of passengers and amount of fare for each trip."

2  NAC 706.3747(2)(b)(1)-(2). Finally, at the end of each shift, the sheet should include: "(1) The

3  time stamp required by subsection 5 of NAC 706.3761 to indicate the time at which the driver's

4  shift ended; and (2) The odometer reading of the taxicab." NAC 706.3747(c)(1)-(2).

5      Importantly, it further states that "[a] driver who is an independent contractor shall

6  submit to the certificate holder at the end of each week in which he or she worked at least one

7  shift a completed trip sheet for each shift worked by that driver during that week." NAC

8  706.3747(5). Employee drivers, on the other hand, are required to submit the completed trip

9  sheet at the end of each shift. NAC 706.3747(6).

10     Mr. Doud is correct that for "independent contractors," the trip sheets are only supposed

11  to be turned in every week, while "employees" are to turn in theirs at the end of each shift. (*See*

12  Doc. # 42 at 5.) In requiring Mr. Doud to submit the time and date stamped trip sheet at the

13  beginning and end of each shift, Yellow Cab goes above and beyond what is required under

14  NAC 706.3747, and its practice is akin to that required of employees under the regulation.

15  Therefore, this factor weighs in favor of finding Mr. Doud was an employee of Yellow Cab.

16                    **f. Wash and Clean Vehicle**

17     Mr. Doud also states that Yellow Cab required its drivers to wash and clean their vehicles

18  subject to inspection by its "road boss," which is not required by State law. (Doud Decl., Doc.

19  # 1-1 at 23 ¶ 21; Doc. # 42 at 6.)

20     In its opposition, Yellow Cab asserts that it is in the interest of the driver to maintain

21  Yellow Cab's goodwill, and that there was no inspection by a "road boss" of the vehicle; rather,

22  if a manager of Yellow Cab saw a vehicle that was a safety hazard due to garbage, the driver

23  may be asked to clean it, but no harm would come to the driver if it was not cleaned. (Doc. # 38

24  at 13.)

25     In his reply, Mr. Doud asserts that he personally observed Mr. Sharma order drivers to

26  "park" their vehicles for the rest of the day because he found them to be unclean. (Doud Decl.,

27  Doc. # 42-1 at 4 ¶ 9.)

28     Mr. Sharma's declaration does not include any attestation as to whether or not vehicles

were inspected for cleanliness. (*See* Doc. # 38-3 at 2.) The discovery responses submitted by Yellow Cab in support of its opposition are similarly devoid of any response dealing with this topic. No other evidence was provided to refute Mr. Doud's assertion that Yellow Cab required its drivers to wash and clean their vehicles subject to inspection by the "road boss." As such, the court concludes that this factor is evidence of control by Yellow Cab and weighs in favor of finding he was an employee.

### g. Health Certificate/DMV Record

Mr. Doud argues that he was required to provide a certificate from a licensed physician demonstrating that he was physically qualified to operate a taxi, and to keep the certificate of health in his possession when operating the taxi. (*Id*. ¶ 13j, k.) He also had to provide a copy of his DMV record. (*Id*. ¶ 13l.)

NAC 706.3571 does require a certificate from a licensed physician demonstrating the driver is physically qualified to operate a commercial motor vehicle, and a copy of the driving record. NAC 706.3571(1)(c)(1), (2). It provides that the "certificate holder" shall retain a copy of each document submitted by the employee or independent contractor. NAC 706.3571(3). The driver is also required to keep the certificate from the licensed physician in his possession when in operation. NAC 706.376(13).

As these requirements are consistent with State law, they are not evidence that Mr. Doud was an employee, as he suggests. They apply whether or not the driver is an employee or independent contractor; therefore, they do not weigh in favor of a finding in either respect.

### h. Reporting of Violent Crimes, Accidents or Losses

Mr. Doud also had to report violent crimes, accidents or losses to Yellow Cab. (*Id*. ¶ 13m.)

With respect to reporting violent crimes, accidents or losses, NAC 706.3748 requires that the certificate holder notify other authorized certificate holders in the county in which the crime occurred of all relevant details of an incident in which a taxicab driver is the victim of a violent crime while on duty, and notify the NTA within twenty-four hours. NAC 706.3748(1). The certificate holder must likewise relay the relevant details to dispatch operators, drivers and

lessees. NAC 706.3748(2).  NAC 706.3749 provides that if a taxicab is involved in an accident, the certificate holder must notify the NTA within twenty-four hours or on the next business day, and make the taxicab available for inspection within three days of its being placed back in service. NAC 706.3749.

Mr. Doud asserts that Yellow Cab's lease agreement goes much further than this by requiring the driver to "obtain a reasonable description of the other vehicle involved in the accident, including but not limited to, the make, model, color, license plate of the vehicle" and to "remain at the accident scene to allow the leasing company to investigate until advised by leasing company to leave the accident scene." (Doc. # 42 at 13.)

Yellow Cab exceeds what is required by State law in requiring the provision of specific, detailed information and in requiring the driver to stay at the scene until released by Yellow Cab. Therefore, the court concludes this is some evidence of control by Yellow Cab. Because some of what is required by Yellow Cab is consistent with State law, the court finds that this factor only tips slightly in favor of finding Mr. Doud was an employee.

### i. Advertisements

The Ninth Circuit determined that the fact that Friendly required its taxis to carry advertisements was further evidence of control as the drivers were "subject to Friendly's discretionary requests to change advertisements" requiring a driver to "sit idle while advertisements are changed" resulting in the driver "losing potential fares." *Friendly*, 512 F.3d at 1100. Friendly drivers had no say in what advertisements their vehicles carried and could not refuse a particular advertisement. *Id*. The Ninth Circuit concluded that this type of control "exceed[ed] that found in the typical case in which a company requires its workers place advertisements on work vehicles." *Id*. It distinguished the facts from those in *City Cab of Orlando I*, where the court concluded that requiring a driver return to its facility to place a decal with a new phone listing on the vehicle was not evidence of control because "the decals primarily benefitted the taxicab drivers and the general public." *Id*. (citing *City Cab of Orlando I*, 285 N.L.R.B. at 1206). Requiring the placement of advertisements on the taxicab, on the other hand, "represents a form of control that inures to the benefit of Friendly at the financial expense

1   of the drivers." *Id.*

2       Mr. Doud similarly contends that he was required to have the taxi-top advertisements, but

3   had no say in what was advertised, and was not compensated by the advertiser. (Doud Decl.,

4   Doc. # 31-1 at 22 ¶ 15.) He could not refuse to drive a taxi with advertisements. (*Id.*) He had to

5   return to Yellow Cab to change out the taxi-top advertisements, and sometimes had to wait up to

6   two hours while the sign was changed and was not compensated for this time spent waiting. (*Id.*

7   at 21 ¶ 13n.)

8       Yellow Cab asserts that only the company may approve of advertising pursuant to NAC

9   706.376; therefore, it is appropriate for Yellow Cab to replace the advertisements. (Doc. # 38 at

10  12.)

11      Mr. Doud contends that Nevada law does not preclude him from receiving revenue from

12  the roof top advertising he is required to carry on his taxi. (Doc. # 42 at 5.)

13      NAC 706.376 states that a driver "shall not display or distribute any advertising within or

14  on the driver's taxicab that has not been authorized by his or her employer." NAC 706.376(12).

15  As Mr. Doud points out, this regulation does not mandate that drivers be required to wait,

16  without compensation, while the advertisements are changed out. While Yellow Cab's opposition

17  states that it refutes that its drivers are required to wait two hours for this replacement (Doc. # 38

18  at 12), it provides no *evidence* to support its position. As such, consistent with *Friendly,* the court

19  finds the fact that Mr. Doud was required to wait without compensation while advertisements

20  were changed out by Yellow Cab is indicative of employee status.

21                          **j. Vouchers/Credit Cards**

22      Next, *Friendly* discussed the requirement that the drivers accept vouchers from

23  customers, and concluded this was further evidence of control. *Id.* at 1100-01. It noted that some

24  courts had found that requiring a driver to accept a flat voucher fee was not "evidence of

25  sufficient control by itself to indicate 'employee' status." *Id.* (citing *Yellow Taxi of Minneapolis*,

26  721 F.2d at 371; *Air Transit, Inc. v. NLRB*, 679 F.2d 1095, 1100 (4th Cir. 1982)). The Ninth

27  Circuit found, however, that Friendly exerted greater control over its drivers because it required

28  its drivers to accept these trips in its discretion, then charged its drivers "graduated processing

fees" when they would redeem vouchers, and the voucher trips could pay lower than metered rates. *Id*. at 1101.

According to Mr. Doud, he was required by Yellow Cab to accept vouchers on occasion. (Doud Decl., Doc. # 31-1 at 24 ¶ 30.) He would go to a business which had an account with Yellow Cab and would be sent by the dispatcher to pick up a parcel and deliver it to a specified location. (*Id*.) The voucher was made out to Yellow Cab, and the amount of the fee was pre-set by Yellow Cab, and Mr. Doud got the pre-set fee regardless if the meter-fee exceeded the pre-set fee. (*Id*.) The amount of the voucher was deducted from the rental agreement. (*Id*.) He also did not receive a tip. (*Id*.) In addition, he contends that on occasion he was required to take people from a medical center for an amount pre-set by Yellow Cab. (*Id*. ¶ 31.) Plaintiff was also required by Yellow Cab to accept credit card payment, which were made out to Yellow Cab and then deducted from his weekly rental. (*Id*. ¶ 29.)

Yellow Cab asserts that certain business have contacted it with the interest of paying for certain fares, and Yellow Cab sets up an account for that business to pay the fares and provides the company slips to provide the fares the company has agreed to pay for, commonly referred to as vouchers. (Doc. # 38-2 at 11-12.) When a voucher is used, the passenger gives the driver the voucher for payment and it is submitted by the driver to Yellow Cab and is credited to the driver as a cash payment. (Doc. # 38-2 at 12.) As a courtesy, Yellow Cab collects the fare from the paying party. (*Id*.) In his declaration, Mr. Sharma states that when he has a customer who pays with a voucher he is credited by Yellow Cab the full-metered amount, and his weekly lease payment is reduced as such. (Sharma Decl., Doc. # 38-3 at 2 ¶ 9.)

In his reply, Mr. Doud contends that he was required by Yellow Cab to accept vouchers for preset amounts from designated Yellow Cab clients and he had no input into what he could charge for those vouchers. (Doc. # 42 at 5.) He also argues that the voucher payments for the flat fee negotiated between Yellow Cab and the customer were deducted from his weekly lease, and he was not given the fare in cash to spend as he wished. (*Id*. at 9.) Mr. Doud acknowledges that he received the full value of the voucher/flat rate negotiated fee when he turned the voucher into Yellow Cab, but the compensation amount was set by Yellow Cab. (*Id*. at 10.)

1    While Mr. Sharma states that when *he* received a voucher it was credited to his weekly

2    rate at the full-metered amount. He does not, however, dispute that on occasions when Mr. Doud

3    had to accept vouchers, he was credited less than the metered amount. The fact that Yellow Cab

4    required Mr. Doud to accept vouchers on occasion and that he received less than the metered

5    amount, coupled with the fact that the payment was credited to his weekly rate and not paid to

6    him in cash so he could spend it as he wished (and without tip) is evidence of control on the part

7    of Yellow Cab and indicative of an employer-employee relationship. The fact that Mr. Doud was

8    required to accept credit card payments from customers on occasion that were paid to Yellow

9    Cab and then deducted from his weekly rate is additional evidence of control on the part of

10   Yellow insofar as once again Mr. Doud did not receive payment in cash to spend as he wished.

11                                        **k. Dress Code**

12   Friendly's dress code also evidenced Friendly's control over its drivers. *Id*. The Ninth

13   Circuit noted a similar conclusion in *City Cab of Orlando II*, where drivers were required to wear

14   a collared shirt, no jeans or shorts, to be clean-shaven, not to wear tennis shoes, and only wear a

15   designated "cab drivers hat." *Id*. (citing *City Cab of Orlando II*, 628 F.2d at 265). Friendly

16   imposed a similar dress code. While this factor is typically not given "much weight," it was

17   another factor that supported the determination that Friendly's drivers were employees. *Id*. (citing

18   *SIDA*, 512 F.2d at 358-59 (finding independent contractor status where drivers were required to

19   "be neat and courteous, display the SIDA identification on their dome lights and uniforms);

20   *Carnation*, 429 F.2d at 1132 (finding the fact that distributors did not have to wear uniforms

21   indicative of independent contractor status); *C.C. Eastern*, 60 F.3d at 858 (finding lack of control

22   over dress or appearance indicative of independent contractor status)).

23   Mr. Doud maintains that Yellow Cab also had a dress code that required him to wear a

24   collared shirt, and he was prohibited from wearing blue jeans, a tank top, a sleeveless shirt,

25   shorts or short pants or sandals, and he was required to be clean shaven. (Doud Decl., Doc. # 31-

26   1 at 23 ¶ 26.) Mr. Dunlap echoes this statement. (Dunlap Decl., Doc. # 31-1 at 29 ¶ 27.)

27   According to Yellow Cab, its drivers were not obligated to do anything with respect to

28   dress, but it did encourage them to be clean, wear clean clothes, and to be courteous. (Doc. # 38-

2 at 6-7.) It acknowledges that it asks its drivers to be clean and not offensive to the traveling public. (*Id.*) It also "encourages that no open toed shoes be worn; non-dirty/non-holey pans, and collared shirts with no offensive language or images contained thereon." (*Id.* at 7.)

In his reply brief, Mr. Doud submits a copy of a sign hanging in Yellow Cab's office which contains its "Dress Code Policy." (Doc. # 42 at 15, Doc. # 42-1 at 2.) The sign reflects that it is company policy to: wear a collared shirt, have no hair on the chin, not have a mustache longer than the corner of the chin and no goatees, no face jewelry, no sweats, no opened toe shoes, cover up tattoos, no torn, dirty or frayed clothing. (*Id.*)

Yellow Cab acknowledges that its lease contains a provision stating that "personal grooming, dress, [and] appearance" are to the parties' benefit, but states the driver was under no obligation to comply. (Doc. # 38-2 at 6.) The statement that the driver was under no obligation to comply is contrary to the position taken by Yellow Cab that it entered into a lease agreement with Mr. Doud which was binding on him. If the lease agreement was binding on him, he was required to comply with its provisions, including the provision that indicated the importance of personal grooming, dress and appearance. Therefore, it has not refuted Mr. Doud's statement that it did in fact employ a dress code, which is evidenced not only from its lease agreement[6] but also the sign hanging in its office. Therefore, as in *Friendly* and *City Cab of Orlando II*, this factor weighs in favor of finding Mr. Doud was an employee.

### l. Training

*Friendly* next turned to the taxicab company's training policy, which contained government as well as company-specific regulations. *Id.* The Ninth Circuit determined that this was "another minimal indicium of control" over the drivers. *Id.* "[T]he incorporation of government regulations into a company's manual is not evidence of an employer-employee relationship," however, if the company's "training requirements exceed those required" by the government, they "constitute some degree of control over the drivers." *Id.* (citing *Carnation*, 429

---

[6] The lease agreement states that it is in each party's best interest to maintain the reputation and goodwill of Yellow Cab and the driver, and "[i]n this regard, cleanliness of Leased Taxicab, courtesy, *personal grooming, dress, appearance*, safety, and observance of traffic laws are to each party's mutual benefit." (Doc. # 31-1 at 15-16 ¶ 31 (emphasis added).)

F.2d at 1132 (distributors not required to undergo training at company's request was indicative of independent contractor status); *Air Transit*, 679 F.2d at 1098 (where drivers received no training or road test to evaluate driving skills independent contractor status was indicated)). Friendly employed a mandatory two-day training that was above and beyond that required by local government regulation. *Id*. The Ninth Circuit found this supported a finding that the drivers were employees. *Id*.

Mr. Doud asserts that he was required to attend training classes at Yellow Cab, including defensive driving classes twice a year for two to four hours, and winter classes on winter driving, for which he was not compensated. (Doud Decl., Doc. # 31-1 at 22 ¶ 13o.) The discovery responses submitted by Yellow Cab acknowledge that they provide training to drivers including a six hour winter safety driving course, an eight hour defensive driving course, an initial driving orientation as well as other opportunities for training. (Doc. # 38-2 at 4.)   Yellow Cab also confirms that drivers are not compensated for time spent in training classes. (*Id*.) Yellow Cab argues, however, that it is justified in requiring this training because State law requires that it maintain a safe operation. (Doc. # 38 at 13, citing NRS 706.475, NAC 706.3571(b)(2)).

NRS 706.475 gives the NTA the power to adopt regulations as are necessary to ensure the taxicab business remains safe, including minimum qualifications and minimum safety standards. It does not mandate specific driver training.

There is no NAC 706.3571, however, in the event this was a typo, NAC 706.3751 states, *inter alia,* that a driver must be at least 21 and have a Nevada drivers' license for at least thirty days, possess a valid driver's permit issued by the NTA, provide the certificate form a licensed physician demonstrating he is physically qualified to operate the vehicle, and a copy of his driving record. It does not mandate driver training. Therefore, the court finds that the fact that Yellow Cab required its drivers to undertake uncompensated driver training militates in favor of finding Mr. Doud was an employee.

### III. CONCLUSION

In sum, the court concludes that federal common law principles of agency apply to determine employee versus independent contractor status for a claim brought pursuant to the

ADA. Here, most of the factors support a finding that Mr. Doud was an employee. In fact, the only factors that clearly support a finding that Mr. Doud was an independent contractor are that the lease agreement entered into pursuant to NRS 706.473 identified Mr. Doud as such, and that Yellow Cab did not provide benefits or withhold taxes on Mr. Doud's behalf. As in *Friendly*, the court concludes that these factors are substantially outweighed by evidence in the record that Mr. Doud was an employee of Yellow Cab. While Yellow Cab argues that disputes as to material facts preclude the entry of summary judgment, the disputed facts identified by Yellow Cab were not material, or where Yellow Cab argued there was a disputed material fact, it did not support its position with evidence so as to meet its burden under Rule 56.

Therefore, Mr. Doud's motion for partial Summary judgment as to Yellow Cab's twenty-fifth affirmative defense is **<u>GRANTED</u>**.

**IT IS SO ORDERED**.

Dated: March 30, 2015.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE