UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JAMES DOUD and MELODIE DOUD,<br><br>　　　　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>YELLOW CAB OF RENO, INC.,<br><br>　　　　　　　　　　　　　Defendants. | Case No. 3:13-cv-00664-WGC<br><br>**ORDER**<br><br>Re: Doc. # 95 |

　　Before the court is Defendant Yellow Cab of Reno, Inc.'s (Yellow Cab) Motion to Enforce Settlement Agreement. (Doc. # 95, Exhibits at Docs. # 95-1, 95-2, 95-3, 95-4.) Plaintiffs, James and Melodie Doud (the Douds), filed a response. (Docs. # 100 (response), # 101 (exhibits).)[1] Yellow Cab filed a reply brief. (Doc. # 102.) The court held an evidentiary hearing on August 3, 2015, and heard testimony from the Douds' counsel, Terri Keyser-Cooper;

---

[1] The Douds initially filed a motion for leave to file their response under seal. (Docs. # 97 (mtn. for leave to file under seal), # 98 (response).) The Douds sought leave to file the response under seal because the opposition concerns matters that were discussed in confidential mediation discussions with the Ninth Circuit and also references conversations related to such confidential discussions. (Doc. # 97 at 1.) The court denied that motion. (Doc. # 99.) The court explained that compelling reasons did not exist for sealing Plaintiff's entire response. (*Id*. at 2.) The court noted that Ninth Circuit Rule 33-1 provides that persons participating in the Ninth Circuit's mediation program must "maintain the confidentiality of the settlement process" and its confidentiality provisions "apply to any communication made at any time in the Ninth Circuit mediation process," and cover communications made by a "Circuit Mediator, any party, attorney or other participant in the settlement discussions." (*Id.,* citing Circuit Rule 33-1(c)(4).) The court advised the Douds that it had reviewed their responsive brief, and only one page out of thirty made substantive reference to communications concerning the Ninth Circuit mediation process. (*Id*. at 2-3, citing Doc. # 98 at 4:3-4, 10-12, 15-19.) In addition, two exhibits to the response referenced an offer conveyed in connection with the Ninth Circuit mediation and communications with the Ninth Circuit Mediator. (*Id*. at 3, citing Doc. # 98 at 41, 67.) Importantly, the court reiterated to the Douds that the Ninth Circuit Rule precludes disclosure of these confidential communications to any one not a party to the mediation, *including this court*. (*Id*. at 3.) The court ordered the Douds to file a new opposition that redacted the confidential provisions identified by the court. (*Id*.) The Douds filed a redacted response (Doc. # 100); however the information that was supposed to be redacted from the exhibits could still be viewed when enlarged. As a result, the Clerk's Office sealed the exhibits, and the Douds filed an errata properly redacting the information in the exhibits (Doc. # 100 (response), Doc. # 101 (redacted exhibits).) The disclosure of this confidential information is the subject of a motion for sanctions filed by Yellow Cab (Doc. # 103) which the court will address in a separate order.

Yellow Cab's former counsel, Michelle Bumgarner; and Yellow Cab's current counsel, Michael Pintar; as well as argument from Ms. Keyser-Cooper and Mr. Pintar. (*See* Minutes at Doc. # 110.) At the close of the hearing, the court indicated it would issue the instant written order denying Yellow Cab's motion. (*Id.*)

## I. BACKGROUND

The Douds filed their Complaint on December 4, 2013, asserting the following claims:

(1) Violation of Title III of the Americans with Disabilities Act (ADA) (James and Melodie Doud);[2]

(2) Violation of Title I of the ADA (Associational Discrimination, James Doud);[3]

(3) Violation of Title I of the ADA (Retaliation in Employment, James Doud);[4]

(4) Violation of Nevada Revised Statutes 706.361, Regulating Motor Carriers;[5]

(5) Violation of Nevada Revised Statute 706.366, Relating to Rights of Persons with Service Dogs;[6] and

(6) Tortious Failure to Furnish Facilities to a Member of the Public.[7]

---

[2] Title III of the ADA, *inter alia,* protects individuals with disabilities and individuals associated with them from discrimination by private entities offering public transportation. 42 U.S.C. § § 12181-12189. Melodie Doud is a qualified individual with a disability under the ADA, and James Doud receives the ADA's protection as a result of his association with Melodie Doud. The court granted the Douds summary judgment as to their Title III claim. (Doc. # 69.)

[3] Title I of the ADA makes it unlawful for an individual or entity to "exclude[ ] or otherwise deny[ ] equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association[.]" 42 U.S.C. § 12112(b)(4).

[4] Title I of the ADA also prohibits an employer from retaliating against an employee who engages in protected activity by opposing unlawful discrimination against persons with disabilities. 42 U.S.C. § 12203(a).

[5] Nev. Rev. Stat. 706.361 makes it unlawful to deny a person with a disability full and equal enjoyment of the facilities of a common motor carrier, or to deny service by interference with the use of an aid that person uses.Nev. Rev. Stat. 706.361(1), (4), (5). The carrier must designate a person to ensure ADA compliance. Nev. Rev. Stat. 706.361(2), (3), (5)(b), (c). The court dismissed this claim with prejudice, finding that Nevada law does not provide a private right of action for a violation of Nev. Rev. Stat. 706.361. *Compare*, *e.g.,* Nev. Rev. Stat. 706.366, which explicitly provides a private right of action for a violation of its provisions. Nev. Rev. Stat. 706.366(4).

[6] This statute makes it unlawful for a common motor carrier to "[r]efuse service to a person with a disability because the person is accompanied by the service animal." Nev. Rev. Stat. 706.366(1)(a). A common carrier found to have violated this provision "is civilly liable to the person against whom the violation was committed for: (a) Actual damages; (b) Such punitive damages as may be determined by a jury, or by a court sitting without a jury, which must not be more than three times the amount of actual damages, except that in no case may the punitive damages be less than $750; and (c) reasonable attorney's fees as determined by the court." Nev. Rev. Stat. 706.366(4)(a)-(c).

1    The Complaint alleges that Melodie Doud is disabled and utilizes a portable electric
2 scooter and crutch for mobility, and is frequently accompanied by her two service dogs. (Compl.,
3 Doc. # 1 1.) James Doud was an employee of Yellow Cab at the time the incidents that are the
4 subject of the complaint occurred. Generally, the Douds allege that they were denied
5 transportation services by Yellow Cab on two occasions in violation of the ADA, various
6 Nevada statutes, as well as Nevada common law, and that Mr. Doud was discriminated and
7 retaliated against when he was terminated from his employment with Yellow Cab.

8    The Douds moved for and were granted a preliminary injunction with respect to their
9 claim under Title III of the ADA by District Judge Du prior to the parties' agreement to enter
10 into the short trial program and the consent and assignment of this case to the undersigned for all
11 purposes. (Docs. # 9 (Mtn. for Prelim. Inj.), # 30 (Order granting Mtn. for Prelim. Inj.).) When
12 the parties consented to the undersigned being assigned to this case, the court held a status
13 conference where it set a trial date and referred the matter to the Honorable Robert A. McQuaid,
14 Jr., recalled United States Magistrate Judge, to conduct a settlement conference, which was set
15 for March 5, 2015. (*See* Docs. # 55, # 57.)

16    It was subsequently established by way of the Douds' motion for partial summary
17 judgment that Yellow Cab denied the Douds transportation services in violation of Title III of the
18 ADA when they sought transportation from Reno's airport on April 9, 2013, and again on
19 May 20, 2013. (Doc. # 69.) The Douds also filed a motion for partial summary judgment with
20 respect to Yellow Cab's twenty-fifth affirmative defense, which asserts that James Doud's Title I
21 claims fail because he was an independent contractor and not an employee of Yellow Cab. (Doc.
22 # 31.) The court granted this motion, finding that James Doud was an employee of Yellow Cab.
23 (Doc. # 79.)[8]

---

[7] The court pointed out that this is not a recognized common law tort claim in Nevada; therefore, it denied the Douds' motion for partial summary judgment as to this claim without prejudice, inviting the Douds, if they see fit, to seek certification of this question to the Nevada Supreme Court. (*See* Doc. # 69 at 28.) At the August 3, 2015 evidentiary hearing and at a status conference on August 13, 2015, the Douds' counsel confirmed that they have abandoned this claim. (*See* Minutes at Doc. # 110 at 3.)

[8] After performing an initial review of the briefing, the court held a status conference to ask for the parties' comment on whether this issue should be certified to the Nevada Supreme Court as an issue of first impression (*see*

1       The claims still pending before the court are: (a) Melodie Doud's fifth cause of action
2  that on April 9, 2013, one of Yellow Cab's drivers refused to transport her because she had her
3  two service dogs with her in violation of Nevada Revised Statute 706.366 (Doc. # 1 at 5 ¶¶ 15,
4  87-91); and (b) James Doud's second and third causes of action under Title I of the ADA,
5  alleging that he was discriminated and retaliated against when he was terminated from his
6  employment because of Melodie Doud's disability and because he complained about being
7  refused service by Yellow Cab's drivers. (Doc. # 1 ¶¶ 12, 39-41, 62-77.)
8       The parties participated in a settlement conference before Judge McQuaid on March 5,
9  2015, but were unsuccessful in resolving the case, though they continued their settlement
10 discussions outside of the formal court setting. (*See* Minutes at Doc. # 71.)
11      On March 31, 2015, Yellow Cab filed a motion seeking sanctions, or alternatively, an
12 order compelling settlement. (Doc. # 80.) In short, this motion was denied without prejudice
13 because the motion contained confidential settlement communications and Yellow Cab, despite
14 being given an opportunity to do so, failed to file an accompanying motion for leave to file the
15 document under seal. (*See* Docs. # 81, # 85.)
16      Following the entry Judge Du's order granting the Douds' motion for preliminary
17 injunction, the Douds filed a motion for interim attorneys' fees and costs. (Doc. # 32.) After the
18 court issued its order granting the Douds' partial summary judgment as to the Title III ADA
19 claim, the court also issued an order granting the Douds' motion for an award of interim
20 attorneys' fees and costs (Doc. # 21), concluding that the Douds' are the prevailing party with
21 respect to the Title III ADA claims. (Doc. # 70.) Due to time constraints, the court noted that it
22 would issue a separate order tabulating the precise amount of fees and costs to which the Douds
23 are entitled. (*Id.*)[9] The Douds subsequently filed a supplement to their motion for interim fees
24 and costs. (Doc. # 78.)

---

Docs. # 67, # 68); however, upon conducting further research, the court concluded that the determination of employee versus independent contractor status was in fact a matter of federal law, and proceeded in issuing its order on the motion. (Doc. # 79.)

[9] The Douds' counsel had expressed a request to have this motion as well as the pending motion for partial summary judgment on the Title III ADA claim resolved prior to their March settlement conference before Judge McQuaid. (*See* Minutes at Doc. # 65.) The court advised the parties it was optimistic it could do so; however, the

On May 1, 2015, Yellow Cab filed, and the court approved, a substitution of counsel indicating that Michael Pintar, Esq., would be substituted in as attorney of record for Yellow Cab in place of Michelle Bumgarner, Esq. (Docs. # 91, # 92.)

After the motion to supplement the request for fees and costs was fully briefed, the court entered an order on May 18, 2015, granting the motion to supplement the fees and costs sought and awarded the Douds a total of $152,273 in attorneys' fees and $4,122.06 in costs. (Doc. # 94.)

On May 29, 2015, Yellow Cab filed the instant motion to enforce a settlement agreement. (Doc. # 95.)

## II. SUMMARY OF ARGUMENT

Yellow Cab argues that the Douds' counsel made a global settlement offer on May 1, 2015, that was held open until June 8, 2015, and which Yellow Cab accepted in writing on May 21, 2015, but the Douds now refuse to recognize Yellow Cab's acceptance of the offer. (Doc. # 95.) As such, it seeks an order from the court enforcing the settlement.

The Douds, on the other hand, maintain that the offer had been discussed verbally with Yellow Cab's prior counsel Michelle Bumgarner, who knew that it would only be held open until *May* 8, 2015, because Ms. Keyser-Cooper was scheduled to leave the country on vacation on May 11, 2015, for a three week trip to Morocco. (Doc. # 100.) When Mr. Pintar substituted into the case, the very same offer was conveyed to him and Ms. Bumgarner in writing. Ms. Keyser-Cooper initially referenced the May 8, 2015 deadline, but in subsequent references to the deadline for acceptance, she accidentally transposed *June* 8, 2015 with *May* 8, 2015, after she had made reference to the scheduled Ninth Circuit mediation which was to occur on *June* 8, 2015. (Doc. # 100.) Ms. Keyser-Cooper contends that she communicated the May 8, 2015 date verbally to Mr. Pintar, and when that date came and went, she communicated to Mr. Pintar in an email that the offer was "no longer on the table." Alternatively, the Douds argue that there was no meeting of the minds sufficient to create an enforceable contract when Mr. Pintar sent the email "accepting" and stating that they could "discuss the particulars" upon Ms. Keyser-

---

court was unable to finish its analysis and tabulation of the amount of fees and costs prior to the settlement conference. The court issued its order finding the Douds to be the prevailing party prior to the settlement conference, and subsequently issued the order delineating the amount of fees and costs to which the Douds are entitled.

- 5 -

1  Cooper's return, because the offer left open further terms for negotiation, such as: the court's
2  retention of jurisdiction, survival of the court's substantive orders following settlement such as
3  the injunctive relief obtained by Mrs. Doud, what happens to Mrs. Douds remaining claim under
4  Nevada Revised Statute 706.366, terms of indemnity, and confidentiality.  The Douds also argue
5  that the "acceptance" does not reflect agreement on the material terms, because while the offer
6  required a confession of judgment, Yellow Cab's purported acceptance only references a
7  dismissal of all claims. For this reason, the Douds also contend that Yellow Cab's "acceptance"
8  was actually a counter-offer because the terms it contained were additional or different from
9  those contained in the offer.
10       In its reply, Yellow Cab contends that the offers made to Ms. Bumgarner verbally on
11 April 30, 2015, and in writing to Mr. Pintar on May 1, 2015, should be considered as separate
12 offers, and the May 1, 2015 offer had an expiration date of June 8, 2015. (Doc. # 102 at 2.)
13 Yellow Cab also argues that the May 1, 2015 offer was not conditioned on acceptance prior to
14 the court issuing its order awarding fees. (*Id*. at 4-5.) Yellow Cab asserts that the May 8, 2015
15 email communications did not revoke the offer, because Yellow Cab contends that the comment
16 that the offer was "no longer on the table" was directed to the earlier verbal offer made to Ms.
17 Bumgarner and not the written May 1, 2015 offer to Mr. Pintar. (*Id*. at 5-6.) Yellow Cab
18 contends that the ongoing discussions that day are evidence that the offer was not revoked. (*Id*. at
19 6-7.) Yellow Cab maintains that the offer is unambiguous and that the court may not consider
20 extrinsic evidence in construing the agreement. (*Id*. at 7-9.) Finally, Yellow Cab asserts that there
21 was a meeting of the minds as to the essential terms. (*Id*. at 10-12.) Yellow Cab contends that the
22 scope of the agreement was clear because the parties both assented to a release of the attorney's
23 fees owed for the ADA claims and a release of Doud's claim. (*Id*. at 11.) Yellow Cab insists that
24 the acceptance communication's inclusion of reference to a dismissal does not add a material
25 term to the offer, but reiterates that the claims will be released in return for the payment. (*Id*. at
26 12.)
27 ///
28 ///

### III. LEGAL STANDARD

"'The construction and enforcement of settlement agreements are governed by principles of local law.'" *Jones v. McDaniel*, 717 F.3d 1062, 1067 (9th Cir. 2013) (quoting *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004)). "That is true, 'even where a federal cause of action is settled or released.'" *Id.* (quoting *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993)).

"Under Nevada law, 'a settlement agreement['s] construction and enforcement are governed by principles of contract law.'" *Id.* (citing *May v. Anderson*, 121 Nev. 668, 119 P.3d 1254, 1257 (2005)). "The 'ultimate goal is to effectuate the contracting parties' intent.'" *In re Amerco Derivative Litig.*, 252 P.3d 681, 693 (Nev. 2011). "Although an analysis of a settlement's terms starts with the language of the agreement, 'when that intent is not clearly expressed in the contractual language, [courts] may also consider the circumstances surrounding the agreement.'" *Id.*

For a contract to be enforceable, basic contract principles require an offer and acceptance, meeting of the minds, and consideration. *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005).

### IV. DISCUSSION

Preliminarily, the court concludes that it is appropriate to consider extrinsic evidence in resolving this dispute. "The parol evidence rule precludes the admission of extrinsic 'evidence that would change the contract terms when the terms of a written agreement are clear, definite, and unambiguous." *In re Cay Clubs*, 340 P.3d 563, 574 (Nev. 2014) (quoting *Ringle v. Bruton*, 120 Nev. 82, 91, 86 P.3d 1032, 1037 (2004)).

The letter Ms. Keyser-Cooper sent to Ms. Bumgarner and Mr. Pintar on May 1, 2015, setting forth the settlement offer is ambiguous on its face as to how long the offer would be held open. Resolving this ambiguity is essential to determining whether Mr. Pintar timely accepted the offer, or whether it was properly revoked on May 8 or May 20. Because the offer is ambiguous as to this issue, the court may consider extrinsic evidence in determining whether there is an enforceable settlement agreement.

The court will now provide a summary of the relevant evidence submitted along with the briefing and at the evidentiary hearing on this motion, and will then turn to its analysis of whether the parties entered into an enforceable agreement.

By way of background only, Ms. Keyser-Cooper sent Ms. Bumgarner a letter on April 15, 2015, asking that Ms. Bumgarner provide the letter to her client in hopes of resolving this matter. (Doc. # 95-1 at 2-5; Doc. # 101-1 at 14-17.) The letter explained, *inter alia,* that there were three components to any settlement of this case: (1) attorneys' fees; (2) Mr. Doud's claim; and (3) how to structure the settlement. (*Id*.)

On April 29, 2015 at 5:12 p.m., Ms. Keyser-Cooper sent Ms. Bumgarner an email stating: "I have a formal offer to present to you. It will need to be finalized by Friday may 9 or it will be withdrawn. If you want to hear it, please call tomorrow. Thanks Terri." (Doc. # 101-1 at 21; Evid. Hearing Ex. 8.)[10] Ms. Bumgarner replied the next day at 9:44 a.m.: "I am picking someone up from the airport from a 9:45 am flight and will call you as soon as I can." (Doc. # 101-2 at 2; Ex. 9.)

On May 1, 2015, Ms. Keyser-Cooper sent a letter to Ms. Bumgarner and Mr. Pintar. (Doc. # 95-2; Doc. # 101-2 at 4-5; Ex. 35.) It states, in relevant part:

> Dear Michelle and Mike:
> 
> Michelle, I received a notice of substitution and immediately called Mike Pintar to ascertain the status of the settlement offer I spoke to you about yesterday.
> ...
> In civil rights cases such as this, when the defendant loses he must pay the winning party attorneys' fees. I have made an offer to settle to Michelle that was good until **May 8, 2015**. It will be withdrawn if not agreed to by that time. It is an extremely good offer for Yellow and is significantly lower than what I expect the court to order. **If it is not accepted**, I am happy to wait for the court to order the fees. Once the court orders the fees, it will be a money judgment against Yellow. My only incentive to settle is to stop the clock and to stop working on the case-it has consumed far too much of my time.
> 
> Now pending is: 1) a mediation with the Ninth Circuit in Reno on **June 8, 2015**; 2) a hearing on June 3, 2015 for Yellow Cab to turn over all its tax

---

[10] Ms. Keyser-Cooper testified that there was no Friday, May, 9, 2015; instead, she was referring to Friday May 8, 2015.  The court will hereinafter refer to the exhibits admitted at the evidentiary hearing simply as "Exhibit 1", etc.

documents and financial records; and 3) a ninth circuit brief which has been put off while we attempted to settle the case.

The offer I am now making will be withdrawn by **June 8, 2015** is as follows:

Payment of $100,000.00 in attorney's fees -- $75,000 in lump sum by June 8, 2015 and $25,000 in monthly payments of $3,000.00 to commence June 8, 2015. The $25,000.00 in payments would be presented by a **"confession of judgment"** which could be executed upon by a Writ of Execution if payments were missed.

Payment of $25,000.00 to my client Jim Doud - in a lump sum for damages by June 8, 2015.

Payment of $5,000.00 to my client Jim Doud - in lump sum for costs by June 8, 2015.

**This amount was discussed extensively with Michelle**. We have had months of discussions regarding how to resolve this case. If **this is agreeable to your client**, I will **stip to dismiss the pending appeal presently at the Ninth Circuit**. There is no way for your client to prevail on that issue as four different judicial opinions have been issued on the matter, including a preliminary injunction by Judge Du and a grant of partial summary judgment on the issue by Magistrate Judge William Cobb. If your client does not want to resolve the case, we can litigate at the Ninth Circuit and I will likely win and your client will owe possibly another $50,000 to $60,000 in additional fees.

I feel that I am making a very fair offer as attorney's fees are now at $156,000.00 for what I have already won. If you and your client prefer to wait until the court awards fees and wish to continue to litigate at the Ninth Circuit--we can always do that. I am enclosing with this letter a letter I wrote to Michelle recently to present to her client to help him understand why settlement might be a good idea.

Please feel free to call with any questions. **I will be available all of next week** to talk and I am happy to do so.

(Doc. # 95-2 at 1-3.)

The email sent to Mr. Pintar and Ms. Bumgarner enclosing this letter states:

Hi Michelle, I spoke to Mike Pintar today and wrote him the letter I promised to write you summarizing the offer to settle we discussed yesterday. The offer is good until **June 8, 2015**. Attached you will find my letter of today's date and the earlier letter I wrote you on April 15th, which will be helpful to catch Mike Pintar up to speed. If either of you have any questions, please do not hesitate to call. I **will be available all next week**. Thanks, Terri.

(Doc. # 95-3 at 1; Doc. # 101-2 at 7; Ex. 11; Ex. 32 (bold added).)

Ms. Keyser-Cooper testified that the offer she made verbally to Ms. Bumgarner on April 30, 2015, was identical to the offer she put in writing to Mr. Pintar and Ms. Bumgarner on May 1, 2015, and that she reiterated verbally to both Ms. Bumgarner and Mr. Pintar that the offer

- 9 -

1  would expire on *May* 8, 2015, but she accidentally wrote *June* 8, 2015 in the May 1 letter and
2  May 1email after she had made reference to the June 8, 2015 Ninth Circuit mediation.
3  Ms. Bumgarner's testimony corroborates Ms. Keyser-Cooper's testimony concerning the May 8
4  deadline and the urgency in getting this resolved before she left the country (on May 11).
5  Mr. Pintar testified that he did not recall the mention of the May 8 date verbally.
6       On May 7, 2015, at 5:29 p.m., Ms. Keyser-Cooper sent an email to Mr. Pintar, referring
7  him to an attached letter of the same date and said: "I look forward to hearing your intentions on
8  how you wish to proceed with the case on my return." (Doc. # 101-2 at 9; Ex. 12.) The letter of
9  May 7 states in pertinent part:

> I am very content to wait until the Court decides the amount of fees. There is no need to settle the entire case. Ms. Bumgarner at all times indicated to me she wishes to settle the entire case...
> If you wish to fight the case at the Ninth Circuit, that's fine. If you wish to fight the retaliatory termination, that's fine too. All I ask is that you let me know your intentions. I am perfectly happy to wait until the Court decides the fees and then litigate the remainder of the case. ...
> ...When the Court awards fees, it would be best if Yellow Cab just cut a check for the entire amount.
> **As it now stands, you do not appear to be interested in resolving the case**. That is fine. No problem. **When the Court issues it's ruling on attorney's fees and costs, I will expect the amount to be paid**. We can proceed to trial on the ADA Title I retaliatory termination portion of the case as the Court has found Mr. Doud to be an employee.
> I will be gone from May 11th until May 31. I will have email capability while I am gone. If you need to talk to me or if you have some question, please do not hesitate to email me. ...I hope to get a straight answer from you once you have reviewed the documents-whatever you want to do is fine-I would just like to know your intentions so I can plan accordingly

(Doc. # 101-2 at 12; Ex. 31 (bold added).)

> On May 8, 2015, at 8:56:52 a.m., Mr. Pintar sent an email to Ms. Keyser-Cooper, stating: As I indicated to you on the phone, I have only recently tendered Yellow Cab's defense of this case to it's [sic] insurance carrier. That coverage decision will help to determine how I proceed.
> ...Also, I do believe the amount of your claimed fees to be excessive but, as you point out, that is a decision Judge Cobb will make.
> Any demand for Yellow Cab's financial records is a non-starter.

(Doc. # 101-2 at 14; Ex. 14.)

///

In response, Ms. Keyser-Cooper wrote to Mr. Pintar:

> If Yellow is planning to make an offer in cash, then I don't need the financial records. The records request was based on Michelle's insistence yellow was broke and would have to make payments. If there is no offer reliant upon making payments I don't need the records. I much prefer cash and not payments. **The court will decide the fees. Let's let it go at that.** I am very content to wait. All the discussion on fees was because Michelle wanted to settle the entire case. I am happy to wait until the court orders the precise amount. I kept making discounts to Michelle in a good faith effort to wind down the entire case. **You appear to have no interest in that.** No Problem. **I will wait, take the fees that are ordered, and we will proceed. No need for records and no need for global settlement.**
> I will represent to the court that there is no need for financial records anymore because Yellow is not interested in settling or making payments. I will inform the court we are content to wait until the fee issue is decided and then go forward with the rest of the case. ...

(Doc. # 101-2 at 17; Ex. 15 (bold added).)

On May 8, 2015 at 10:02 a.m., Mr. Pintar wrote: "The only way I will settle the case is if it [sic] globally." (Doc. # 101-1 at 2, Doc. # 101-2 at 20; Ex. 16.)

On May 8, 2015, at 10:09:26 a.m., Ms. Keyser-Cooper sent an email to Mr. Pintar, stating, in relevant part:

> The case cannot be settled without the attorney's fees component and something for my client. If we cannot work it out together, I am happy to wait and see what the court does. I am not in a hurry. Michelle and I had almost worked out a deal, she said her client was "interested" in the proposal. **That offer is no longer on the table.**
> We can talk more on my return if you wish. If you don't wish, we can wait for what the court orders. It is probably far better for the parties to just wait and see what the court does instead of this endless back and forth.

(Doc. # 101-1 at 2; Doc. # 101-3 at 2; Ex. 17; Ex. 33 (bold added).)

On May 8, 2015, at 10:12 a.m., Mr. Pintar wrote to Ms. Keyser-Cooper: "As I understand it, you are at $130,00[0] and we are at $100,000. Is that correct? If so, we should be able to resolve the case." (Doc. # 101-3 at 4; Ex. 18.)

Ms. Keyser-Cooper responded at 10:23 a.m.:

> Do you want to discuss it briefly so I can tell you where we are and my reasoning? I am in the office all day today wrapping up before I leave. The situation is complicated because what I won on, ADA Title III provides as a remedy only injunctive relief, attorney's fees and costs -- no damages. So I am entitled to money but my clients are not.

> I cannot resolve the case without getting something for my clients. Mr. Doud has a right to go to trial on his ADA Title I case and see if he can win. That case has unknown value. He has no incentive to give that up just so I get paid.
> I had offered to discount the fees from $160,000 to $100,000. A very significant discount. I also said I needed to get $4000 in costs and $25,000 for my client. This was a very favorable settlement for you[r] client as the court is likely to award me more than that in attorney's fees. I have no incentive to lower it more than that. I have great incentive to wait until the court awards me fees and then just collect on that and go to trial on the ADA retaliatory termination.
> So, if you follow me, I cannot settle the case for $100,000, because that goes all to me and none of it goes to my client.
> If you want to talk, I am happy to do so.

(Doc. # 101-2 at 6; Ex 19.)

On May 20, 2015, Ms. Keyser-Cooper emailed Mr. Pintar: "Hi Mike, As you are aware I am traveling in Morocco and unable to telephone you until my return on June 1. **Please let me know when I can expect a check for the amount of fees and costs awarded by the court?** Thank you, Terri." (Doc. # 101-3 at 8; Ex. 20 (bold added).)

On May 21, 2015, Mr. Pintar sent Ms. Keyser-Cooper (copying Ms. Bumgarner, Ms. Vaillancourt, and Ninth Circuit mediator Roxane Ashe) a letter stating:

> This letter will confirm that my client accepts the settlement offer set forth in your letter dated May 1, 2015. By way of this settlement, **all claims against Yellow Cab will be dismissed** in return for payment as set forth in your letter.
> We can discuss the particulars when you return to the country.

(Doc. # 95-4 at 2; Doc. # 101-3 at 10; Ex. 21; Ex. 34 (bold added).)

On May 26, 2015, Ms. Keyser-Cooper emailed Mr. Pintar regarding his letter purporting to accept the settlement offer. (Doc. # 101-3 at 17.) Her email states in relevant part:

> I made it clear in numerous emails and telephone calls that the offer I made would be withdrawn after receiving the court's order regarding fees. In April I wrote the offer would be withdrawn by May. As I mentioned to you many times, the fee order changes things. Part of the prior offer was payments. My acceptance of payments depended upon the production of Yellow's financial records. You insisted the production of the financial documents was a "non starter" and would never be done. Your definitive statement that the financial records would not be produced is ipso factor a rejection of the offer.
> Before I left for Morocco I verbally communicated to you and Michelle the offer would have to be finalized before I left. I told you and Michelle on the phone the offer had a one week duration. I was leaving on May 11th and you needed to finalize it by May 8. You refused, insisting you could not settle anything before I left because you needed to ascertain the amount of insurance coverage. Accordingly the offer expired. And I told you it expired and we would have to

>   wait and see what the court did, we would both have to live with whatever the court's fee order would be.
>   As soon as the fee order was received, I also wrote you asking when I could expect a check for fees. My request for payment as per the judge's order unambiguously indicated the earlier offer was withdrawn.
>   ...

(Doc. # 101-3 at 17.)

First, the court will address Yellow Cab's contention that there were two separate offers: one made verbally to Ms. Bumgarner on April 30, 2015, and one made in writing to Mr. Pintar on May 1, 2015. The court concludes based on the evidence presented that the offer conveyed verbally to Ms. Bumgarner on April 30, 2015, and the offer set forth in writing to Ms. Bumgarner and Mr. Pintar on May 1, 2015 are the same offer. The testimony given by both Ms. Keyser-Cooper and Ms. Bumgarner supports this conclusion.

Second, the power of an offeree to accept an offer may be terminated at a time specified in the offer. *Morrison v. Rayen Investments, Inc.*, 624 P.2d 11, 12, 97 Nev. 58, 60 (Nev. 1981); *see also* Restatement (Second) of Contracts § 41 (Am. Law. Ins. 1981); 1 Williston on Contracts § 5:5 (4th ed). "[W]here an offer has expired by lapse of time, an attempt to accept is ineffectual to create a contract." *Id.*

Despite Ms. Keyser-Cooper's transposition of June for May in the May 1 letter and email, it was understood that the offer would expire on May 8, 2015. Ms. Keyser-Cooper testified that this was her intent and that she conveyed this to both Ms. Bumgarner and Mr. Pintar verbally. In addition, the May 1, 2015 letter itself confirms that the offer made verbally to Ms. Bumgarner, which is the same offer conveyed in writing in the May 1, 2015 letter, was "good until May 8, 2015." (Doc. # 95-2 at 1.) Ms. Bumgarner testified that Ms. Keyser-Cooper had conveyed the May 8, 2015 deadline to her verbally, and that Ms. Bumgarner understood that the reason for the May 8, 2015 deadline was because Ms. Keyser-Cooper was going on vacation. Ms. Bumgarner recalled Ms. Keyser-Cooper stressing that she wanted to get the settlement resolved before she left on her trip. Mr. Pintar testified that he recalled having discussions with Ms. Keyser-Cooper after he substituted into the case, but did not recall her saying there was a May 8 deadline.

1        Ms. Keyser-Cooper sent an email and letter to Mr. Pintar on May 7, 2015, the day before
2    she contends the offer was going to expire, asking Mr. Pintar to let her know his intentions on
3    proceeding with the case when she returned to the country. In that letter she stated: "As it now
4    stands, you do not appear to be interested in resolving the case. That is fine. No problem. When
5    the Court issues it's [sic] ruling on attorney's fees and costs, I will expect the amount to be paid.
6    We can proceed to trial on the ADA title I retaliatory termination portion of the case..." (Ex. 31.)
7    These communications support Ms. Keyser-Cooper's contention that it was understood that the
8    offer was open until May 8, prior to her departure.
9        Based on: (1) the testimony of Ms. Keyser-Cooper and Ms. Bumgarner that the offer was
10   good through May 8; (2) the initial reference to May 8 in the May 1, 2015 offer; and (3) the
11   testimony that Ms. Keyser-Cooper made it well known that she would be leaving the country on
12   May 11, 2015, and would be gone for three weeks and wanted this wrapped up before she left,
13   the court cannot find that there was ever an intention to hold the offer out until June 8, 2015.
14       Third, whether the offer was held open until May 8, 2015, or June 8, 2015, Ms. Keyser-
15   Cooper effectively revoked the offer before Mr. Pintar sent his May 21, 2015 letter purporting to
16   accept the offer. It is well settled that an offeror may revoke an offer at any time prior to
17   acceptance, thereby terminating the offeree's power to accept. Restatement (Second) of
18   Contracts §§ 36, 42 (Am. Law. Ins. 1981); *see also* Comment (a) to § 42; 1 Williston on
19   Contracts § 5:8 (4th ed.). This rule applies even when the offeror has agreed to keep the offer
20   open for a certain period of time. *See* 1 Williston on Contracts § 5:8 (4th ed) ("[E]ven though the
21   offeror specifies in the offer a definite time within which acceptance may be made, the offeror
22   may, nevertheless, revoke the offer within that time period."). A revocation need not say "I
23   revoke," instead, it is simply "[a]ny clear manifestation of unwillingness to enter into the
24   proposed bargain." Restatement (Second) of Contracts § 42, Comment (d); *see also* 1 Williston
25   on Contracts § 5:8 (4th ed.) ("any statement which clearly indicates or implies unwillingness on
26   the part of the offeror to contract according to the terms of the offer is sufficient, though the
27   offeror does not use the word 'revoke' or any similar operative language").
28

Ms. Keyser-Cooper sufficiently manifested her intent to revoke the offer first in her communications with Mr. Pintar on May 8, 2015.

> At 9:07 a.m. on May 8, 2015, she wrote to Mr. Pintar, in relevant part:
> The court will decide the fees. Let's let it go at that. I am very content to wait. ... I am happy to wait until the court orders the precise amount. I kept making discounts to Michelle in a good faith effort to wind down the entire case. You appear to have no interest in that. No Problem. I will wait, take the fees that are ordered, and we will proceed. No need for records and no need for global settlement.
> I will represent to the court that there is no need for financial records anymore because Yellow is not interested in settling or making payments. I will inform the court we are content to wait until the fee issue is decided and then go forward with the rest of the case.

(Ex. 15.)

> At 10:09 a.m. on May 8, 2015, she wrote, in part:
> The case cannot be settled without the attorney's fees component and something for my client. If we cannot work it out together, I am happy to wait and see what the court does. I am not in a hurry. Michelle and I had almost worked out a deal, she said her client was 'interested' in the proposal. That offer is no longer on the table.
> We can talk more on my return if you wish. If you don't wish, we can wait for what the court orders. It is probably far better for the parties to just wait and see what the court does instead of this endless back and forth.

(Ex. 17.)

The court concludes that these communications sufficiently indicated that the May 1 offer was no longer on the table, and that it was Ms. Keyser-Cooper's intention to wait for the court's award on the attorneys' fees issue and proceed with the case. Even if this did not sufficiently manifest an intention to revoke the May 1 offer, her email to Mr. Pintar on May 20, 2015 certainly did. This letter was sent two days after the court entered its order awarding the Douds $152,273 in attorneys' fees and $4,122.06 in costs. The email states: "As you are aware I am traveling in Morocco and unable to telephone you until my return on June 1. Please let me know when I can expect a check for the amount of fees and costs awarded by the court?" This clearly manifests an intent to revoke the offer. One of the terms of the May 1 offer was the payment of $100,000 for the attorneys' fees component of the case, a significant reduction from the amount sought bay way of the Douds' fees motions. This May 20 communication clearly indicates that

the offer to reduce the amount of fees sought conveyed in the May 1 offer was being revoked, and that Ms. Keyser-Cooper was now seeking the full amount of fees awarded by the court. Therefore, Ms. Keyser-Cooper effectively revoked the May 1 offer.

Finally, even if the offer was held open to June 8, 2015, and even if Ms. Keyser-Cooper did not effectively revoke the offer on May 8 or May 20, Mr. Pintar's letter purporting to accept the offer does not reflect a meeting of the minds as to the material terms of the May 1 offer.

As set forth above, "a settlement agreement is a contract" and "its construction and enforcement are governed by principles of contract law." *May*, 119 P.3d 1254, 1257 (citation omitted). "With respect to contract formation, preliminary negotiations do not constitute a binding contract unless the parties have agreed to all material terms." *Id*. (citation omitted). "A valid contract cannot exist when material terms are lacking or are insufficiently certain and definite." *Id*. In addition, "[i]n the case of a settlement agreement, a court cannot compel compliance when material terms remain uncertain." *Id*. (citation omitted). "The court must be able to ascertain what is required of the respective parties." *Id*. (citation omitted). In *May v. Anderson*, the Nevada Supreme Court concluded that the release terms of a settlement agreement are material. *May,* 119 P.3d at 1257-58 (citation omitted).

Where essential terms of a proposal are accepted with qualifications or not accepted at all, there is no agreement. *Heffern v. Vernarecci,* 544 P.2d 1197, 1198, 92 Nev. 68,  (Nev. 1976) (citation omitted); *Pravorne v. McLeod*, 383 P.2d 855, 79 Nev. 341 (Nev. 1963). "It is the law that when A offers B to enter into a contract on certain terms, and B declines to accept those terms but offers a counter-proposition, the original offer loses its effect, and is thereafter only open to acceptance by B when renewed by A." *Pravorne v. McLeod*, 383 P.2d 855, 855, 79 Nev. 341, 342 (Nev. 1963) (internal quotation marks and citation omitted).

Here, the offer proposed by Ms. Keyser-Cooper on May 1, 2015, specifically provided that "[t]he $25,000.00 in payments would be presented by a 'confession of judgment' which could be executed upon by a Writ of Execution if payments were missed." (Doc. # 95-2 at 1; Ex. 35.) Mr. Pintar's letter purporting to accept the offer on May 21, 2015, states: "By way of this

1  settlement, *all claims against Yellow Cab will be dismissed i*n return for payment as set forth in
2  your letter.*"* (Doc. # 95-4 at 2; Ex. 34 (emphasis added).)
3        Ms. Keyser-Cooper testified that the inclusion of the term that the $25,000 in payments
4  would be presented by a confession of judgment which could be executed upon by a writ of
5  execution if payments were missed was material because she and her clients wanted an
6  admission of liability from Yellow Cab, and wanted the orders already issued by the court (*i.e.,*
7  the order granting injunctive relief) to remain in place following any settlement.  Mr. Pintar
8  argued that he understood the confession of judgment term to equate to a dismissal of all claims.
9        A confession of judgment is defined as "[a] person's agreeing to the *entry of judgment*
10 upon the occurrence or nonoccurrence of an event, such as making a payment." *Confession of*
11 *Judgment,* Black's Law Dictionary (10th ed. 2014) (emphasis added). As such, Yellow Cab's
12 assent to enter into a confession of judgment would require the entry of a *judgment* against
13 Yellow Cab. This is completely different than a *dismissal* of all claims against Yellow Cab,
14 which is what is contemplated by Mr. Pintar's May 21, 2015 communication. (Doc. # 95-4 at 2.)
15 While there appears to have been an agreement as to the amount Yellow Cab would end up
16 paying, the evidence demonstrates that there was not an agreement as to the material term of
17 disposition of the case, which the offer indicated included a confession of judgment, and the
18 response indicated was a dismissal of all claims. Therefore, the court cannot conclude that there
19 was a meeting of the minds as to this material term.
20       The court notes that Mr. Pintar argued that the May 1 offer did call for a stipulation for
21 dismissal, but a reading of the May 1 offer indicates that the Douds were only agreeing to
22 stipulate to dismiss "the pending appeal presently at the Ninth Circuit." (Doc. # 95-2 at 3.) This
23 is referring to the appeal taken with respect to the order granting the Douds' request for a
24 preliminary injunction. The offer did not convey that the Douds were agreeable to a global
25 stipulation to dismiss the case, which is the term proposed by Mr. Pintar's May 21
26 communication.
27       On this additional basis, the court finds that the parties did not enter into an enforceable
28 agreement.

### V. CONCLUSION

In sum, the court finds that there is no enforceable settlement agreement between the parties resulting from Ms. Keyser-Cooper's May 1, 2015 offer. As a result, Yellow Cab's motion to enforce the settlement agreement (Doc. # 95) is **DENIED**.

**IT IS SO ORDERED**.

Dated: August 14, 2015.

WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE